1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

THOMAS NGUYEN,

11

Plaintiff,

12

v.

13

SAN DIEGO POLICE OFFICERS
EDUARDO LOPEZ (#6654) &
DAVID VALDEZ (#6562),

14

Defendant.

CASE NO. 11cv2594 WQH (MDD)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

15

HAYES, Judge:

16

The matter before the Court is the Findings of Fact and Conclusions of Law

17

pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

18

A bench trial took place on September 22 and 23 of 2015.  The causes of actions

19

before the Court are claims one through three of the First Amended Complaint against

20

Defendants Lopez and Valdez: (1) violation of Plaintiff's Fourth Amendment rights,

21

false arrest, against Defendants Lopez and Valdez pursuant to 42 U.S.C. § 1983; (2)

22

violation of Plaintiff's Fourth Amendment rights, excessive force, against Defendants

23

Lopez and Valdez pursuant to 42 U.S.C. § 1983; and (3) violation of Plaintiff's First

24

Amendment rights against Defendants Lopez and Valdez pursuant to 42 U.S.C. § 1983.

25

**II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW**

26

    *A.     Factual Background*

27

On December 30, 2010, Plaintiff Thomas Nguyen attended San Diego's Big

28

Balloon Parade (also known as the Holiday Bowl Parade) on North Harbor Drive in San

Diego, California. The parade drew crowds of people, many of them families with small children.  Arriving before the parade began, Plaintiff began protesting against the Central Intelligence Agency ("CIA") on and around North Harbor Drive.  Plaintiff carried a hand-printed sign, a two-by-three-feet poster board mounted on a wooden stake that was approximately two meters long.  The wooden stake protruded at least one meter below the sign and served as a handle for Plaintiff.  Written on the sign were the words "Justice? CIA destroyed my life. CIA is demon. Justice NSA & FBI cover up CIA's evil. Central Idiot Agency."  Plaintiff was repeatedly yelling, "CIA evil. CIA demon. CIA is stupid. CIA trained Bin Laden. CIA evil."

Plaintiff testified at trial  that since 2006, he has dedicated his life to protesting the CIA.  Plaintiff testified that the CIA has been torturing him almost every day since 2006.  Plaintiff testified that the CIA can transmit messages to his brain, can read his mind, and can make him see things.  Plaintiff testified that his problems with the CIA began in March 2006 when he was in the hospital for kidney failure.  Plaintiff testified that during his hospital stay the CIA investigated him and did psychological testing on his brain to determine if he was qualified to become a member of the CIA's psychological team.  Plaintiff testified that he agreed to be a specimen for the CIA's mind reading machine, that the CIA used him for tests, and that the CIA did not offer him a position to work for the CIA as promised.  Plaintiff testified that the CIA then labeled him as mentally ill to cover up what the CIA had done to him in the hospital. Plaintiff testified that the CIA tortured him primarily through his weekly dialysis treatments.  Plaintiff testified that he wants people to know that he is an innocent victim of the CIA.

Plaintiff testified that he lost his job teaching at Grossmont College, that his wife obtained a restraining order against him and divorced him, and that parents of students Plaintiff tutored fired him as a result of his beliefs about the CIA interfering in his life. Plaintiff testified that he blames all of these events on the ability the CIA has to control other people in his life and to cause these people to cut ties with Plaintiff.  Plaintiff

1   denies that he has ever suffered from mental illness.

2       Plaintiff testified that in 2010 he  was living in his van in downtown San Diego.

3   Plaintiff's van was covered with signs about the CIA.  The signs Plaintiff put on his van

4   stated that Plaintiff is a musician and an inventor, holds two masters degrees, and has

5   taught calculus.  The signs stated that the CIA ruined Plaintiff's life.  Plaintiff testified

6   that in 2010, he would park his van in various places in downtown San Diego and

7   would protest at crowded places like SeaWorld, ComicCon, and docking cruise ships

8   because he wanted to tell as many people as he could about his victimization by the

9   CIA.  Plaintiff testified that he believed that the more people who knew his story, the

10  harder it would be for the CIA to kill him.  The Court accepts the testimony that

11  Plaintiff believes the CIA is conspiring against him.

12      On December 30, 2010, Plaintiff stood near the television stand for Cox

13  Communication's Channel 4, a scaffolded platform where Channel 4 announcers were

14  broadcasting the Big Balloon Parade.  John Turner, the Cox Communications engineer

15  responsible for making sure the equipment was technologically sound for the Channel

16  4 broadcast, testified that he observed Plaintiff standing inside a fenced off secured area

17  reserved for Cox Communications employees and their families.  Turner testified that

18  when he first observed Plaintiff, Plaintiff was standing at the base of the media platform

19  and appeared to be lifting his sign as high as possible in an attempt to place his sign in

20  the background of the camera shot.  Behind the television stand, close to where Plaintiff

21  was standing, there were wires and cables connecting the cameras and equipment on the

22  television stand to the communications truck.  Turner testified that he was concerned

23  that Plaintiff would damage the equipment or injure himself.

24      Turner testified that he approached Plaintiff and told Plaintiff to leave the secured

25  area.  Turner testified that Plaintiff responded that he was exercising his freedom of

26  speech, that Plaintiff became agitated, and that Plaintiff did not move.  Turner testified

27  that he told Plaintiff that he could do what he wanted outside the secured area, but had

28  to leave the secured area.  Turner testified that Plaintiff repeatedly cursed at Turner and

1  declared his intention not to move.  Turner called the Elite security guards working the
2  parade to assist him in getting Plaintiff to leave the secured area.

3      Both Turner and Shane Fortin, the maintenance engineer for Cox
4  Communications, testified that when Elite security guards approached Plaintiff, Plaintiff
5  began arguing with the security guards and yelling profanity.  Turner testified that Elite
6  Security managed to back Plaintiff away from the television stand and the technical
7  equipment, but Plaintiff was still yelling at the security guards and speaking in an
8  agitated and incoherent manner.  Turner and Fortin testified that at that time, the
9  security guards called the police help to remove Plaintiff from the secured area.  Turner
10  and Fortin testified that they saw the Defendants approach and begin speaking to
11  Plaintiff.

12      Defendant Valdez was working as a police officer at the Big Balloon Parade.
13  Defendant Valdez testified that he was radioed at 9:54 a.m. on December 30, 2010 and
14  instructed to leave his post at the parade to cover a disturbance by "some guy with a big,
15  large sign . . . with a bunch of people" around him.  (Ex. J at 1).  Defendant Valdez
16  testified that he left his post and began walking to the area of the reported disturbance,
17  which was approximately three minutes away on foot.  Defendant Valdez testified that
18  as he walked toward Plaintiff he was approached by several parade goers who told him
19  that someone was creating a disturbance and pointed in Plaintiff's direction.  Defendant
20  Valdez testified that the parade spectators who approached Defendant Valdez appeared
21  scared and concerned and acted like they needed to leave the area around Plaintiff.

22      Defendant Valdez testified that an Elite security guard told him that Plaintiff had
23  been walking into the street where the parade was being held, but by the time Defendant
24  Valdez approached, Plaintiff was pacing back and forth on the grass and sidewalk near
25  the scaffolding of the television stand.  Defendant Valdez testified that he watched
26  Plaintiff from a distance before he approached because he was waiting for Defendant
27  Lopez to arrive and assist him.  Defendant Valdez observed that Plaintiff was screaming
28  about the CIA and yelling profanities.  Defendant Valdez testified that Plaintiff

appeared to be very angry and had a wide-eyed, blank stare on his face as he marched back and forth. Defendant Valdez testified that Plaintiff was yelling and holding the large sign attached to a big wooden stake. Defendant Valdez testified that the area surrounding Plaintiff was crowded with people walking by or trying to watch the parade. Defendant Valdez testified that the people around Plaintiff were trying to get out of Plaintiff's way.

Defendant Lopez testified that on the morning of December 30, 2010, he was working as a police officer at the parade and received a radio call to respond to a disturbance in the area of 1400 North Harbor Drive. Defendant Lopez testified that he arrived at the scene minutes after the call. Defendant Lopez testified that he observed Plaintiff walk onto North Harbor Drive where the parade was ongoing and then back to the sidewalk. Defendant Lopez testified that before he reached Defendant Valdez, several people in the crowd came up to Defendant Lopez to point out Plaintiff and express their concerns that a man was angrily yelling profanities. Defendant Lopez testified that from a distance he observed Plaintiff yelling very loudly, using profanity while rambling incoherently, and exhibiting rage and agitation through his facial expressions.

Defendant Valdez testified that Defendant Lopez joined him and as they approached Plaintiff together Plaintiff continued to appear agitated, out of control, and his yelling was loud and carrying over the noise of the crowd. Defendant Lopez testified that Plaintiff's demeanor and actions seemed out of place for the event. Defendant Lopez testified that his police officer training taught him that such behavior may indicate that person may have violent tendencies toward police officers or the general public. Defendants testified that they were concerned that Plaintiff would injure someone with the wooden stake attached to his sign.

Defendant Lopez testified that Defendants greeted Plaintiff and asked Plaintiff to move to the nearby easement, a large grassy area beyond the sidewalk on North Harbor Drive, where he would not be obstructing anyone. Defendant Lopez testified

that Plaintiff did not move and acted as if he did not register the Defendants' presence. Defendant Lopez testified that Plaintiff looked back at the Defendants blankly and demonstrated an inability to reason and to understand anything the Defendants were trying to express to him.

Defendants testified that Plaintiff continued rambling and screaming. Defendant Lopez testified that it became apparent during the course of the interaction that Plaintiff may have a mental health disorder. Defendant Lopez testified that he suspected that Plaintiff could be a danger to others based on Plaintiff's unpredictable behavior, the stake he was waving up and down, and the fact that Plaintiff was standing in a crowd that contained many small children. Defendant Lopez testified that he had received training when he joined the police academy to look for indicators of mental illness and to assess whether a person poses a danger to themselves or others for purposes of California Welfare and Institutions Code § 5150. Defendant Lopez testified that police officers are instructed that some of the behaviors that may indicate mental illness and whether a person poses a danger to themselves or others include aggressiveness, poor impulse control, rage, explosiveness, and rambling speech. Defendant Valdez testified that police officers are trained to take into consideration their own observations as well as information that other people give them and consider the totality of the circumstances when investigating a California Welfare and Institutions Code § 5150 hold, or any matter.

Defendants testified that they wanted to evaluate Plaintiff but determined that it was not appropriate to do so in the middle of the loud parade crowd. Defendants testified that they determined it was necessary to ask Plaintiff to accompany them to the easement or the adjacent parking lot because they believed Plaintiff's actions posed a threat to the officers, the public, and himself. Defendant Lopez testified that Plaintiff was unresponsive to the Defendants' request to accompany them to the easement or adjacent parking lot so the officers placed a control hold on Plaintiff's arms and escorted Plaintiff out of the parade crowd. Defendants testified that their decision to

move Plaintiff from the parade crowd was based on safety concerns and unrelated to the message that was on Plaintiff's sign or the profanity he was using.

Defendants testified that Plaintiff was gripping the sign tightly in his hands and appeared so angry and agitated that the officers were concerned he would use it as a weapon. Defendants testified that Plaintiff refused to relinquish control of the sign. Defendants testified that they grabbed the sign and pulled it out of Plaintiff's hands. During this interaction, the wooden stake of the sign splintered and broke and Plaintiff's hand was cut.

Defendants testified that they placed Plaintiff's arms behind his back, walked him to the adjacent parking lot, and handcuffed him. Plaintiff struggled against the Defendants. Defendant Lopez testified Plaintiff's irrational and unpredictable behavior caused the officers to handcuff Plaintiff because they did not want the situation to escalate to anything that would force the officers to use a higher magnitude of force against Plaintiff.

Plaintiff testified that he does not recall a security guard speaking to him at the parade and does not remember the Defendants approaching him to inquire about his behavior and to request that he move. Plaintiff testified that the first thing he recalls about the interaction with the Defendants is each officer grabbing one of Plaintiff's arms and taking him out of the parade crowd onto a grassy area. Plaintiff admits that he swung his sign at the Defendants to keep the officers from taking the sign away.

Defendant Lopez testified that Plaintiff was detained because the officers suspected he was mentally disordered and might be a danger to himself or others. Defendants testified that the acting lieutenant arrived at the scene, spoke to Plaintiff, and directed Defendants to request a Psychiatric Emergency Response Team ("PERT"). PERT is a county mental health contractor that works side by side with law enforcement agencies, including the San Diego Police Department. At 10:07 a.m., approximately four minutes after arriving at the scene, Defendant Lopez called the PERT unit on his radio. Defendant Lopez told the PERT unit that Plaintiff's protests had become a

problem when he started getting in front of people and yelling with a big sign. Defendant Lopez asked the PERT unit to do a psychiatric evaluation of Plaintiff to determine if he should be held pursuant to California Welfare and Institutions Code § 5150.  While the Defendants waited for the PERT unit to arrive, Plaintiff remained handcuffed in the back of the police car with the door open.  Plaintiff testified that he complained about his handcuffs being too tight.  Defendant Lopez testified that when Plaintiff complained that the handcuffs were too tight he loosened the handcuffs.

Before the PERT unit arrived, a PERT clinician told Defendant Lopez on the radio that members of the unit knew Plaintiff from prior interactions and Plaintiff would not likely meet the criteria for a § 5150 hold.  (Exhibit J at 22).  The PERT clinician expressed to Defendant Lopez that Plaintiff generally obliged requests to leave an area when there was a complaint. *Id.* After speaking to Lieutenant Cesena, Defendant Lopez called the PERT unit again and confirmed the request that PERT come give Plaintiff an evaluation.  *Id.* at 22-23.   When the PERT clinician and PERT officer arrived approximately thirty minutes after being called, they spoke to the officers about the incident and then spoke to Plaintiff.  PERT clinician Katherine Alban testified that when she went to the police vehicle where Plaintiff was sitting, he was agitated, not directable, cursing, and yelling about the SDPD being involved with the CIA. Approximately fifteen minutes after having arrived on the scene, the PERT unit made the decision to take Plaintiff to the hospital for a psychiatric evaluation pursuant to California Welfare and Institutions Code § 5150.   Plaintiff spent two days in a psychiatric ward.

Plaintiff testified that he has been afraid to protest with his sign since December 30, 2010 because he is afraid of the police.  Plaintiff testified that he now protests solely through the signs on his van and through posting on websites.  Plaintiff testified that the damages caused by his detention are somewhere between eleven and thirteen million dollars.

**B.    *Detention Without Probable Cause***

Under California Welfare and Institutions Code § 5150, probable cause exists for detention to conduct a mental health evaluation:

> if facts are known to the officer that would lead a person of ordinary care and prudence to believe, or entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself. To justify the detention, the officer must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion. Each case must be decided on the facts and circumstances presented to the officer at the time of detention, and the officer is justified in taking into account the past conduct, character, and reputation of the detainee.

*Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (quoting *People v. Triplett*, 144 Cal. App. 3d 283, 288 (1983)).

Section 5278 of the California Welfare and Institutions Code "provides that an individual authorized to detain a person pursuant to section 5150 shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." *Id.* at 1221. The Supreme Court has recognized that due to police officers' "broad range of duties and authority [they] must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Scheur v. Rhodes*, 416 U.S. 232, 245-47 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

The Court concludes that specific facts credibly testified to by Defendants, and the rational inferences from those facts, warranted the officers' strong suspicion that Plaintiff was mentally disordered and posed a danger to himself or others. Defendants testified that they had been trained to take into account certain behaviors when evaluating whether an individual should be detained under § 5150. These behaviors include aggressiveness, poor impulse control, rage, explosiveness, and rambling speech. Based on Defendants' observations of Plaintiff and third party reports that were relayed to the Defendants, Defendants credibly testified that Plaintiff exhibited these behaviors when the officers encountered him on December 30, 2010. Defendants credibly testified that they observed Plaintiff yelling at such a high volume that he could be heard over the loud noise of the parade crowd. Defendants credibly testified that

1  Plaintiff appeared full of rage as he shouted, paced, and waived his sign.  Defendants
2  testified that Plaintiff's behavior stood out as unusual given the event.  Defendants
3  credibly testified that, based on their observations and reports of parade watchers and
4  Elite security, Plaintiff appeared unable to control his actions.  Defendants credibly
5  testified that they were concerned, as Plaintiff waived the sign and large wooden stake
6  in the midst of the parade crowd, that Plaintiff could hurt someone.

7       Defendants' strong suspicion that Plaintiff was mentally disordered and posed a
8  danger to himself or others was also based on their interaction with Plaintiff.
9  Defendants credibly testified that when they approached Plaintiff he stared blankly back
10  at Defendants as if he did not register their presence.  Defendants testified that Plaintiff
11  was unresponsive to Defendants' request that he move but continued rambling and
12  screaming.  Defendants testified that Plaintiff gripped the wooden stake attached to his
13  sign tightly and Defendants were concerned that Plaintiff would try to use the sign as
14  a weapon.  Plaintiff testified that he swung the sign at Defendants when they attempted
15  to move him to an area where they could evaluate him.

16       Defendants credibly testified to facts and circumstances surrounding the events
17  leading up to Plaintiff's detention that demonstrate that a reasonable officer would have
18  entertained a strong suspicion that Plaintiff should be evaluated pursuant to California
19  Welfare and Institutions Code § 5150.  The Court concludes that Defendants Lopez and
20  Valdez had strong suspicions, based on articulable facts and reasonable inferences, that
21  Plaintiff was mentally disordered and posed a danger to himself and others.
22  Defendants' decision to detain Plaintiff and call a PERT unit was a reasonable decision
23  in light of the circumstances.  Defendants acted with probable cause and within their
24  legitimate authority as police officers.  The PERT unit affirmed Defendants' assessment
25  under § 5150 when they decided to transport Plaintiff to the hospital for further
26  evaluation.

27       Once the PERT unit arrived, approximately forty minutes after Defendants first
28  approached Plaintiff, Defendants' role in Plaintiff's detention ceased.  The PERT

1   clinician made the decision pursuant to §5150 to hold Plaintiff and transport him to a
2   hospital for further mental health evaluation and decisions made by the PERT unit are
3   not the subject of this action.  Plaintiff has not shown by a preponderance of the
4   evidence that Defendants did not have probable cause to detain him pursuant to
5   California Welfare and Institutions Code § 5150.

6   **C.**   ***Unlawful Use of Force***

7   A claim against law enforcement officers for excessive force is analyzed under
8   the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490
9   U.S. 386, 388 (1989).  "Determining whether the force used to effect a particular
10  seizure is reasonable under the Fourth Amendment requires a careful balancing of the
11  nature and quality of the intrusion on an individual's Fourth Amendment interests
12  against the counterveiling governmental interests at stake." *Id.* at 396.  Whether the
13  force was "reasonable" is an objective inquiry–"the question is whether the officers'
14  actions are 'objectively reasonable' in light of the facts and circumstances confronting
15  them, without regard to their underlying intent or motivation." *Id.* at 397.  "The
16  reasonableness of a particular use of force must be judged from the perspective of a
17  reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id.* at
18  396.

19  Defendants credibly testified that Plaintiff was unresponsive to Defendants'
20  attempts to communicate with Plaintiff.  Defendants testified that they led Plaintiff
21  away from the crowd of the parade with the intent to speak to Plaintiff in a more private
22  setting.  Defendants testified that they were concerned the stake attached to the sign
23  could inflict bodily injury on another person at the parade or could be used as a weapon.
24  Based on Defendants' testimony about Plaintiff's behavior—agitation, angry yelling,
25  and seeming inability to register the Defendants' presence or questions directed at
26  Plaintiff—as well as the reports the officers relied on from third parties, the officers
27  acted with reasonable force in holding Plaintiff by the arms and escorting him out of the
28  parade crowd.

Plaintiff testified that he swung his sign at the Defendants to keep them from taking his sign away.  Defendants testified that they feared Plaintiff would use the stake of his sign as a weapon.  Defendants testified that Plaintiff was gripping the sign so tightly that they had to pry it out of his hands.  The sign broke during the officers attempt to pull it out of Plaintiff's hands and caused a cut on Plaintiff's hand.  Based on the credible testimony of the Defendants, the Defendants acted with reasonable force in taking Plaintiff's sign out of his hand.

Plaintiff testified that he complained that his handcuffs were too tight while he was sitting in the police car.  Defendant Lopez testified that when Plaintiff asked for his handcuffs to be loosened, he loosened the handcuffs.  Plaintiff has not shown by a preponderance of the evidence that the force used by the Defendants during the course of their interaction with Plaintiff was unreasonable under the circumstances.

**D.   *First Amendment***

Under the First Amendment, a citizen has the right to be free from governmental action taken to retaliate against the citizen's exercise of First Amendment rights or to deter the citizen from exercising those rights in the future.  *Sloman v. Tadlock*, 21 F.3d 1462, 1469-70 (9th Cir. 1994).  To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) the plaintiff was engaged in political speech or other constitutionally-protected activity; (2) the defendant's actions "would chill or silence a person of ordinary firmness from future First Amendment activities;" and (3) that "deterrence [of plaintiff's speech] was a substantial or motivating factor in [the defendant's] conduct."  *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Testimony at trial showed that Plaintiff's actions on December 30, 2010 caused a number of people at the parade to become concerned for the well-being and safety of the Plaintiff and others watching the parade or working at the parade.  Cox Communications employees testified that they first noticed Plaintiff when they saw him standing in the secured area reserved for Cox Communications Employees, trying to

move his sign into the camera shot.  Cox Communications employees credibly testified that they became concerned that Plaintiff would harm the equipment or himself if he did not move away from the television stand.  Turner credibly testified that he found it necessary to call Elite security for reinforcement in getting Plaintiff to leave the secured area because Plaintiff reacted to Turner's request that Plaintiff leave the secured area by screaming and refusing to move.  Turner testified that the security guard managed to back Plaintiff away from the television stand and equipment but Plaintiff was still yelling at the security guards and acting agitated.  Elite security called the police for assistance.

Plaintiff was not targeted by Defendants because the Defendants had any concern over the message Plaintiff shared at the parade.  Defendants credibly testified that their actions were not motivated by the goal of deterring Plaintiff's protest against the CIA.  Defendants testified that they only became aware of Plaintiff's presence at the parade because the Elite security guards who were working at the parade called the police to assist them with a man who was causing a disturbance.  Defendants testified that they observed Plaintiff angrily yelling, pacing, and waiving his sign.  Defendants credibly testified that Plaintiff was unresponsive when the officers attempted to talk to him and continued to yell in an agitated state.  Plaintiff's demeanor and conduct caused Defendants to suspect that Plaintiff was mentally disordered and posed a danger to himself or others.

The context of Plaintiff's actions—the fact that he was in a crowded parade area, that he had reportedly been walking onto the parade route, and that his sign was posted on a nearly six foot long wooden stake—informed Defendants' decision to detain Plaintiff under § 5150.  The crowded nature of the parade supported Defendants' belief that members of the crowd, including many small children, could be harmed by Plaintiff waiving a six foot long wooden stake in the crowd with apparent disregard for the people standing near him.  Defendants credibly testified that the content of Plaintiff's speech and the use of profanity were not substantial or motivating factors in detaining him.

Defendants acted reasonably, out of concern for the public and Plaintiff, when

- 13 -

11cv2594 WQH (MDD)

1  they removed Plaintiff from the crowded area and detained him until a PERT unit

2  arrived.  Plaintiff has not shown by a preponderance of the evidence that deterrence of

3  Plaintiff's speech was a substantial or motivating factor in Defendants' decision to move

4  Plaintiff away from the parade crowd and detain him.

5          **E.**     *Qualified Immunity*

6        Defendants alternatively contend that they are entitled to qualified immunity for

7  their actions taken pursuant to their role as San Diego police officers.  Because the Court

8  finds that no constitutional rights were violated, the Court does not address Defendants'

9  claims to qualified immunity for each cause of action.

10  **III.**    **CONCLUSION**

11        IT IS HEREBY ORDERED that the Clerk of the Court shall enter judgment in

12  favor of Defendants Lopez and Valdez and against Plaintiff Thomas Nguyen as to all

13  claims in the complaint.

14  DATED:  December 21, 2015

15   

16                           **WILLIAM Q. HAYES**
                         United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28