1                    UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    THOMAS NGUYEN,                    )
                                       )
5         Plaintiff,                   )  No. 11-CV-2594-WQH
                                       )
6              v.                      )  September 22, 2015
                                       )
7    SAN DIEGO POLICE DEPARTMENT, et   )  9:00 a.m.
     al,                               )
8                                      )  San Diego, California
          Defendants.                  )
9    _____ )

10

11                 TRANSCRIPT OF BENCH TRIAL - DAY ONE
                  BEFORE THE HONORABLE WILLIAM Q. HAYES
12                  UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:        Robert H. Rexrode, III
                               Law Offices of Robert Rexrode
15                             427 C Street, Suite 310
                               San Diego, CA 92101
16
     For the Defendant:        Timothy C. Stutler
17                             Beverly Roxas
                               San Diego City Attorney
18                             1200 Third Avenue, Suite 1100
                               San Diego, CA 92101
19

20

21

22   Court Reporter:           Melinda S. Setterman, RPR, CRR
                               District Court Clerk's Office
23                             333 West Broadway, Suite 420
                               San Diego, California, 92101
24                             melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer

```
 1                        I N D E X

 2   Proceedings:                                    Page:

 3   Opening Statement by Mr. Stutler........................5

 4
     Testimony:
 5
     Witness:              Examination by:              Page:
 6
     Eduardo Lopez         Direct Exam by Mr. Rexrode...........17
 7                         Cross-Exam by Ms. Roxas..............37
                           Direct Exam by Ms. Roxas.............46
 8                         Redirect Exam by Mr. Rexrode.........59

 9   David Valdez          Direct Exam by Mr. Rexrode...........69
                           Cross-Exam by Ms. Roxas..............76
10                         Direct Exam by Ms. Roxas.............78
                           Redirect Exam by Mr. Rexrode.........95
11                         Recross-Exam by Ms. Roxas............105

12   John Spriet           Direct Exam by Mr. Stutler...........118
                           Cross-Exam by Mr. Rexrode............129
13
     Thomas Nguyen         Direct Exam by Mr. Rexrode...........105
14                         Contd Direct Exam by Mr. Rexrode......130
                           Cross-Exam by Mr. Stutler............149
15
     Exhibits:
16
     No./Letter    Page:
17   BL            123
     BM            122
18   BN            121
     BP            135
19   BQ            127
     E             119
20   G             123
     I             37
21   J             31
     X             125
22

23                        * * * *

24

25
```

```
 1          SAN DIEGO, CALIFORNIA, SEPTEMBER 22, 2015, 9:00 A.M.

 2                              * * * *

 3          THE CLERK:  Number 1, 11-CV-2594, Nguyen vs San Diego

 4   Police Department, on for bench trial, day one.

 5          MR. REXRODE:  Good morning, Your Honor.  Robert

 6   Rexrode for the plaintiff, Thomas Nguyen.  He is here.

 7          THE COURT:  Good morning, sir.

 8          MR. STUTLER:  Good morning, Your Honor.  Timothy

 9   Stutler on behalf of the defendants in this case.  I have with

10   me Beverly Roxas, also a city attorney in my office; Crystal

11   Beal, who is our paralegal in this case; Officer David Valdez;

12   Officer Eduardo Lopez, and we have Cheryl Forhan, our

13   investigator back here.

14          THE COURT:  Thank you, sir.

15          Are you ready to proceed, Mr. Rexrode?

16          MR. REXRODE:  We are.  Given that this is a bench

17   trial, we're pretty confident that you'll be able to follow

18   along.  I won't give an opening statement.  I believe

19   Mr. Stutler wanted to give a brief one.

20          THE COURT:  Fair enough.

21          Mr. Stutler, would you like to give an opening?

22          MR. STUTLER:  I would, and I have one housekeeping

23   matter that I told Mr. Rexrode about, an oral motion in limine.

24   If I may approach, I would like to give the Court two documents

25   I marked for identification as Defendants Exhibit BV, bravo
```

1  Victor, and BW.

2         THE COURT:  Okay.

3         MR. STUTLER:  And I would like to focus on the

4  responses, which is BW, and it is specifically response number

5  three.  Request number three is a request that Mr. Nguyen admit

6  that on December 30, 2010, you were carrying a sign, a pointed

7  wooden sign, at the San Diego Big Balloon Parade, and he

8  responded yes.

9         My oral motion in limine is to exclude any evidence

10  that the sign was square or other than pointed.

11         THE COURT:  Mr. Rexrode.

12         MR. REXRODE:  Thank you, Your Honor.

13         Mr. Stutler did let me know about this.  I opposed

14  this motion for two primary reasons.  As the Court will note,

15  Mr. Nguyen was pro se at the time that these requests for

16  admissions were propounded.  I don't think I am saying anything

17  that is going to be contested when I say that Mr. Nguyen --

18  English is Mr. Nguyen's second language.

19         Also, if you look at BV-5, the actual request for

20  admission, at lines 4 through 6, the request itself is

21  illiterate, and Mr. Stutler certainly didn't propound this.  It

22  was the city attorney beforehand.  I don't think it is the

23  clearest request ever made.

24         And Mr. Nguyen's position has always been that while

25  he was carrying the sign, that won't be disputed, that the

1    stick was squared at the bottom and not pointy.

2              THE COURT:  Anything else, Counsel?

3              MR. STUTLER:  No.  I think the Court knows the issues

4    on it.

5              THE COURT:  At this point I am going to deny your

6    request, but that is without prejudice for you to renew it at

7    some point subsequent during the trial, but I am not going to

8    preclude the admission of evidence on that point, at this point

9    in the case.

10             MR. STUTLER:  Thank you, Your Honor.

11             Opening?

12             THE COURT:  Yes, sir.

13             MR. STUTLER:  Your Honor, the defendants here, Eduardo

14   Lopez and David Valdez, couldn't care less about Mr. Nguyen

15   telling the world that the CIA was performing mind control

16   experiments on them and wouldn't bother them if he marched up

17   and down Harbor Drive or any other major thoroughfare cursing

18   up a blue storm or if he carried a picket sign at a parade

19   talking about demons and evildoers as he did at the Big Balloon

20   Parade.

21             When they found him surrounded by families and

22   children, apparently out of his wits, waving a six-foot long

23   stick that was pointed at the end, babbling incoherently,

24   cursing and tromping up and down, that did bother them very

25   much.  They cared very much about that.

1              Their concern and their suspicion was that he was

2      mentally ill and he was a danger to the families and children

3      surrounding them, and that is what this case is all about.

4              Let's talk about December 30th, 2010, the date of the

5      Big Balloon Parade in this case.  Officers Lopez and Valdez

6      were new officers.  They had been on the force about two years.

7      They arrived very early at the parade that day, and they were

8      supervised by Sergeant Jesus Cessena, who was an acting

9      lieutenant that day.

10             Exhibit E, please.  I've spoken to Mr. Rexrode and

11     told him the exhibits that we plan to present, and I don't

12     believe he has any objections.

13             MR. REXRODE:  No objection to the exhibits.

14             MR. STUTLER:  I am putting Exhibit E up on the monitor

15     here, and this is a nonscale parade map.

16             And can you go ahead and enlarge the start of the

17     parade?  There you go.

18             We're enlarging the area where all the events in this

19     case happened.  You can see from the ship on the left side,

20     that is where the water obviously is in the harbor.  The blue

21     line is Harbor Drive, and on the right you can see the county

22     administration building, further down the Holiday Inn, and then

23     the Navy complex.

24             There is an area that says "grandstand and television

25     area."  Across the street from that was is the television stand

1   where the -- excuse me -- across the street from the grandstand

2   was the television stand where the broadcast was being

3   conducted from, and that is where all the events in this case

4   happened.

5          Exhibit BN, please.

6          This is a photograph of the parade, and this was taken

7   from a camera at the Holiday Inn that is on Harbor Drive.  We

8   don't have -- we only have a couple pictures unfortunately of

9   the grand -- or the TV stand, but you can see it down in the

10  lower part of the picture, which I've just circled.

11         Mr. Nguyen was down in the area I just circled to the

12  right of the stand, and we have a number of witnesses who are

13  going to testify that were in other areas of the stand.

14         Erase that please.  Thank you.

15         As I said, Officers Valdez and Lopez arrived very

16  early.  Mr. Nguyen arrived shortly before the parade started

17  that morning.

18         And Mr. Nguyen ardently believed four years earlier in

19  2006 he became the subject of a CIA mind control study.  He

20  says that the CIA offered him a job that year, through voices

21  in his head, not in person, but through voices that nobody else

22  could hear.

23         And he also concluded that the CIA decided for come

24  reason that he was a terrorist and he didn't get the job.  But

25  he says because the agency feared that it would expose -- he

 1   would expose this ability to telepathically insert words and

 2   thoughts into people's heads, it started labeling him as

 3   mentally ill.

 4        And he also believes that because the CIA couldn't

 5   capture Osama bin Laden for some reason it turned his attention

 6   on him and started torturing him for the next ten years or so.

 7        Among other things, he feels the CIA controls his mind

 8   and makes him see and hear things that are not real.  He

 9   believed the CIA beams invisible electronic waves directly into

10   his head to sexually stimulate him.  It reads his mind and

11   implants thoughts in his head that are not his own, poisons his

12   food, uses doctors, other healthcare providers, and even

13   patients to harass and torsion him.

14        And the torture includes stimulating flatulence and

15   coughing loudly.  He believes the CIA dispatches strangers and

16   three-legged dogs to send messages.

17        And finally, he believes the CIA controls his ex-wife,

18   the San Diego College District, local hospitals, the police

19   department, and even the courts.

20        Since 2006 Mr. Nguyen has devoted his life to crusade

21   against the CIA.  You are going to learn that he's mentally ill

22   and that his fixation with the CIA has cost him his health, his

23   family, his job, and his home.

24        I understand he recently received a new kidney, but

25   back in 2010 he was undergoing kidney dialysis three times a

1   week, which is a very painful ordeal, but he refused to

2   acknowledge his mental illness and seek psychiatric treatment,

3   so he was removed from the kidney donation list.

4          When Mr. Nguyen is not on dialysis, he spends most of

5   his days -- he has two websites, and he spends hours a day

6   posting diatribes about the CIA and what it has done to him.

7          He lives in a van.  He parks near a federal public

8   building festooned with signs about the CIA and the issues he

9   has had with them, proclaimed the CIA is demon, it is idiot, it

10  tortured him, it is evil.  And by December 30, 2010, he was

11  living in that van on the day of the parade.

12         Can we look at Exhibit BP, please.

13         This is Mr. Nguyen's van parked near the parade.  This

14  is the typical way he had it set up for his protest.  Can you

15  see he's got a horse on -- a wooden horse on top of the van

16  that says CIA demon and a number of other things posted all

17  around the parade.

18         His wife -- his former wife -- didn't like it.  She

19  would tear the stuff down.  He would put it back up, and he

20  would be down there every day.  He considered it his job to go

21  after the CIA.

22         On December 30th, 2010, when this photograph was shot,

23  it was a cool day.  It was noisy, and it was quite windy.  And

24  the parade was attended as usual by families and by children

25  and by Thomas Nguyen.  His intention was to use the public

1  broadcasts of the parade to tell the world about his issues

2  with the CIA.

3          Exhibit BR, please.

4          This is the front of the sign that he carried at the

5  parade.  As you can see it says, justice, CIA destroyed my

6  life; CIA is demon; justice, NSA and FBI; his website address;

7  cover up, CIA is evil, central idiot agency.

8          He took that sign to the parade, and he took it into

9  the area near the television broadcast stand.

10          BL, please.

11          This is a photograph of the two broadcasters at the

12  parade, Dennis Morgigno on the right and Jane Mitchell on the

13  left, and I believe those were two television anchors or news

14  personalities for Channel Four at the time.

15          Mr. Nguyen is going to testify that the CIA through

16  its operative, Mr. Morgigno, ordered the police to arrest him

17  in order to conceal his message.

18          In addition to Officers Lopez and Valdez, you are

19  going to hear the testimony at this trial of three independent

20  witnesses who will corroborate the events as the officers

21  testified that led up to Mr. Nguyen's detention.  Those three

22  individuals are John Spriet, John Turner, and Shane Fortin.

23  Those are all employees of Cox Channel Four.

24          Exhibit BN, again, please.  Go ahead and blow up the

25  area around the TV stand.

 1          Exhibit BN is up on the monitor, and we've blown up

 2   the television stand there.  Mr. Fortin was -- is right here on

 3   the stand.  I've circled him.  He is standing up on the

 4   platform.

 5          Off to the right, out of the picture, is a truck, one

 6   of the cable channel's trucks, and that is where the other two

 7   witnesses, Mr. Turner and Mr. Fortin, started out in this case.

 8          Exhibit BM, please.

 9          This is another photograph, another angle, showing the

10   television stand, Exhibit BM.  One of the things you'll notice

11   down here is an orange security screen.  Mr. Nguyen was on this

12   side of the screen.

13          The area on the harbor side of the security screen was

14   a restricted area.  Unless you were a member of the press,

15   worked for Cox Channel Four, were police or security or were

16   family of somebody that worked for Cox Channel Four, you were

17   not allowed in that area.

18          That is where Mr. Nguyen was.  He was waving his sign.

19   He was blocking parade viewers.

20          The Cox viewers, including Mr. Spriet, up on the

21   platform had a couple different concerns.  First, they were

22   concerned because you have a guy who is yelling and screaming

23   and we have a broadcast going.

24          More importantly for them, they were concerned about

25   all the cables that ran up to that stand, the sensitive

1    equipment that was there, the stairs leading up to the stand

2    and what somebody like Mr. Nguyen might do if they were a

3    little bit unstable, and they did believe he was unstable.

4            Mr. Turner tried to persuade Mr. Nguyen to leave the

5    area.  He said, look, you just need to get out of this

6    restricted area.  You can take your sign back there.  You can

7    do whatever you want, but you can't be in this area.  That

8    started spinning him up.

9            Mr. Nguyen was relatively calm when it began.  He was

10   cursing a little bit, but when he interacted with Mr. Turner,

11   he just started getting amp'd up.  Mr. Turner backed up, called

12   one of the security -- Elite Security.  The security guard

13   talked to him.  That spun him up.  He was cursing, sputtering.

14   He was whipped up into a lather.

15           And finally somebody called the police, and Officer

16   Valdez and Officer Lopez responded to the scene.  On the way

17   several other people, parent's with little children and others,

18   said, there is a crazy guy over there, he is causing a raucous

19   over there, you need to do something about him.

20           They arrived.  They paused.  They watched him for

21   awhile, and they could see that there was a problem with him.

22   What they saw was a man who was cursing and ranting

23   incoherently and waving a sign saying the CIA destroyed his

24   life and the CIA was a demon.

25           Where the TV crews were worried about their cables,

1    equipment, and broadcast, what the two officers were concerned

2    about were the safety of the crowds that were all around

3    Mr. Nguyen within striking range of his stick.

4         Take a look at Exhibit BQ.  Exhibit BQ, which is up on

5    the monitor now, is the other side of the stick -- excuse me --

6    of the sign.

7         Go ahead and blow up the stick itself.

8         We have blown up the portion of the stick, the stick

9    that held the sign.  That stick was about two meters, six feet

10   long.  The end of the stick was pointed, and that was -- as far

11   as the physical issues there, that was the biggest thing that

12   concerned the officers, the way he was waving it around, the

13   way he was sputtering.  He was sweating, and it was a cool day,

14   and he was just ranting.

15        So they approached Mr. Nguyen, the officers, Lopez and

16   Valdez, and said, look, your cursing is not appropriate for

17   this kind of setting, maybe you should leave the area.

18        He wouldn't.  He was -- he looked very angry.  He

19   basically looked right through them as if he didn't even

20   comprehend what they were saying, and he mumbled something, I

21   am not leaving the area.

22        So the officers at that point decided they needed to

23   grab him.  That was the first time that he realized, from

24   appearances, that they were even there.  Mr. Nguyen is going to

25   testify that he did not realize that anybody from Cox cable had

1    spoken with him, anybody from Elite Security had spoken to him,

2    that the officers had interacted with him at all until the

3    moment they touched his arms.

4         He's going to admit that he was so fixated on Dennis

5    Morgigno who he believed looked down on him and said "crazy

6    man" but that nothing else registered with him.  In fact, he

7    can't even say where he was on that day.

8         Next exhibit, please.

9         You'll learn from the cable folks that Dennis Morgigno

10   was on a scaffold stand.  It is a very distinctive stand.

11   Mr. Nguyen will insist that Mr. Morgigno was on a scissor

12   stand.  And the scissor stand is shown in Exhibit BN on the

13   left side of the photo.

14        Let's show Exhibit G, if you will.

15        We're putting Exhibit G on the monitor.  And a scissor

16   stand is shown on the right, and you'll learn from the Cox

17   cable employees that they never put the talent -- the broadcast

18   anchors on one of these stands.

19        Mr. Nguyen says that he was standing just two or

20   three meters away from the stand, but he can't identify what it

21   looked like.  All he was focused on was Dennis Morgigno.  That

22   is all he remembers about what happened when the police

23   officers touched him.

24        Based on the police officers' reports, their own

25   observations, and their interaction with Mr. Nguyen, they

1    decided they needed to get him out of the area, get him to a

2    quieter, safer place, and they decided for safety they needed

3    to get the sharp stick out of his hand.

4         They grabbed the stick.  He resisted.  They fought for

5    it, and the stick broke and cut Mr. Nguyen's hand in the

6    process.  Afterwards the officers took Mr. Nguyen off to the

7    side on Ash Street and put him in the back of their car.

8         He complained the cuffs were too tight.  They

9    immediately checked and loosened them.  They cleaned the blood

10   from his hand from the cut on his fingers.  They left the door

11   open so he had circulation and so he could continue talking and

12   interacting if he so chose.

13        Officers Valdez and Lopez are not mental health

14   professionals.  They were new police officers.  They had a guy

15   that they thought was dangerous and mentally ill, and they

16   weren't sure what to do.  They talked with Acting Lieutenant

17   Cessena, and they decided to call in the PERT, Psychiatric

18   Emergency Response Team.

19        They are trained psychiatric clinicians who respond

20   when officers suspect when somebody, like Mr. Nguyen, has

21   mental health problems and might be a danger.  Their task is to

22   determine if the person has such problems and may be a danger

23   to himself or unable to care for himself.

24        The county certifies these clinicians to put a person

25   on a 5150 hold for up to 72 hours where he can be evaluated.

1    In this case the officers and the PERT unit -- and the PERT

2    unit I am talking about is Kathryn Alban, who will be

3    testifying most likely this afternoon.

4          They spoke on the phone over the next several minutes.

5    The officers called them within ten minutes after their first

6    contact, and they decided we need to get the PERT person here.

7    They held Mr. Nguyen only long enough for the PERT technician

8    to arrive.

9          After that it was her show.  She spoke to the officers

10   and spoke to Mr. Nguyen, and she concluded that, yes, he does

11   qualify for a 5150 hold.

12         In summary, what the evidence is going to show is that

13   Officers Lopez and Valdez detained Mr. Nguyen because they

14   reasonably suspected that he was mentally ill and dangerous.

15   It is not going to show that his protected speech was a

16   substantial or motivating factor in detaining him.

17         It will show that the contact with Mr. Nguyen was

18   short, professional, and reasonable.  They held him only long

19   enough for the PERT technician to get there and take over the

20   scene.

21         Mr. Nguyen is an intelligent man.  He is gifted.

22   Before 2006 he had a very bright future, a very promising

23   future.  Since then he has had a sad and tragic existence.

24         But at the end of the trial, the evidence is going to

25   make one final thing clear, and that is that Officers Lopez and

1    Valdez did absolutely nothing wrong in their dealings with

2    Mr. Nguyen.

3                THE COURT:  Thank you.

4                Mr. Rexrode.

5                MR. REXRODE:  Thank you.  Call Officer Lopez.

6         (Oath administered.)

7                THE CLERK:  Please state your full name and spell it

8    for the record.

9                THE WITNESS:  Yes.  Eduardo Lopez, E-D-U-A-R-D-O,

10   L-O-P-E-Z.

11                         EDUARDO LOPEZ,

12                     DIRECT EXAMINATION

13   BY MR. REXRODE:

14   Q.  Good morning, sir.

15   A.  Good morning.

16   Q.  I just want to talk to you, obviously, about the events

17   that occurred on December 30th, 2010.  All right?

18   A.  Yes.

19   Q.  How long had you been a police officer at that point?

20   A.  Approximately two years.

21   Q.  Two years.  And if you could briefly tell me the type of

22   training that you went through.

23   A.  I went through the regional academy training at Miramar

24   College to obtain my certificate in Peace Officers Standards

25   Training in the state of California and city of San Diego.

1    Q.   Any other training at the time of December 30th, 2010?

2    A.   Within the academy training, sir?

3    Q.   No, on the job.

4    A.   After post-academy, we do undergo a field training through

5    a field training officer, and that encompasses them evaluating

6    you on a daily basis on all your activities.

7    Q.   Okay.  And correct me if I am hearing you wrong, but

8    post-academy, the training is a more experienced police officer

9    watching you in the field and providing you feedback?

10   A.   Yes.

11   Q.   There is no form -- you have no formalized training in

12   terms of classes, seminars, post-academy?

13   A.   There were some.  There are some, yes.

14   Q.   Okay.  But in -- by the time of December 30th, 2010; do you

15   recall?

16   A.   I recall taking some mini-classes in other areas, but not

17   specifically for mental health.

18   Q.   And what were the other areas?

19   A.   Driving under the influence of alcohol and evaluating for

20   substance abuse, specifically narcotics.

21   Q.   Anything else that you can recall, sir?

22   A.   I don't recall.

23   Q.   All right.  Now, on -- on December 30th, you were obviously

24   working as a police officer?

25   A.   Yes.

1   Q.   Okay.  And the parade is a very large event.  Is the parade

2   an event where a great number of people congregate?

3   A.   Yes.

4   Q.   Are there a number of police officers that work that

5   parade?

6   A.   Yes.

7   Q.   And how do those officers communicate with each other?

8   A.   Via -- most of the time via radio dispatch.

9   Q.   Via radio.  And that day were you given an identifying

10  number for you to use on these radio dispatches?

11  A.   Yes.

12  Q.   And what was that number?

13  A.   Event 51.

14  Q.   Event 51.  Thank you.  Now, you came to know Mr. Nguyen, I

15  believe, because of a radio call?

16  A.   Yes.

17  Q.   Okay.  Can you describe to the Court what that radio call

18  was?

19  A.   Yes.  It was a call of a 415 with a bunch of people in the

20  area of 1400 North Harbor Drive.

21  Q.   Now, you were not the first officer at that incident;

22  correct?

23  A.   That's correct.

24  Q.   Between the time that you got the call to respond and you

25  showed up and saw Mr. Nguyen, about how much time had passed?

```
1   A.   Estimated between 5 and 10 minutes.

2   Q.   About four minutes sound about right?

3            MS. ROXAS:  Objection, Your Honor, misstates

4   testimony.

5            THE COURT:  Overruled.

6            THE WITNESS:  Could have been.  It is an estimation.

7   I don't recall.

8   BY MR. REXRODE:

9   Q.   Now, I believe, did you hear -- when you arrived and you

10  saw Mr. Nguyen, did you hear him yelling?

11  A.   Yes.

12  Q.   Did you hear him using profanity?

13  A.   Yes.

14  Q.   And do you recall what he was yelling?

15  A.   Vaguely, yes.

16  Q.   Okay.  And I understand it has been five years.  Can you

17  give an idea, in summary, the types of things that were being

18  yelled?

19  A.   Yes.  Your Honor, may I --

20           THE COURT:  Sure.

21           THE WITNESS:  -- curse?

22           Thank you.  Sir, he said, "fuck the CIA."  It is a

23  conspiracy, in part.

24  BY MR. REXRODE:

25  Q.   Okay.  I understand it is a little awkward to use
```

1   profanity, but you recall the words, "fuck the CIA"?

2   A.   Yes, sir.

3   Q.   Now, you -- did you ask Mr. Nguyen to leave the area?

4   A.   Yes.

5   Q.   Why?

6   A.   I asked him to move to a safer place in a place that wasn't

7   obstructing the parade.

8   Q.   Well, you actually asked him to move and told him that

9   profanity was not appropriate in that location?

10  A.   Yes, in part.

11  Q.   Well, you said that to him.  You said that profanity is not

12  appropriate?

13  A.   Yes.

14  Q.   And you asked him to leave?

15  A.   I asked him to move from the area, yes.

16  Q.   And you said that he was obstructing pedestrians.  Is that

17  what you said just now?

18  A.   No.  Obstructing the parade.

19  Q.   Okay.  Well, let's talk about that.  The parade itself is

20  going down Harbor Avenue; right?

21  A.   It is my understanding, yes.

22  Q.   Well, you were at the parade.  I am asking you.

23  A.   Yes.  But I am not -- I wasn't there to observe the parade.

24  I was there to -- more as a public safety officer.

25  Q.   I guess I'll ask you this, when you interacted with

1    Mr. Nguyen you were not on Harbor Avenue?

2    A.   We were.

3    Q.   You were on the sidewalk next to Harbor Avenue?

4    A.   When I observed him, he was coming onto Harbor -- Harbor

5    Drive and onto the sidewalk.

6    Q.   My question, when you interacted with Mr. Nguyen, he was on

7    the sidewalk of Harbor Drive; correct?

8    A.   I don't recall.

9              MR. REXRODE:  May I approach, Your Honor?

10             THE COURT:  Certainly.

11   BY MR. REXRODE:

12   Q.   I am going to hand you a two-page document.  Do you

13   recognize that?

14   A.   Yes.

15   Q.   What is that?

16   A.   It is the ARJIS-9 report that I wrote on the day of the

17   event.

18   Q.   In that report do you summarize what you saw that day?

19   A.   Yes.

20             THE COURT:  Counsel, the exhibit that you showed the

21   witness is what?

22             MR. REXRODE:  I'm sorry.  It is a report from the day.

23   I think he said ARJIS, A-R-J-I-S.

24             THE COURT:  Is it marked as an exhibit?

25             MR. REXRODE:  I was going to use it to refresh.

```
 1            THE COURT:  I understand.  You need to mark it as an
 2   exhibit.
 3            MR. STUTLER:  It is Q.
 4            MR. REXRODE:  I apologize.  I don't have any exhibit
 5   stickers.  Am I numbers?
 6            THE COURT:  You can mark it.  What is it marked, Q?
 7            MR. STUTLER:  Yes.  He should have a copy of the
 8   exhibits.  We can get him another exhibit.
 9            THE COURT:  Mark it as Q.  It is the only Q that is in
10   at this point.
11            MR. REXRODE:  For identification it should be Q, Bates
12   Stamp 9 and 10, I guess, would be the best way to describe it.
13            THE COURT:  All right.
14   BY MR. REXRODE:
15   Q.  All right, where was I?
16       That is the report you wrote on the day of the incident?
17   A.  Yes, sir.
18   Q.  Okay.  Now, you also described what Officer Valdez saw that
19   day, correct, in your report?
20   A.  I am not -- I am not sure what the question is, sir.
21   Q.  Okay.  In your report you also describe what Mr. -- what
22   Officer Valdez saw that day?
23   A.  I described in it in the context of my own observations,
24   yes.
25   Q.  If I could ask you to look at Q-009, is there a section
```

 1   there where you describe Officer Valdez' observations?  I'll

 2   refer you to the second paragraph.

 3   A.   Again, I am -- these are my own observations.

 4   Q.   Okay.  So let me just make sure I am not confusing you.

 5   Okay.  So the second paragraph of Q-009, those are your

 6   observations?

 7   A.   Yes, sir.

 8   Q.   Even though it says "Valdez" above that paragraph?

 9        MS. ROXAS:  Objection, Your Honor, argumentative.

10        THE COURT:  Overruled.

11        THE WITNESS:  It doesn't say "Valdez" above that

12   paragraph, sir.

13   BY MR. REXRODE:

14   Q.   I could be wrong?

15   A.   Within the paragraph, yes, it says, Officer Valdez and I

16   asked.

17   Q.   All right.  So Officer Valdez and you.  And you wrote the

18   day of the event that Mr. Nguyen was blocking pedestrians?

19   A.   Correct.

20   Q.   Now, the sidewalk at the Big Balloon Parade, are there a

21   lot of people on the sidewalk?

22   A.   Yes, sir.

23   Q.   Is that where I would go to watch the parade?

24        MS. ROXAS:  Objection, Your Honor.  Poses an

25   inappropriate hypothetical as to whether or not plaintiff's

```
 1   counsel would watch a parade from there.
 2          THE COURT:  Overruled.  You can answer.
 3          THE WITNESS:  I am not sure, sir.
 4   BY MR. REXRODE:
 5   Q.   Okay.  The sidewalk of Harbor Avenue, that is where people
 6   are standing watching the parade?
 7   A.   There were people seated along the curb, yes.
 8   Q.   Were there people milling about on the sidewalk?
 9   A.   Walking, sure.
10   Q.   Were there people standing on the sidewalk watching the
11   parade?
12   A.   It wasn't my observations.
13   Q.   So while you were at the Big Balloon Parade, you didn't see
14   anyone standing on the sidewalk watching a parade?
15   A.   I wasn't looking for that, sir, and I don't recall.
16   Q.   You're actually the one who called for the PERT team;
17   correct?
18   A.   Yes, sir.
19   Q.   And you did that at 10:07?
20   A.   Sounds about right, sir.
21   Q.   Okay.  I am going to show you a piece of paper, and this is
22   marked J, Bates Stamp 12, so J-012.  I am going to ask you to
23   read that and let me know if that refreshes your recollection.
24   A.   Yes.
25   Q.   10:07?
```

```
 1  A.  Yes.

 2  Q.  So about four minutes after you arrived at the scene?

 3  A.  Yes.

 4  Q.  My understanding -- and correct me if I'm wrong -- after

 5  you asked Mr. Nguyen to leave the area, he refused?

 6  A.  To leave the immediate area where he was standing, yes, he

 7  did acknowledge.

 8  Q.  Is that the same as -- did he say, no, I am not going to do

 9  it, something along those lines?

10  A.  He did.

11  Q.  So he refused?

12  A.  Yes.

13  Q.  And at some point either you and Officer Valdez or both

14  grabbed Mr. Nguyen's arms?

15  A.  Yes.

16  Q.  Okay.  And you took the sign from him?

17  A.  Yes.

18  Q.  The sign that he was holding?

19  A.  Eventually, yes.

20  Q.  Okay.  Now --

21      Could I trouble you to bring up BQ that you used in

22  opening?

23          MR. STUTLER:  BQ?

24          MR. REXRODE:  BQ.

25  BY MR. REXRODE:
```

1    Q.   Okay.  Is that showing up on your screen, Officer?

2    A.   Yes.

3    Q.   I just want to be clear.  While grabbing this sign, it

4    broke; right?

5    A.   Yes, it splintered, eventually breaking.

6    Q.   Splintered?

7    A.   Eventually breaking.

8    Q.   So the photograph in BQ that we're looking at, that is not

9    the condition of the sign at the time that Mr. Nguyen was

10   holding it on the sidewalk?

11   A.   The wooden portion of it, no.

12   Q.   The wooden portion of it, that condition is as a result of

13   the sign being grabbed by you or Officer Valdez and

14   splintering?

15   A.   In part.

16           THE COURT:  Are you offering BQ?

17           MR. REXRODE:  Yes.  Actually, yeah.

18           You didn't offer it?

19           Yes, I'll offer BQ.

20           MS. ROXAS:  No objection.

21           THE COURT:  No objection.  Received.

22       (Exhibit BQ was admitted.)

23           MR. REXRODE:  Thank you.

24   BY MR. REXRODE:

25   Q.   Now, I want to go back to Q-9.  You still have that in

```
 1   front of you; right?

 2   A.  Yes.

 3   Q.  Okay.  The reason you detained Mr. Nguyen was because you

 4   thought he might be a danger to himself?

 5   A.  Yes.

 6   Q.  And that is what you memorialized in your report on the day

 7   of the arrest?

 8   A.  Yes.

 9   Q.  Now, how long did the PERT team take to show up?

10   A.  I don't -- I don't recall.

11   Q.  Let's see.  We -- you called for the PERT team at 10:07?

12   A.  Yes.

13   Q.  Okay.  Do you recall calling the PERT team itself at 10:23

14   to see where it was?

15   A.  Sounds about right.  I don't know.

16   Q.  All right.  I am showing you -- just for identification

17   we'll mark it as J-021 -- if you could take a look at that, and

18   see if that refreshes your memory.

19       Do you recall now that you called to see where the PERT

20   team was at 10:23?

21   A.  Yes.

22   Q.  And I am actually -- how can I do this?

23       Could I have one moment, Your Honor?

24           THE COURT:  Yes.

25   BY MR. REXRODE:
```

1   Q.  I am going to play an audio just to you, and I want to see

2   if it just refreshes your memory as to who you called.

3   A.  Okay.

4   Q.  And if it doesn't --

5           THE COURT:  Counsel, the audio will not be recorded.

6           MR. REXRODE:  It will not.

7           THE COURT:  We need something in the record to show

8   what was played.  Do you have a transcript of what was played?

9           MR. REXRODE:  I do, and I'll reference the transcript

10  as J-021 to J-022.

11          THE COURT:  So 22 is the transcript?

12          MR. REXRODE:  21 to 22 is the transcript.

13          MR. STUTLER:  Do you have a line number?

14          MR. REXRODE:  I'm sorry?

15          MR. STUTLER:  Line number, please.

16          MR. REXRODE:  One, where it starts --

17          MR. STUTLER:  The line number on 22.

18          MR. REXRODE:  I'm sorry.  J is the Exhibit.  21 and 22

19  are the internal Bate Stamps in the exhibit.

20          THE COURT:  There are two exhibits.  There is one

21  exhibit which is this recording.

22          MR. REXRODE:  That is "I."

23          THE COURT:  And so "I" is the recording, and then you

24  have a transcript which is -- because already J-21, is that the

25  deposition?

1          MR. REXRODE:  It is not.

2          THE COURT:  What is that?

3          MR. REXRODE:  It is a transcript of police

4    communications.

5          THE COURT:  So J-21 is a transcript, and then this

6    also -- is this also in the transcript?  This is the same

7    transcript, J-21?

8          MR. REXRODE:  Yes.

9          THE COURT:  All right.  And so then J-21 is a

10   transcript of the recording, and the recording is "I."

11         MR. REXRODE:  Yes.  To make it a little more

12   confusing, and -- I'm sorry, "I" is a series of six audio

13   clips, all of which are police transmissions from that day.

14         THE COURT:  And is J the --

15         MR. REXRODE:  Is a transcript, the entirety of those

16   six clips.

17         THE COURT:  All right.  So do you intend to put in all

18   six?

19         MR. REXRODE:  I am trying to refresh right now.  I am

20   not tying to put anything in now.

21         THE COURT:  You are trying to refresh by playing "I,"

22   is that right, by a recording which is "I," but the transcript

23   that you are playing of "I" is J, and that is pages 21 to 22?

24         MR. REXRODE:  Yes.

25         MR. STUTLER:  Your Honor, for clarity, perhaps we can

 1   know which lines on Exhibit J-21, 22 he will be reading.

 2          MR. REXRODE:  14 through --

 3          MR. STUTLER:  Lines 14 through 22, we understand.

 4          THE COURT:  All right.  Any objection to that being

 5   received, J-21?

 6          MS. ROXAS:  No, Your Honor.

 7          THE COURT:  The record needs to be -- I need to have

 8   something in the record as to what you refreshed with.

 9          MR. REXRODE:  Frankly, I will just move J in its

10   entirety if there is no objection from the city.

11          MS. ROXAS:  No objection.

12          MR. REXRODE:  So I would move J in its entirety into

13   evidence.

14          THE COURT:  All right.  So Exhibit J is received, and

15   Exhibit J has -- is a transcript of six recordings; correct?

16          MR. REXRODE:  Correct, sir.

17          THE COURT:  Fair enough.  All right.  So J is

18   received.

19          MR. REXRODE:  Thank you.

20      (Exhibit J was admitted.)

21          MR. REXRODE:  I am just trying to figure out who he is

22   talking to.

23          THE COURT:  All right.

24   BY MR. REXRODE:

25   Q.  I think this is the right one.  Can you hear that?

```
 1   A.   Yes.

 2        (Audio playing.)

 3             MR. REXRODE:   If you would listen to the next.

 4   BY MR. REXRODE:

 5   Q.   Do you recognize -- I'm sorry.  I guess I should first ask

 6   you, is that you on the recording?

 7   A.   Yes.

 8   Q.   Okay.  Do you recognize who you are speaking with?

 9   A.   I am speaking to the PERT unit, yes, sir.

10   Q.   Okay.  Do you recognize the individual officer that you are

11   speaking with?

12   A.   No, sir.

13   Q.   Okay.  Now, so -- sorry for all the hassle.  I had an idea,

14   and I just didn't know who it was.

15        All right.  So at around 10:23 you call the PERT unit to

16   see where they are?

17   A.   Yes.

18   Q.   And you -- and you -- you give them much more information

19   about the -- about the situation you are facing?

20   A.   Yes.

21   Q.   Okay.  And you tell them that it is a problem because

22   Mr. Nguyen is getting in front of people?

23   A.   Getting in front of people, yes.

24   Q.   And that is the problem?

25   A.   There is a lot more to it.
```

1   Q.  Okay.  Well, this is you telling the PERT team why you need

2   them?

3   A.  Yes, but I am not narrating everything that I have

4   observed.

5   Q.  Okay.  Calling the PERT team is a pretty big deal, would

6   you say?

7   A.  No.

8   Q.  Okay.  The powers that a PERT team have are pretty big?

9   A.  Not different than what a normal peace officer has, no.

10  Q.  Okay.  Well, those are pretty big, the power to take

11  someone into custody?

12  A.  Absolutely.

13  Q.  The power to take away someone's liberty at least

14  temporarily?

15          MS. ROXAS:  Objection, Your Honor.

16          THE COURT:  To what?

17          MS. ROXAS:  To the allegation taking away somebody's

18  liberty by wanting a PERT team.

19          THE COURT:  I'll sustain the objection.  The line of

20  questioning seems to be like what is big, and that I think is

21  vague.

22          MR. REXRODE:  Fair enough.

23  BY MR. REXRODE:

24  Q.  When you get a radio call to come to a scene, you are given

25  information about what you are going to be facing?

1    A.   Sometimes.

2    Q.   If you get a radio call from a fellow police officer, you

3    get information about what you'll be facing?

4    A.   Again, sometimes.

5    Q.   If they know?

6    A.   If they know and if they transmit it.

7    Q.   Okay.  Do you want to know the situation that you are going

8    into?

9    A.   Depends on the situation, sir.  Sometimes we can evaluate a

10   little bit better once we're on scene, as opposed to someone

11   else, a third party, relaying information.

12   Q.   Would you prefer as a police officer to know the details of

13   a situation that you are being dispatched to?

14   A.   Again, depends on the situation, sir.

15   Q.   I am just asking you.  You don't know anything about the

16   situation, would you prefer to have information about the

17   situation you are about to walk into?

18   A.   In a general context, yes, sir.

19   Q.   Okay.  And that type of information is communicated among

20   police officers over dispatch?

21   A.   Sometimes.

22   Q.   So when you are talking to the PERT unit, you never

23   mentioned that you thought that Mr. Nguyen was a danger to

24   other people; correct?

25   A.   Correct.

1    Q.  And I understand you are not a mental health expert, but

2    two years in you knew that one of the things that PERT officers

3    look at is whether a person is a danger to others; correct?

4    A.  Yes.

5    Q.  What does, he's 29 all around, mean?

6    A.  There are no wants or warrants coming back.

7    Q.  Now, when you were speaking with the PERT officer at 10:23,

8    they told you, hey, we know this guy, we know who you are

9    talking about.

10            MS. ROXAS:  Objection, Your Honor, misstates

11   testimony.  He already testified that he did not know who the

12   officer was that he was speaking with when he is going back and

13   forth on the radio transmission.

14            THE COURT:  Overruled.  Can you answer?

15            THE WITNESS:  Yes.  The PERT team that I was

16   communicating with did say that.

17   BY MR. REXRODE:

18   Q.  We're familiar with the guy.  He is probably not going to

19   meet our criteria.  Do you recall that?

20   A.  Yes.

21   Q.  Okay.  When talking with the PERT team, there was a point

22   where you gave the PERT team the impression that you no longer

23   needed them?

24   A.  Yes.

25   Q.  And the reason for that is you asked the PERT team whether

1  Mr. Nguyen was normally the type of person who would oblige a

2  request to leave the area?

3  A.   Yes, I did ask.

4  Q.   And they said yeah?

5  A.   Yes.

6  Q.   And then you told them, okay, we'll be okay then?

7  A.   I did.

8  Q.   But then three minutes later you called them back and said,

9  hey, no, we want you to come down?

10  A.   Yes.

11  Q.   And in those three minutes you spoke with, I believe, then

12  Sergeant Cessena?

13  A.   Then acting-Lieutenant Cessena.

14  Q.   I'm sorry, acting-lieutenant -- I don't want to demote

15  anyone -- acting-Lieutenant Cessena?

16  A.   Yes.

17  Q.   And he told you, no, get the PERT team?

18  A.   Correct.

19        MR. REXRODE:  Your Honor, I believe without -- I am

20  done with my questioning.

21        And then, I believe without objection from the city, I

22  would move Exhibit I into evidence.  Exhibit I is the series of

23  six audio recordings.

24        THE COURT:  And do you have a CD that these would be

25  played on?

```
 1              MR. REXRODE:  I do.

 2              THE COURT:  All right.  So "I" is then a CD of the six

 3   recordings.

 4              MR. REXRODE:  Of which J is the transcript, yes, sir.

 5              THE COURT:  Any objection?

 6              MS. ROXAS:  No, Your Honor.

 7              THE COURT:  All right.  "I" is received.

 8          (Exhibit I was admitted.)

 9              MS. ROXAS:  Your Honor, at this time defense asks

10   whether or not we can just do the full examination of Officer

11   Lopez, instead of bringing him back and doing redirect of him?

12              THE COURT:  Sure.  Why don't you do the cross first,

13   and then when you want to get to the direct, then just indicate

14   you are done with the cross and you want to go to the direct.

15              MS. ROXAS:  All right.

16              THE COURT:  So you can lead on the cross but not the

17   direct.

18              MS. ROXAS:  Okay.

19                          CROSS-EXAMINATION

20   BY MS. ROXAS:

21   Q.  Officer Lopez, you indicated on direct that you didn't have

22   any post-training -- post-academy training with respect to

23   mental disabilities; correct?

24   A.  Post-academy?

25   Q.  Yes.
```

1   A.   I have since, yes.

2   Q.   Let's talk about the post-academy.  You received training

3   with respect to 5150 Welfare Institutions Code when joining the

4   academy; correct?

5   A.   That's correct.

6   Q.   In that training they didn't train to you diagnose mental

7   disorders; correct?

8   A.   Correct.

9   Q.   And they trained you actually to look at sort of indicators

10  with respect to diagnose -- not diagnosing -- but recognizing

11  whether or not a mental illness is a danger to someone else or

12  themselves; correct?

13  A.   Correct.

14  Q.   And what -- are some of the those indicators -- actions

15  interpreted as aggressive?

16  A.   Yes.

17  Q.   How about poor impulse control?

18  A.   Yes.

19  Q.   I want to draw your attention to Exhibit D, specifically

20  D-094.  I want you to take a look at that exhibit.

21  A.   Are we able to zoom in on that, ma'am?

22  Q.   Yes.

23       If you can zoom in on the indicators.

24       Are you able to recognize indicators that show a person who

25  lacks self-control?  Were you trained in that area?

1    A.   Yes.

2    Q.   And within that training, you were trained to recognize

3    certain behaviors; correct?

4    A.   Yes.

5    Q.   And those certain behaviors are such as rage?

6    A.   Yes.

7    Q.   Aggression?

8              MR. REXRODE:   If I could, Your Honor, could we get --

9    I guess, I object on foundation grounds for D-94.

10             THE COURT:   Yes.   What is the purpose of it?   Are

11   you -- how is the exhibit being used?   Is it being used to

12   refresh the witness' recollection?

13             MS. ROXAS:   Just going to his training with respect to

14   -- he was asked on direct with respect to training as a police

15   officer, formal training, class training, field training about

16   5150s.

17             THE COURT:   All right.   Although the exhibit -- now,

18   you are just asking him to read from the exhibit --

19             MS. ROXAS:   Okay.

20             THE COURT:   -- and the exhibit is not in evidence.

21             MS. ROXAS:   I would like to -- at this time I would

22   like to move --

23             THE COURT:   Speak into the microphone.

24             MS. ROXAS:   I'm sorry.

25             MR. REXRODE:   Foundation at this point.

1          THE COURT:  What is the -- what is the foundation for

2    the exhibit being introduced?

3          MS. ROXAS:  I'll lay the foundation, Your Honor.

4          THE COURT:  All right.

5    BY MS. ROXAS:

6    Q.  Officer Lopez --

7        Can you please -- can you please put on Exhibit D, the

8    first page of Exhibit D.

9        Officer Lopez, do you recognize what this exhibit is?

10   A.  Yes.

11   Q.  What is this exhibit?

12   A.  It is a learning domain that we obtained -- or were issued

13   for the academy, for both learning and testing examination.

14   Q.  And what is this domain?  What do they use this domain to

15   train you in?

16   A.  It covers persons with disabilities.

17   Q.  And I want you to take a look at zero dash -- I'm sorry

18   D-094, is this one of the pages within that domain that you

19   were given as part of your training?

20   A.  Yes.

21   Q.  Is that a fair and accurate depiction of what it is that

22   you read or studied throughout your training?

23   A.  Yes.

24          MS. ROXAS:  Your Honor, at this time I would like to

25   admit Exhibit D, D-094, into evidence.

1          MR. REXRODE:  I would object, Your Honor.  On the

2    second page of the exhibit, it says that the workbook was

3    corrected in August 28th, 2009, which would by my calculations

4    postdate this officer's time at the academy.

5          THE COURT:  You are trying to offer one page -- and

6    this is just a book that -- this is a book that he looked at

7    when he was in the academy?

8          MS. ROXAS:  Yes.  This is his training material, Your

9    Honor.

10         THE COURT:  I'll allow to you refresh his recollection

11   with it.

12         MS. ROXAS:  Okay.

13         THE COURT:  But to admit the document itself, D-94,

14   I'll sustain the objection.  You can use it to refresh his

15   recollection.

16         MS. ROXAS:  Thank you, Your Honor.

17   BY MS. ROXAS:

18   Q.  Going back to the indicators that you were trained to look

19   for to recognize individuals who lack self-control, okay,

20   you -- if you can recall, are one of those indicators rage?

21   A.  Yes.

22   Q.  How about aggression?

23   A.  Yes.

24   Q.  How about explosiveness?

25   A.  Yes.

```
 1   Q.   Rambling speech?
 2   A.   Absolutely, yes.
 3   Q.   And on December 30th, 2010, was Mr. Nguyen exhibiting
 4   behaviors of rage?
 5   A.   Yes.
 6   Q.   And how was he doing that?
 7   A.   Facial expressions.  His intonation as he yelled very
 8   loudly over the already loud sounds of spectators in the
 9   parade.
10        The words that were coming out of his mouth were likely to
11   incite a violent reaction by someone else near him or listening
12   to him.  His random speech.  Incoherence.
13        And later in evaluating him and in speaking with
14   Mr. Nguyen, his inability to reason and to understand anything
15   that we were trying to express to him.
16   Q.   How about agitation?
17   A.   Yes.
18   Q.   What was he doing that day that exhibited an expression of
19   agitation?
20   A.   His facial expressions were such that in my opinion seemed
21   extremely agitated, very angry, very violent.
22        There were so many kids around him that it didn't appear to
23   have any content appropriate for that particular area.
24   Q.   And anger?
25   A.   Yes, yes, absolutely.
```

1   Q.  Officer Lopez, you testified on direct that -- and after

2   listening to your audio recording of the radio transmission,

3   that the PERT team indicated to you that Mr. Nguyen usually

4   obliges and he leaves the area when asked; correct?

5   A.  Yes, ma'am.

6   Q.  And he didn't leave the area this time --

7   A.  No, ma'am.

8   Q.  -- when you asked; correct?

9   A.  No, he did not.

10  Q.  And you called the PERT team back because you got orders

11  from your sergeant; correct?

12  A.  That's correct.

13  Q.  So based on what the PERT team told you, this wasn't the

14  same situation that they encountered, was it?

15  A.  Correct.

16  Q.  He was acting a little bit differently maybe in this

17  situation?

18  A.  I am not -- I am not sure what they were -- what they were

19  referencing to.  I had no prior knowledge of him at all.

20      But based on the transmission, it seemed that this was a

21  completely different scenario to what they were used to.

22  Q.  And when -- initially when you called the PERT team -- you

23  know what the PERT team is used for; correct?

24  A.  Yes.

25  Q.  You know what they are trained to look for?

1    A.   Yes.

2    Q.   And you know they are trained to look for someone with a

3    mental disorder; correct?

4    A.   To evaluate them, yes.

5    Q.   To evaluate them.  And a mental disorder specifically that

6    results in a danger to yourself or danger to others; correct?

7    A.   Correct.

8    Q.   So when you called the PERT team, you knew what they were

9    going to look for; correct?

10   A.   Yes.

11   Q.   So you didn't have to call them and tell them, hey, this

12   guy is a danger to himself or danger to others.  You know that

13   when you call them -- it is your understanding that they know

14   to come and what to expect?

15   A.   Yes.  It is my understanding they come in, and they do

16   their own evaluation and assessment of the patient or the

17   individual.

18   Q.   So you didn't feel the need to call them and say, hey,

19   heads up, guys, he is going to be a danger to someone, he is

20   going to be a danger to himself?

21   A.   No.  At the point where I relay the transmission to the

22   PERT team, Mr. Nguyen was already seated in the back of our

23   car, secured, safe.  There was no danger at that particular

24   moment for me to relay that information to them.

25        They knew that we had the situation as far as -- as far as

```
 1   Mr. Nguyen and us and the corresponding public control per se.
 2   Q.  Okay.
 3   A.  We needed them for further assessment, evaluation, on the
 4   grounds of psychiatric -- a psychiatric evaluation or a hold
 5   for mental illness.
 6   Q.  For an evaluation to see whether or not it is appropriate?
 7   A.  Correct.
 8   Q.  Because you are not trained to diagnose mental disorders;
 9   correct?
10   A.  No.  Correct.
11   Q.  You thought it was reasonable, hey, let me see if this is
12   the right thing to do, let me see if this is appropriate, let's
13   call in a professional person to actually see if there is
14   something else to be diagnosed here?
15         MR. REXRODE:  Objection, Your Honor.  The question is
16   a bit long, compound, I guess.
17         THE COURT:  Sustained as to the form of the question.
18   BY MS. ROXAS:
19   Q.  Officer Lopez, when you call the PERT team, it was for
20   further evaluation; correct?
21   A.  Yes.
22   Q.  So see whether or not a 5150 hold is appropriate in this
23   scenario?
24   A.  Yes, ma'am.
25   Q.  Officer Lopez, I want to bring your attention back to your
```

1  police report that you were questioned on during your direct

2  examination.

3  A.   Okay.

4  Q.   When you were questioned on that police report, how many

5  years were you on the job?

6  A.   Approximately two years.

7  Q.   And what was your -- you put certain information in that

8  police report at that time.  Was it everything that you saw

9  that day?

10  A.   No.

11  Q.   Was it every -- every behavior that Mr. Nguyen was

12  exhibiting?

13  A.   No.

14  Q.   Why didn't you put everything in that report?

15  A.   Well, when we're assigned to special events, many times

16  we're denied access or we don't have access to computers, so we

17  have to handwrite it in.  This is a handwritten report.

18       I believed at the time because the PERT team, including the

19  clinician and the officer, placed a 5150 hold on Mr. Nguyen, I

20  believed that I put enough information in there to justify the

21  detention on my behalf, but not -- but not -- not a full

22  account of what took place.

23          MS. ROXAS:  Your Honor, at this time I would like to

24  conduct my direct examination.

25          THE COURT:  Okay.

```
1                           EDUARDO LOPEZ,

2                        DIRECT EXAMINATION

3    BY MS. ROXAS:

4    Q.   Officer Lopez, you are currently employed by the city of

5    San Diego; correct?

6    A.   Yes, ma'am.

7    Q.   And what is your title?

8    A.   Detective with Juvenile Services at Southeastern Division.

9    Q.   When did you start with the San Diego Police Department?

10   A.   In October of 2008.

11   Q.   And what was your title when you began with the police

12   department?

13   A.   Police recruit.

14   Q.   Was that during the academy?

15   A.   Yes, ma'am.

16   Q.   And after the academy, what was your title?

17   A.   Police Officer One.

18   Q.   And how long did you hold that title for?

19   A.   For approximately one year.

20   Q.   And then did you change titles at that point?

21   A.   It changes to Police Officer Two, nothing else changes

22   except for the pay scale.

23   Q.   Okay.  And on December 30th, 2010, what was your title?

24   A.   It was police officer.

25   Q.   One or Two?
```

1    A.   Two.

2    Q.   What were your job duties on December 30th, 2010?

3    A.   To provide public safety for the balloon -- the Holiday

4    Bowl Balloon Festival -- or parade.

5    Q.   Can you describe this big -- this Holiday Balloon Parade

6    for us, please?

7    A.   Sure.  As far as my observations is that there are large

8    balloons that parade around Harbor Drive.  The balloons include

9    some of Thomas the Train, Bob the Builder, the Wienerschnitzel

10   hotdog with caricature faces, some planes, Sesame Street

11   characters, basically all the characters associated with

12   children, infant-to-toddler-age child programs.

13   Q.   And how would you describe the type of parade this is?

14   A.   It is a family atmosphere.  There is a lot of kids.  The

15   adults supervising the kids, of course, and it is mainly geared

16   towards providing a wholesome entertainment, if you will, for

17   those children.

18   Q.   It is geared towards providing entertainment for the

19   children?

20   A.   In my opinion, yes.

21   Q.   And did there come a time on December 30th, 2010, that you

22   came into contact with plaintiff, Mr. Nguyen?

23   A.   Yes.

24   Q.   Can you please explain to the Court how you came into

25   contact with him?

1  A.   Yes.   There was a radio transmission in which a 415 was

2  discussed, including a bunch of people, and they gave the

3  location, and they gave a brief explanation as to what the

4  person was wearing and how he looked.

5  Q.   And when you say "415," what are you referring to?

6  A.   Normally disturbances including the use of language likely

7  to incite an immediate and violent reaction.

8  Q.   Anything else?

9  A.   Well, 415 covers a broader area, but normally -- normally

10  what we're referring to is a disturbance that is typically

11  either violent in nature or has the potential of being violent

12  in nature.

13  Q.   That is how the call came in?

14  A.   Yes, ma'am.

15  Q.   Where were you when you received that call?

16  A.   I was just south of 1400 North Harbor.

17  Q.   How far away from that was -- from that is where plaintiff

18  was?

19  A.   From my location?

20  Q.   Yes.

21  A.   Approximately one block, one city block.

22  Q.   When you received the call, what did you do in response?

23  A.   I walked over.

24  Q.   Did you arrive at the location at some point?

25  A.   Yes.

1    Q.   And when you got to the location, was the parade already in

2    progress?

3    A.   Yes, I believe so.

4    Q.   Can you please describe the layout of the parade.

5    A.   Yes.  As far as the North Harbor Drive, ma'am?

6    Q.   Yes.

7    A.   There are two lanes southbound, two lanes northbound.

8    There is a simulated island along a big stretch of that.

9    Specifically to 1400 North Harbor, there is also a left turning

10   lane.  There are parking stalls on both -- on the west and the

11   east side of the -- of this.  North Harbor is a north-to-south

12   street, and on the east side there is also a left -- or a right

13   turning lane that turns onto Harbor Drive from Ash.

14   Q.   And where was plaintiff when you saw him?

15   A.   As I was walking towards the location, before I actually

16   was speaking to him or becoming -- or coming to a distance

17   where I could be heard, he was walking onto North Harbor Drive

18   and back onto the sidewalk.

19   Q.   Was he actually on North Harbor Drive?

20   A.   Yes.

21   Q.   In the parade route?

22   A.   My understanding, yes.  It was the closed-off section of

23   the parade route, yes.

24   Q.   Was North Harbor Drive closed off in both directions?

25   A.   Yes.

```
 1   Q.   Okay.  Who is allowed on that parade route?

 2   A.   Only parade personnel, grand marshals, et cetera, people

 3   with permits.  Media is allowed if they have their

 4   corresponding credentials.  Public safety personnel, security

 5   personnel and their affiliates.

 6   Q.   Can you describe the volume of the crowd when you arrived?

 7   A.   It was -- there was a lot of people, mostly -- at least in

 8   the areas where I was, was -- mostly consisted of younger age

 9   children.

10   Q.   How about the volume of the crowd?

11   A.   The noise level?

12   Q.   Yes.

13   A.   It was very loud.

14   Q.   What type of activity was going on in that particular area?

15   A.   Well, they were clapping.  They were maybe whistling at the

16   floats, the people that were participating in the parade.

17   Q.   The floats were going by?

18   A.   Yes.

19   Q.   How were the floats being -- being taken?

20   A.   There is people holding large strands or strings or rope

21   attached to the actual balloons.  These are very large

22   balloons, and they drag them along, if you will.  They are

23   elevated, I am not sure, maybe some as low as maybe 8, 10 feet,

24   others a little bit higher, and they were holding them

25   around -- or, I think, take them along Harbor.
```

 1   Q.   How about the marching bands, were there marching bands on

 2   the parade route?

 3   A.   There were, yes.

 4   Q.   When you arrived at the location where Mr. Nguyen was and

 5   you saw him going onto North Harbor Drive itself, was he just

 6   on the street or was he moving back and forth or something

 7   else?

 8   A.   He was on the street but moving back to the sidewalk.

 9   Q.   Did he do this continuously?

10   A.   He did that a couple of times, as I recall.

11   Q.   And how far away from -- were you from plaintiff when you

12   observed this?

13   A.   Approximately 30 feet or so.

14   Q.   Aside from walking back and forth from the sidewalk to the

15   street, what else was he doing?

16   A.   He appeared to be yelling.  I couldn't make out what he was

17   yelling at that particular moment.

18   Q.   In sum and substance can you tell the Court what he was

19   yelling?

20   A.   Eventually I was able to make out a few words, but he was

21   so incoherent.  His reaction -- I could see he had a very, very

22   violent, agitated facial expression.  He was sweating, and it

23   wasn't a hot day, and there was -- there was spit coming out of

24   his mouth.  And this is as I was walking.  These are all

25   observations that stand out -- that stood out.

1   Q.   And how was his tone?

2   A.   It was very loud, very angry, a very violent tone, if you

3   will.   It was -- I relate it to a person who was in an

4   incontrollable state.

5   Q.   What did that indicate to you based on your training and

6   experience at the time?

7   A.   Well, that perhaps he was a person that could have violent

8   tendencies both towards us and the neighboring public.

9   Q.   Did it indicate anything else?

10   A.   Yes.   It indicated that he may have a mental health

11   disorder.

12   Q.   Was the reaction of the crowd a concern for you?

13   A.   Absolutely, yes.   Before we actually made our way to

14   Mr. Nguyen, several people came up to me and voiced their

15   concerns, saying there is a person there, he is -- he is angry,

16   he is yelling, he is screaming profanity, there is kids around,

17   can you please address it.

18   Q.   And can you describe the sign he was holding?

19   A.   Yes.   It was a large, very large sign he held towards his

20   head and above his head.   That sign came out of a stick, maybe

21   about a one-by-two-inch stick with a very pointed -- pointed

22   end at the bottom.

23   Q.   Okay.   Can we see Exhibit BQ, please.

24       Officer Lopez, can you please -- using your touch pad

25   screen -- draw a circle around the pointed stick part that you

1  were just referring to.

2  A.  Yes, (indicating).

3  Q.  Can you please zoom in on that.

4      Did there come a time when you approached Mr. Nguyen?

5  A.  Yes.

6  Q.  Why did you approach him?

7  A.  Why did we?

8  Q.  Yes.

9  A.  Well, because it was becoming apparent that there were

10  concerns both on my end with my observations and obviously the

11  people around him showing concerns for public safety.

12  Q.  When you approached him, what did you say?

13  A.  I introduced myself, and I asked him if he would refrain

14  from using profanity, that there were children around him, if

15  he could accompany us to the easement or adjacent parking lot.

16  Q.  What was his reaction?

17  A.  He looked right through me.  He didn't give me an initial

18  reaction.  He continued yelling loudly.  Eventually he told me

19  that he wasn't going to go anywhere.

20  Q.  Did you offer him an alternative location to go to?

21  A.  Yes, yes.  I told him if he stood in the easement that he

22  wouldn't be obstructing anyone and that that would be a good

23  place for him to stand.

24  Q.  And why did you do that?

25  A.  Well, initially I figured if he obliged to our request and

1    perhaps understood that behavior wasn't appropriate that things

2    would subside.

3    Q.   What were your thoughts as you were talking to him?

4    A.   As far as Mr. Nguyen is concerned?

5    Q.   Yes.

6    A.   It appeared more and more that there needed to be an

7    evaluation for mental health -- for his mental health state.

8    He appeared very incoherent.  He wasn't -- he wasn't speaking

9    or showing any signs that he was going to stop the behavior.

10        And because of what he was saying, the intonation, his

11   facial expressions, and the actual words that he was using, I

12   believed him to be a danger to himself at that particular

13   moment.

14        I did wish to further evaluate him, but that particular

15   place wasn't the appropriate place to do so.

16   Q.   How about with respect to the 415, what were your concerns

17   about that, if any?

18   A.   Well, that is what I mean by the words that he was using.

19   If I was participating in the parade or having heard that with

20   so many children around me, I think it would cause a reaction

21   of wanting to stop this person from using that type of

22   language.

23   Q.   As an officer or as a civilian or spectator?

24   A.   As a parent, ma'am.

25   Q.   Okay.

1   A.   As a parent of five children under eight, I wouldn't want

2   them to be exposed to profanity in such a manner.  It is not

3   the proper context, and his violent tendencies, his stick

4   pointed at one end, in totality, it just seemed like a bad

5   scenario and a bad incident waiting to happen.

6   Q.   Would you describe his behavior as predictable?

7   A.   No, not at all, very unpredictable.  At best it was --

8   because he moved his stick up and down, I believed that to be a

9   safety risk, both my -- my -- risk to myself, my partner, and

10  the public, and himself.

11       And his reaction, everything and anything that he was

12  saying, in the manner he was saying it, and how he wasn't

13  addressing us, and his inability to reason led me to believe

14  that he was very unpredictable.

15  Q.   When he refused to leave or move onto the egress or

16  sidewalk what did you do next?

17  A.   Well, we -- I grabbed onto his left arm and also grabbed

18  onto the stick that he held.

19  Q.   And why did you grab onto his stick?

20  A.   Well, like I said, I believed it to be a safety risk, both

21  for me and for the public around him and for himself.  I didn't

22  want him to get stuck or hurt by it.  I didn't want the

23  children around him to get stuck or hurt by it, and I certainly

24  did not want myself to get hurt from the stick, and I believed

25  it to be a weapon to get away from him.

1   Q.   Why did you hold onto his arm?

2   A.   I was going to detain him for further evaluation, and

3   because he wasn't responding to our request to accompany us to

4   the adjacent parking lot or easement, I had to place a hold on

5   him, control hold.

6   Q.   And what was his reaction when you tried to take his sign

7   away?

8   A.   He vigorously held onto it very tightly.  His grip went

9   from a normal grip to a very tight grip.  His arms tensed up,

10  his fists closed as much as they could within the -- within the

11  stick itself.

12  Q.   And what happened to the stick?

13  A.   It splintered and eventually breaking once he let go of it.

14  Q.   And once that happened what did you do next?

15  A.   I placed his hands behind his back.  I walked him over to

16  the easement, eventually the parking lot, and I handcuffed him.

17  Q.   Officer Lopez, when you removed the sign form him, did it

18  have anything to do with the message that was on the sign?

19  A.   No.

20  Q.   And when you removed him from the crowd, did it have

21  anything to do with the message that he was trying to express

22  on the sign?

23  A.   Absolutely not.

24  Q.   Did there come a point where he complained about the

25  handcuffs being too tight?

1   A.   Yes, ma'am.

2   Q.   And what did you do in response to that?

3   A.   I immediately loosened them.

4   Q.   And when you brought him outside of the crowd, did you

5   bring him back to your patrol car?

6   A.   Yes.

7   Q.   Where did you place him?

8   A.   In the backseat of our patrol car on the passenger side.

9   Q.   Why did you place handcuffs on him?

10  A.   Well, it is -- again, in my observations and coming to the

11  conclusion that his behavior was both irrational and

12  unpredictable, I didn't want the situation to escalate to

13  anything that forced a higher magnitude that could be used or

14  should be used.

15     I believed it to be more of a safety concern, so I placed

16  handcuffs on him for those reasons.

17  Q.   When you placed him in the back of the patrol car, did you

18  speak to him further?

19  A.   Small talk, very little.  I left the door open to allow the

20  flow of air to come in and make him more comfortable.

21  Acting-Lieutenant Cessena arrived on the scene, and he spoke to

22  him further.

23  Q.   And after he spoke to him, what happened?

24  A.   Well, he requested that -- he told us to request a PERT

25  unit to arrive on the scene, and this came shortly before he

1   began speaking to Mr. Nguyen.

2   Q.   How much time had passed between the time that you removed

3   plaintiff from the crowd and the time the PERT clinician was

4   called?

5   A.   No more than -- no more than a few minutes.

6   Q.   And did there come a time when the PERT clinician arrived?

7   A.   Yes.

8   Q.   And what happened when she arrived?

9   A.   The PERT clinician and PERT officer made their assessment.

10  They determined that he met the criteria for 5150, and they

11  placed him on a hold.  From then on they took custody of

12  Mr. Nguyen.

13  Q.   And he was transported?

14  A.   He was transported.

15  Q.   You didn't transport him; correct?

16  A.   No, ma'am.

17          MS. ROXAS:  I have no further questions, Your Honor.

18          THE COURT:  Any redirect, Counsel?

19          MR. REXRODE:  Yes.  Thank you, sir.

20                     REDIRECT EXAMINATION

21  BY MR. REXRODE:

22  Q.   You said that the words on Mr. Nguyen's sign had nothing to

23  do with your decision to approach him and ask him to leave the

24  area when you were being asked questions by counsel.

25  A.   Correct, correct.

1    Q.   The words Mr. Nguyen was saying certainly had everything to

2    do with why you approached him and asked him to leave the area;

3    correct?

4    A.   No.

5    Q.   Well, let's go back a little bit, okay.  You told me on

6    direct that Mr. Nguyen said, "fuck the CIA"?

7    A.   Yes.

8    Q.   And one of the first things you said to Mr. Nguyen when you

9    approached him was this is not an appropriate place to use

10   language like that?

11   A.   Correct.

12   Q.   And as a father of small children you didn't think it was

13   appropriate to have profanity at the Holiday Bowl Parade?

14   A.   In part, yes.

15   Q.   And also, in part, you thought that a man using profanity

16   at the Holiday Bowl Parade might elicit a reaction from other

17   people in the crowd?

18   A.   Along with his other indicators, yes.

19   Q.   You thought that the words he was using, the profanity,

20   would elicit a reaction from people in the crowd?

21   A.   Again, along with the other indicators, yes.

22   Q.   So, in part, one of the reasons you approached Mr. Nguyen

23   and asked him to leave the area was because he wouldn't oblige

24   your request to stop yelling, "fuck the CIA"?

25   A.   I didn't ask him to leave the area.  I asked him to leave

1    the specific place where he was standing.

2    Q.   Okay.  I don't -- we won't get caught up on the word

3    "area."

4        One of the reasons that you approached Mr. Nguyen and told

5    him to stop doing what he was doing was because he was yelling,

6    "fuck the CIA"?

7    A.   Along with other indicators, yes, sir.

8    Q.   So that is one of the reasons; correct?

9    A.   There is a lot more to it.  We were dispatched to a radio

10   call for that particular person, and a 415, we needed to

11   address the issue.

12   Q.   Yeah.  Let's talk about 415 a little bit.  When you are

13   referring to 415, you are referring to California Penal Code

14   Section 415; correct?

15   A.   Yes, sir.

16   Q.   And 415 is used amongst people, police officers, shorthand

17   for disturbance?

18   A.   Yes.

19   Q.   Okay.  Something is going on?

20   A.   Yes.

21   Q.   Okay.  And one of the subsections of California Penal Code

22   415, that I believe you talked about with the city attorney

23   there, was language likely to elicit a violent reaction; right?

24   A.   Yes, sir.

25   Q.   Tell me what your academy training told you about the

1    Fourth -- the First Amendment case law that construes that

2    section?

3    A.   I'm sorry, sir.

4            MS. ROXAS:  Objection, Your Honor, overly broad.

5            THE COURT:  Overruled.

6            Do you understand the question?

7            THE WITNESS:  No, I don't.

8            THE COURT:  All right.

9    BY MR. REXRODE:

10   Q.   That particular subsection of California Penal Code 415,

11   please tell me the academy -- where in the academy training you

12   were trained on First Amendment law in the context of that

13   subsection?

14   A.   As far as what learning domain, I don't recall.  We did

15   cover that area, but I don't recall where specifically.

16   Q.   You received training at the academy?

17   A.   I did.

18   Q.   Did you receive training on the academy about the First

19   Amendment limitations as to that specific subsection of

20   California Penal Code 415?

21   A.   I don't recall.

22   Q.   You asked him to go to the easement?

23   A.   Yes, sir.

24   Q.   What do you mean by that?

25   A.   There is a large grass area beyond the sidewalk on the east

1    side of North Harbor Drive, and it allowed us -- or gave us a

2    place where it was both away from people that could possibly be

3    in danger and provide us kind of a ground where we can speak

4    without the audible sounds of the parade.

5    Q.   Maybe I just heard you wrong, but I got the feeling that if

6    Mr. Nguyen had obliged to your request to go to the easement,

7    the situation would have resolved itself?

8    A.   When I requested that, yes.

9    Q.   What I mean by "the situation would have resolved itself,"

10   you would have let Mr. Nguyen stand there and hold the sign?

11   A.   Absolutely.

12   Q.   As long as he didn't yell profanity; correct?

13   A.   In part.

14   Q.   In part.  In part, because part is if he wouldn't yell

15   profanity, correct, and in part, if he stood where you told him

16   to stand in the easement?

17   A.   Or any other area that wasn't in the parade route or in --

18   obstructing a public way.

19   Q.   All right.  Let's talk about that.  When -- did you work

20   December 31st of 2010?

21   A.   December 31st?

22   Q.   Yeah?

23   A.   I am not sure, sir.  I don't know.

24   Q.   Did you work January 1st of 2011?

25   A.   I don't recall, sir.

```
 1   Q.  Did you work January 2nd of 2011?
 2   A.  Again, I don't recall.  I would have to look at my schedule
 3   to see if I did.
 4   Q.  But you recall -- and just so we're clear, the report that
 5   I showed you, your report, I believe it was Q -- marked Q?
 6   A.  Yes, sir.
 7   Q.  That is the only report that you wrote in this case?
 8   A.  Yes, sir.
 9   Q.  Okay.  There are no other notes that you wrote that you've
10   looked at before testifying today?
11   A.  There was a declaration that was prepared in 2012.
12   Q.  2012.  A year and a half after these events, right, the
13   declaration?
14   A.  More or less.
15   Q.  But there is no other report?
16   A.  I did look at -- for the clinician and Officer
17   Moran's report.
18   Q.  Super.  Yeah.  I'm sorry.  I am not trying to go down that
19   rabbit hole.  I am asking about things that you wrote.  That is
20   the one report that you wrote?
21   A.  Yes.
22   Q.  And there is nothing in the report about you observing
23   about Mr. Nguyen going on the street and back onto the
24   sidewalk?
25   A.  That's correct.
```

1  Q.  And I know you explained to the city attorney that it was

2  handwritten and you didn't put down everything that you saw

3  that day; right?

4  A.  That's correct, sir.

5  Q.  But as you sit here today, five years after the fact, you

6  have a recollection of that happening?

7  A.  Yes, sir.

8  Q.  Okay.  But you don't have a recollection of whether you

9  worked the following day?

10  A.  That's correct, sir.

11          THE COURT:  Excuse me, Counsel.

12          It is 10:30.  We'll take our morning recess.  We'll be

13  in recess until 10:45.

14          MR. REXRODE:  Thank you.

15      (Recess ensued from 10:29 a.m. to 10:47 a.m.)

16          THE COURT:  All right.  Counsel, you may resume your

17  examination.

18          MR. REXRODE:  Thank you, sir.

19  BY MR. REXRODE:

20  Q.  Officer, when talking with the city attorney, you said you

21  didn't feel a need to tell the PERT unit what was going on

22  because you knew what they were going to ask when they got

23  there?

24  A.  No.

25  Q.  Okay.  You sort of threw me off there, sir.  If I recall

1   correctly, when you were speaking with the city attorney, when

2   speaking with the PERT unit and being told that Mr. Nguyen

3   usually just leaves the area, you realized that you were

4   dealing with a completely different scenario?

5   A.   Yes.

6   Q.   And it was a completely different scenario because earlier

7   he had refused to leave?

8   A.   Correct.

9   Q.   And it was a completely different scenario because when you

10  asked him to stop yelling, he wouldn't?

11  A.   Correct.

12  Q.   After the PERT team told you that Mr. Nguyen usually

13  complies, you told the PERT team, okay, we'll be okay then?

14  A.   Yes.

15  Q.   And you told them that a couple minutes into a call that

16  you made at 10:23; right?

17  A.   Yes.

18  Q.   Okay.  But your interactions with Mr. Nguyen started around

19  10:04, 10:03?

20  A.   Yes.

21  Q.   So by the time the PERT unit was telling you, hey, you

22  know, he usually obliges, you already knew it was a completely

23  different situation; right?

24  A.   Completely different situation from what they are

25  accustomed to.  I didn't know that until that transmission.

1   Q.   Okay.  But when they told -- when the PERT team told you

2   that Mr. Nguyen normally just leaves the area, if asked to,

3   when they told you that, you knew at that time that it was a

4   completely different scenario?

5   A.   Yes, sir.

6   Q.   And knowing that, you told the PERT team, hey, we'll be

7   okay?

8   A.   Yes, sir.

9   Q.   And I just want to go back.  I mean, you did explain in

10  some detail to the PERT unit what the situation was; right?

11  A.   In some, yes.

12  Q.   Okay.  Well, would you like to take a look at it?  I am not

13  trying to sandbag you here.

14  A.   No, no.

15  Q.   I mean, you told them about Mr. Nguyen's van?

16  A.   Yes.

17  Q.   About the content of Mr. Nguyen's message?

18  A.   Yes.

19  Q.   That he was yelling?

20  A.   Yes.

21  Q.   And that it -- I am assuming the situation, when you said

22  -- when you say it to the PERT team?

23  A.   Yes.

24  Q.   It became a problem when he started addressing people at

25  the parade with his big signs, you know, getting in front of

1   them, yelling justice for CIA, FBI, conspiracy, a whole bunch

2   of stuff?

3   A.   Yes.

4   Q.   You told them all that information?

5   A.   Yes.

6   Q.   Why did you tell them that information?

7   A.   I don't -- because I believed that was information that

8   they -- that they needed either to make a determination as to

9   whether to continue for further evaluation or to disregard

10   completely.

11   Q.   Okay.  So you told them that information to allow them --

12   "them" being the PERT team -- to make a decision whether to

13   honor the call from 10:07, to actually show up?

14   A.   Because of the lapse in time and the amount of time that it

15   was going to take them to arrive on scene.

16   Q.   Okay.  So you gave them all that information to let them

17   make a decision, the PERT team, about whether they should still

18   respond?

19   A.   In part, yes.

20   Q.   But -- but you didn't tell them that you thought Mr. Nguyen

21   was a danger to other people around him?

22   A.   No, I did not.

23            MS. ROXAS:  Your Honor, asked and answered on direct.

24            THE COURT:  Overruled.

25            THE WITNESS:  No, I did not.

1    BY MR. REXRODE:

2    Q.  You didn't tell them that you thought that Mr. Nguyen was a

3    danger to himself?

4    A.  No, I did not.

5    Q.  You didn't tell him that you thought the crowd might turn

6    on Mr. Nguyen and that was a concern?

7    A.  No, I didn't.

8             MR. REXRODE:  Nothing further.

9             THE COURT:  All right.  Any redirect or recross?

10            MS. ROXAS:  I have no further questions, Your Honor.

11            THE COURT:  May the witness be excused?

12            MR. REXRODE:  Yes, sir.  Thank you.

13            THE COURT:  All right.  You may step down.  Thank you,

14   Officer.

15            THE WITNESS:  Thank you.

16            THE COURT:  Please call your next witness.

17            MR. REXRODE:  Thank you, sir.  David Valdez, please.

18       (Oath administered.)

19            THE CLERK:  Will you please state your name and also

20   spell it for the record.

21            THE WITNESS:  David Valdez, first name spelled

22   D-A-V-I-D, last name spelled V-A-L-D-E-Z.

23                         DAVID VALDEZ,

24                     DIRECT EXAMINATION

25   BY MR. REXRODE:

1   Q.   Good morning, sir.

2   A.   Good morning, sir.

3   Q.   How long had you been a police officer on December 30th,

4   2010?

5   A.   At that time approximately two years.

6   Q.   Two years.  You've been sitting here, right, listening to

7   Officer Lopez testify?

8   A.   Yes, sir.

9   Q.   Did you have similar training to him?

10   A.   Yes, similar academy training, yes.

11   Q.   Are there any other academy trainings that you can think of

12   that weren't mentioned?

13   A.   My training between there and 2010, I can't recall

14   specifically what additional training I have had.

15   Q.   Any formal training in between the two years or so that you

16   left the academy and December 30th, 2010?

17   A.   Not that I recall, at this time.

18   Q.   Okay.  Going to December 30th, 2010, did you get a call

19   from a security officer around 9:54?

20   A.   It was more of what we call a flag down, where a security

21   guard approached me while I was at my traffic post.

22   Q.   Okay.  That was about 9:54?

23   A.   I would have to look at my time stamp on my radio

24   transmission, but if that is what you say --

25   Q.   You got it.  I guess it is in -- so J, first page.  I am

1  showing you the first page of Exhibit J.  If you can take a

2  look at that and see if it refreshes your memory.

3  A.  That is the time stamp, yes.

4  Q.  So -- and I understand we're a minute on either side, but

5  we're talking around 9:54?

6  A.  Yes, approximately.

7  Q.  Okay.  Now, so let me just get this straight, so a security

8  officer approaches you and says, hey, we have a problem?

9  A.  Yes, says someone was along the parade route creating a

10  disturbance, yes.

11  Q.  Some guy with a big, large sign?

12  A.  Large sign attached to, yes.

13  Q.  And that there was a bunch of people there?

14  A.  Yes.  He was creating a disturbance, you know, with a bunch

15  of people along the parade route, yes.

16  Q.  Okay.  So just so I am clear, where Mr. Nguyen -- where you

17  ultimately got into contact with him, there was a bunch of

18  people around him watching the parade?

19  A.  Watching the parade, walking by, yes.

20  Q.  Okay.  Now, about three minutes after -- it took you about

21  three minutes after talking with the security guard to get to

22  Mr. Nguyen himself?

23  A.  Walking through the crowd and talking with people along the

24  way, yes.

25  Q.  About three minutes?

```
 1   A.   That sounds about right.

 2   Q.   Okay.  I'll take it.

 3        And when you actually -- and this whole time after you

 4   get -- after you get the report from the security officer and

 5   you are walking towards him, you are keeping the San Diego

 6   Police Department informed of what you are doing?

 7   A.   Yes.  I broadcast over the radio that I was going to go

 8   investigate a 415 and look for this gentleman that was

 9   described to me by the security guard.

10   Q.   Gotch you.  And you are Event 52, right, or you were that

11   day?

12   A.   I was that day, yes.

13   Q.   So on December 30th, 2012 -- 10, excuse me, you are Event

14   52?

15   A.   Yes.

16   Q.   Okay.  Now, in about three minutes we figure out you

17   actually found Mr. Nguyen; right?

18   A.   Yes.

19   Q.   Okay.  And you're asked a question by the dispatcher?

20   A.   I don't recall a specific question.

21   Q.   Okay.  Page two.

22   A.   Yes, yes, one of our supervisors.

23   Q.   So one of your supervisors.  This is before you made

24   contact with Mr. Nguyen; right?

25   A.   It might have been when I was watching him from a distance
```

 1   because I had approached -- watched from a distance before

 2   another police unit came to assist me.

 3   Q.   Okay.   Perfect.   So you get to Mr. -- where Mr. Nguyen is,

 4   and you watch him for a little bit?

 5   A.   Yes.

 6   Q.   Okay.   And then you call in to one of your supervisors and

 7   say, hey, I am here, I found the Vietnamese man with the large

 8   sign?

 9   A.   Yes.

10   Q.   Okay.   And your dispatcher, your supervisor, says, hey, is

11   this the kind of person we can just kind of keep off the parade

12   route, or is this going to be more than that?

13   A.   Yes.

14   Q.   Okay.   And then you see Event 52, 109, I am assuming that

15   "109" is a request to repeat what was said?

16   A.   A radio code to repeat.

17   Q.   Because your supervisor then repeats the exact same

18   question, right, okay, and then you answer his question; right?

19   A.   I -- yes, I believe I did, yes.

20   Q.   And you say, might be more, possibly more than that.   He is

21   yelling pretty loud, and then, I think he is trying to get a

22   lot of attention?

23   A.   Yes.   I observed him screaming and yelling very -- just out

24   of rage -- out of context, so it didn't seem like someone to

25   approach by myself and tell him to calm down.

1    Q.   What do you mean by "out of context"?

2    A.   You know, he was just using a lot of profanity, just

3    screaming, yelling, incoherently rambling on and on.

4    Q.   Is profanity incoherent?  Is that the same thing in your

5    mind?

6    A.   No.  Incoherent statements in addition to the profanity

7    that I was hearing.

8    Q.   What were those incoherent statements?

9    A.   I don't recall the specific statements made.

10   Q.   Do you remember the general subject matter?

11   A.   I do not, no.  I just remember being very loud over the

12   crowd that was there.

13   Q.   People being bothered by it?

14   A.   People being bothered by it, people getting out of his way

15   and moving away from him and kind of, yeah.

16   Q.   Yeah?

17   A.   Yes.

18   Q.   Okay.  And then in that same answer, you talk about where

19   he is standing; right?

20   A.   I would have to look at that again.

21   Q.   All right.  Page three, 1 through 6.

22   A.   Yes.  While I was there, an Elite Security guard told me

23   that he was walking into the street, obstructing the parade

24   route, but at the time that I was observing him, I just

25   observed him kind of on the grass, on the sidewalk, just south

1   of the scaffolding for the grandstand that was there.

2   Q.   Okay.   Thank you so much because -- so you had a chance to

3   read that.   I take it "a lease" is a typo, and it should be

4   Elite, E-L-I-T-E?

5   A.   Yes.

6   Q.   That is the security firm that -- a private firm that

7   contracts for events in San Diego?

8   A.   That is how I understand it, yes.

9   Q.   Okay.   So you explained to your supervisor that someone

10  else had told you that Mr. Nguyen had been in the street;

11  right?

12  A.   Yes.

13  Q.   But you hadn't seen that?

14  A.   At that time, no.

15  Q.   No, because he was just standing here on the sidewalk

16  yelling, right?

17  A.   He was pacing back and forth, marching back and forth on

18  the sidewalk, on the grass, just south of the grandstand.

19  Q.   Yelling?   Yelling?

20  A.   Yelling, screaming, yes.

21  Q.   You ran a criminal history check on Mr. Nguyen that day?

22  A.   Later on that day, yes, towards the end of our, I guess,

23  contact, so to speak.

24  Q.   I am not sure -- I'll just ask a question.   You did that

25  criminal history run before the PERT team ever showed up;

1   right?

2   A.  I don't know if I did that when they were there or before

3   or after.  That would have been when I would have conducted my

4   records check right here.

5   Q.  And that would have been at 10:20?

6   A.  10:20, yes.

7   Q.  And I guess we established with Officer Lopez he called to

8   check on the status of the PERT unit at 10:23?

9   A.  I'm sorry.  I missed the first part of your question.

10  Q.  I think we established with Officer Lopez that he called to

11  check on the status of the PERT unit at 10:23, so you would

12  have called for the records check before the PERT unit arrived?

13  A.  Yes.

14  Q.  Why did you -- why did you run the criminal history run?

15  A.  You know, it is normal procedure.  Whenever I, you know,

16  meet somebody that we're detaining, I write down their personal

17  information.  I verify the information that they give me is

18  accurate, that that is who that person is, and I am a police

19  officer, so I check to see if they have a criminal history,

20  helps me determine kind of whom I am dealing with.

21  Q.  Okay.  Well, you requested that information, what,

22  20 minutes or so after you encountered Mr. Nguyen?

23  A.  About 20 minutes, yes.

24          MR. REXRODE:  Nothing further.  Thank you.

25          THE COURT:  Thank you.

```
 1              Your examination, Counsel.
 2              MS. ROXAS:  Your Honor, the same as --
 3              THE COURT:  Sure.  You can do the cross, and then just
 4  let us know when you are ready for the direct.
 5              MS. ROXAS:  Okay.  Just give me one second.
 6              THE COURT:  Certainly.
 7                       CROSS-EXAMINATION
 8  BY MS. ROXAS:
 9  Q.  Officer Valdez, you were questioned on direct examination
10  about your radio transmission that you put over the radio
11  regarding Mr. Nguyen.
12  A.  Yes.
13  Q.  And you were questioned on Elite saying that he was trying
14  to get into the street earlier but right now he is standing
15  here on the sidewalk yelling?
16  A.  Yes.
17  Q.  And you testified that you didn't actually see him get --
18  try to get on the street; correct?
19  A.  No, I did not see what was described to me by another
20  security guard.
21  Q.  And part of your training with respect to 5150 or
22  investigating any matter, you are trained to take into
23  consideration information that other people give you; correct?
24  A.  Yes.
25  Q.  And observe?
```

```
 1   A.   Yes.
 2   Q.   And you take that information and you apply it to what you
 3   see and the context of the situation; correct?
 4   A.   Yes, the totality of the circumstances, yes.
 5   Q.   And that is what you did in this case?
 6   A.   Yes.
 7   Q.   And when you called to find out Mr. Nguyen's background,
 8   you already observed him in the crowd; correct?
 9   A.   You mean the criminal check, is that --
10   Q.   Yes.  I'm sorry.
11   A.   Yes.  I had already been observing him at that point, yes.
12   Q.   And you already came to a determination?
13   A.   Yes.
14   Q.   And requesting background was just protocol?
15   A.   Yes, it was just part of my normal routine.
16        MS. ROXAS:  Your Honor, at this time I'll just conduct
17   direct examination.
18        THE COURT:  Okay.
19             DAVID VALDEZ,
20           DIRECT EXAMINATION
21   BY MS. ROXAS:
22   Q.   Officer Valdez, you are employed with the San Diego Police
23   Department; correct?
24   A.   Yes.
25   Q.   And when did you first start with the SDPD?
```

```
 1   A.   April of 2008.
 2   Q.   And is that the time that you underwent the police academy?
 3   A.   Yes.
 4   Q.   And your title was police recruit at the time?
 5   A.   Yes.
 6   Q.   And did there come a point when you changed titles to
 7   police officer?
 8   A.   Yes.
 9   Q.   When was that?
10   A.   October of 2008.
11   Q.   And did you hold that same title on December 30th, 2010?
12   A.   Yes.
13   Q.   And as part of your police academy training you underwent
14   some basic training with respect to 5150, under the Welfare and
15   Institutions Code?
16   A.   Yes.
17   Q.   And please explain to the Court what your -- what the
18   training was with respect to that area?
19   A.   Training teaches us to learn how to identify when someone
20   is a danger to themselves, a danger to others, and/or gravely
21   disabled.
22   Q.   And based on your training did you see Mr. Nguyen on
23   December 30th, 2010, exhibiting behaviors of that?
24   A.   Yes.
25   Q.   Can you describe to the Court what you saw?
```

1   A.  I saw him to be very, very angry and full of rage.  He had

2   this wide-eyed, blank stare on his face as he was marching back

3   and forth and pacing back and forth, holding that large, you

4   know, sign with the stick attached to it, just was really

5   emotional and an angry look.

6       And I heard him screaming, yelling incoherently, using

7   profanity, just all of that as he was walking back and forth.

8   And the people that were around him, the kids and women, the

9   men, they were all kind of just kind of getting out of his way,

10  and as I watched him, people were coming up to me and saying,

11  are you going to do something about this?

12  Q.  You spoke on direct about how his behavior, specifically

13  his language and yelling and tone, and how that was out of

14  context.  Can you please explain to the Court how that behavior

15  is out of context?

16  A.  For that day -- we were at the balloon parade.  There was

17  the big balloon displays and the marching bands and the girls

18  with the pom-poms, the dancers.  There was kids there sitting,

19  standing, watching the parade with their parents, with people.

20  It just -- it just seemed out of place for him to be doing that

21  right there.

22  Q.  Let's talk specifically about December 30th, 2010, when you

23  first came into contact with plaintiff.  How was it that you

24  came into contact with him?

25  A.  I was -- I was working a traffic post at Harbor and Ash,

1  and while working the traffic post I was stopped by a security

2  guard who approached me and told me about this person creating

3  a disturbance.

4  Q.  Is that one of the Elite Security guards?

5  A.  I think he was a county security guard.  I don't recall

6  exactly.

7  Q.  Okay.  And what did the security guard tell you?

8  A.  Something to the effect of leading to describe somebody

9  creating a disturbance for the parade-goers along the parade

10  route.

11  Q.  And what did you do in response to the security guard

12  telling you this?

13  A.  I broadcast over the police radio that I was going to go

14  investigation someone causing a 415 for people on the parade

15  route.

16  Q.  Did you do this based on what the security guard told you?

17  A.  Initially, yes.

18  Q.  And what did you do in response?

19  A.  I began to walk in the direction the security guard

20  pointed.  He said -- he said the gentleman was up the street

21  from me, so I began walking in that direction.  As I walked in

22  that direction, there were a few people that came up to me,

23  telling me there is someone up the street, pointing in the same

24  direction as the security guard, causing a disturbance, causing

25  problems for people along the parade route, and they were

1    walking away scared, that they couldn't stand there, sit there,

2    be in that area around him.

3    Q.   Did you understand them to be spectators?

4    A.   Yes.

5    Q.   And is there anything else that the spectators told you

6    with respect to Mr. Nguyen?

7    A.   Not that I can remember specifically, no.

8    Q.   What was their demeanor as they were telling you or as they

9    were complaining about Mr. Nguyen essentially?

10   A.   They seemed scared and concerned, like they couldn't be

11   there.

12   Q.   And they physically described the plaintiff?

13   A.   The Elite -- the security guard initially did.  If they

14   did, I don't recall, but I do remember them kind of like bread

15   crumbs, kind of pointing in that same direction where I was

16   walking towards where they said he was at.

17   Q.   When the spectators came to complain about Mr. Nguyen's

18   behavior, did you understand them to be referring to the same

19   person that the security guard was referring to?

20   A.   Yes.

21   Q.   And what did you do in response to the spectators coming to

22   complain to you?

23   A.   I, you know, as they said that, I knew that I had to get

24   there, that I had to investigate further as to who this person

25   was causing a disturbance, what is he doing that all these

1   people are telling me that I needed to go do something about

2   it.

3   Q.   Did there come a point that you arrived at the location?

4   A.   Yes.

5   Q.   Did you see the plaintiff?

6   A.   Yes.

7   Q.   Where was he when you saw him?

8   A.   He was just -- I was on the east curb line of Harbor Drive.

9   He was just south of the scaffolding there, the grandstand that

10  was there.  He was pacing back and forth from the grass to the

11  sidewalk, kind of perpendicular to where I was standing there

12  watching him.

13  Q.   What was he doing when you saw him?

14  A.   He had his -- he had the large sign that was described to

15  me earlier by the security guard.  He held it in his hands

16  tightly.  He was looking straight up screaming, yelling

17  incoherently, using profanity.  He was pacing back and forth,

18  and as he was marching.

19       He was kind of going in and through people that were just

20  kind of getting out of his way, people that just couldn't stand

21  there, couldn't sit there, and he kept going back and forth

22  along the sidewalk and the grass right in front of me.

23  Q.   Did he physically make contact with other people?

24  A.   Not that I saw, no, not that I recall anybody indicating,

25  no, but it was pretty close.  It was a crowded area.  There

 1   were people sitting there, standing there, and people kind of

 2   walking back and forth along Harbor -- on the sidewalk on

 3   Harbor Drive, I imagine, looking for a spot to see the parade

 4   or just passing through.

 5   Q.  And how would you describe his demeanor?

 6   A.  Very angry, very agitated, just very -- just, like, very

 7   out of control, not someone that I would be able to go up to

 8   and talk calmly with.

 9   Q.  And how loud was he with in comparison to the rest of the

10   crowd?

11   A.  His voice carried well over the crowd.  I could clearly see

12   that it was him yelling as I watched him.

13   Q.  If you sat there and closed your eyes, would you be able to

14   see where he was -- I'm sorry -- would you be able to determine

15   where he was based on the loudness?

16   A.  Yes, most definitely.  One of the examples, if I closed my

17   eyes and heard the screaming and yelling, I knew that was the

18   guy scheming and out of control.

19   Q.  You could base that on the tone of his voice?

20   A.  Not the just the tone of voice but the facial expression,

21   the rigidity of carrying the sign, just pumping it up and down

22   back and forth.

23   Q.  At this point how far away were you from him?

24   A.  I was 20 to 25 feet away from him marching back and forth.

25   Q.  Can you describe the sign that he was holding?

```
 1   A.   A large, white sign with black writing on it attached to a
 2   large wooden stick.
 3   Q.   About how long tall was this stick?
 4   A.   As easily as tall as I am.
 5   Q.   How tall are you?
 6   A.   I am five-foot-eight.
 7   Q.   Was it taller, about the same, or something else?
 8   A.   I would say about the same, about the same as tall as me.
 9   Q.   Taking all of his behaviors, put them together, what is --
10   what does that indicate to you based on your training and
11   experience at the time?
12   A.   Well, I mean, this person was definitely the person that
13   was described to me as causing the 415, causing that
14   disturbance, but it seemed more than that.  It seemed that this
15   was someone who was in need of possible medical attention.  I
16   needed to investigate further as to what happened, what was
17   wrong with him, why is he doing what he is doing.
18   Q.   Did there come a time when you saw Officer Lopez?
19   A.   Yes.
20   Q.   And what happened once you saw Officer Lopez?
21   A.   Once he arrived on scene with me, together we approached
22   Mr. Nguyen and began to try to talk with him.
23   Q.   And did you approach him?
24   A.   Yes.
25   Q.   And when you approached him, what did you say?
```

1   A.   I don't recall specifically what we said.  I think we were

2   trying to talk with him, trying to calm him down.  I don't

3   specifically recall.  He appeared to be ignoring us talking

4   with him, and not just the, I am not listening to you, just you

5   are not even there, you know, just kind of just continuing to

6   ramble on very loudly, screaming, yelling.

7   Q.   What was he doing with the sign as you were talking to him?

8   A.   He was holding the sign right in front of him, really high

9   up, like this, (indicating), with both hands holding tightly.

10  I could see in his hands how tightly he was holding the stick.

11  We were concerned about that.  I was concerned about that.

12  Q.   What was your concern about that?

13  A.   The way that he was so angry and agitated, he could

14  potentially use that as weapon.

15  Q.   What did you do next?

16  A.   At that point we -- he was kind of ignoring our verbal

17  commands, our conversation, so at that point I decided, you

18  know, I need to hold him.  We held him.  He held his sign in

19  his arms.  We put his hands behind his back, and we placed him

20  in handcuffs.

21  Q.   When you -- I'm sorry.  Did you try to on take the sign

22  away from him?

23  A.   I think at some point we struggled with the sign, and the

24  sign kind of slightly broke.  I don't recall what happened to

25  it after that, because I was on one side of Mr. Nguyen and

1  holding his arms, and Officer Lopez was on the other side of

2  him holding his arms together.  We were placing him in

3  handcuffs.

4  Q.  Did he fight you when you tried to take the sign away?

5  A.  It was a minor struggle because he wouldn't let go of it.

6  He was holding it with both hands very tightly.

7  Q.  And why did you take his sign away?

8  A.  Once again, I thought it could be used as a weapon.  There

9  was a lot of people kind of standing and sitting and walking

10  around us, you know, just trying -- and I didn't want to get in

11  a fight with somebody in front of everybody that close where

12  somebody could get hurt.

13  Q.  When you say "a fight," what do you mean by that?

14  A.  You know, a struggle with somebody, you know, fighting over

15  that the stick that he had in his hand.

16  Q.  He didn't appear to be willing to let it go?

17  A.  No.  He did not appear to be willing to let it go.

18  Q.  And why did you remove him from the crowd?

19  A.  To further our investigation to whether or not he needed to

20  receive psychiatric care.

21  Q.  Did you remove him because he was cursing?

22  A.  No, not that in and of itself, no.

23  Q.  What about his yelling?

24  A.  All of that, the yelling, the screaming, the cursing, just

25  the outrage.

1   Q.   And what did that indicate to you?

2   A.   He was someone that was a danger to other people.

3   Q.   Did it indicate anything else?

4   A.   That he was -- he was the person, once again, that we

5   initially -- or that I was initially being directed to that was

6   creating a disturbance, that was causing the 415.

7   Q.   Did the reaction of the crowd at all concern you?

8   A.   Yes.

9   Q.   What was your concern?

10  A.   My concern was that I didn't want, you know, somebody to --

11  he was going to possibly confront somebody else, maybe get in a

12  physical altercation with somebody else, continue to scare

13  people away from that immediate area, you know, get in a

14  physical fight with somebody in that immediate area, somebody

15  that would challenge him.  I didn't want to see any of that.

16  Q.   Could you predict something like that?

17  A.   No.  It was such an awful situation that he was so

18  unpredictable in my opinion, and because -- you know, it was a

19  parade, people were just there to watch the parade, pass

20  through, and enjoy the day.

21  Q.   And did there come a time when you brought him to the

22  police vehicle?

23  A.   Yes.  After placing the handcuffs, Officer Lopez and I

24  walked him back to the police vehicle, sat him in the backseat

25  of the police car so we could further talk with him in private.

 1   If he did suffer from a mental illness, we wanted to be able to

 2   talk with him in an environment where it was just us and him.

 3       In my opinion, you would be able to relay information

 4   better than if we were out among the crowd where I know I would

 5   be embarrassed to be talking in front of a bunch of other

 6   people I don't know about my problems.

 7   Q.   Did there come a point when Sergeant Cessena arrived?

 8   A.   Yes.

 9   Q.   And what happened once he arrived?

10   A.   Described to him kind of what I had with Mr. Nguyen.  At

11   that point the decision was made that we need to call a PERT

12   clinician to further evaluate him for psychiatric care.

13   Officer Lopez and I were assigned to the Holiday Bowl Balloon

14   Parade.  They wanted the two of us to be back at our traffic

15   posts, so it was a combination of that.

16   Q.   And Officer Cessena, did he essentially give you the order

17   to call the PERT clinician?

18   A.   He gave us, not me directly, but he gave us the word that,

19   yes, and that I don't know who specifically he spoke to about

20   that, but I know it was done.

21   Q.   He was your supervisor that day; correct?

22   A.   Yes.

23           MS. ROXAS:  Just give me one moment, Your Honor.

24   BY MS. ROXAS:

25   Q.   Officer Valdez, when you did a check on Mr. Nguyen's

1    background?  Do you specifically recall what you -- what that

2    background revealed, what that search revealed?

3    A.  I'm sorry.  I don't recall what it revealed, no.

4              MS. ROXAS:  Your Honor, may I approach the witness?

5              THE COURT:  Yes.  Are you showing him an exhibit?

6              MS. ROXAS:  It is not admitted yet.  I just want to

7    refresh his recollection.

8              THE COURT:  Just mark it, though.

9              MR. STUTLER:  W.

10             MS. ROXAS:  It is Defendant's Exhibit W for

11   identification.

12             THE COURT:  All right.

13   BY MS. ROXAS:

14   Q.  Officer, I am showing you what has been marked for

15   identification as Defendant's Exhibit W.  Can you please take a

16   look at that document?

17   A.  Okay.  Yes.

18   Q.  And --

19             MR. REXRODE:  Your Honor, I'm sorry.  Before any

20   questions are asked, I'll have an objection.

21             MS. ROXAS:  You want to take a look?

22             MR. REXRODE:  Just the first page.  I'm sorry.  The

23   whole document.  I'm sorry.

24   BY MS. ROXAS:

25   Q.  Officer Valdez --

1          THE COURT:  What is the objection, Counsel?

2          MR. REXRODE:  Your Honor, my objection is to

3   foundation.  It is being used to refresh his recollection, but

4   there is no foundation that he viewed this document during his

5   encounter with Mr. Nguyen.  This is different than the dispatch

6   conversation in which this officer requested a criminal history

7   run that I referenced and contains substantially more

8   information.

9          THE COURT:  What is the -- what is the document,

10  Counsel?

11         MS. ROXAS:  It is a -- it is the background check that

12  he requested, that Mr. Rexrode referred to during his direct.

13         MR. REXRODE:  It is not -- it is a criminal history

14  run.  What I was referring to was the radio transmission that

15  this officer had with dispatch getting the result of whether

16  there were any warrants.

17         My objection to this document is that there is no

18  foundation that this was before the officer during this time

19  period.

20         THE COURT:  So this is the criminal history report

21  that he requested?

22         MS. ROXAS:  Yes.  I believe it was 10:20 -- 10:17,

23  10:20, and, Your Honor, I am not using it to admit it.  I

24  specifically asked him whether or not he recalled what the

25  request -- the information that he got as a result of the

1    request.  He said he didn't recall, so therefore, I am just

2    trying to refresh his recollection.  As far as foundation, I am

3    not trying to admit it into evidence.

4          THE COURT:  Mr. Rexrode, then, this is the -- the

5    officer requested a records check, and this is what the records

6    check is.

7          MR. REXRODE:  I don't believe so.  I don't believe

8    this information that she is asking him to refresh his

9    recollection with, this information was before this officer at

10   the time.  That is why I am --

11         THE COURT:  But would he have been told this orally?

12         MR. REXRODE:  What I am proffering to the Court is

13   that what she is using to try to refresh his recollection has

14   substantially pages and pages more information than what was

15   orally communicated to the officer by radio dispatch at the

16   time.

17         THE COURT:  Counsel, so when -- what is your

18   understanding as to when the witness first saw this?

19         MS. ROXAS:  I don't believe it is a matter of seeing

20   it, Your Honor.  I believe it is a matter of gathering his

21   information and his investigation into the matter.  I think

22   that he was being questioned on direct with respect to what

23   exactly he called in for and why he called in for it at the

24   time that he called in for it.  I am just simply getting what

25   he got out of it.

```
 1              THE COURT:  So when did he first see this?

 2              MS. ROXAS:  I would have to inquire.

 3              THE COURT:  All right.  Please, do so.

 4   BY MS. ROXAS:

 5   Q.  Officer Valdez, when did you first see this document?

 6   A.  This would have been when I conducted my records check.  I

 7   get information over the radio from the dispatcher, and in

 8   addition to that any pertinent information that would come up,

 9   I get -- it gets sent directly to MCT, our computer information

10   inside the police car.

11   Q.  Did you receive that document as a result of MCT that you

12   referred to?

13   A.  It indicates that I received, Event 52, that my event was

14   designated that day.

15   Q.  Does it show that you received this at 10:18 AM on

16   December 30th, 2010?

17   A.  Yes, it does.

18              MS. ROXAS:  Your Honor, he received it almost one

19   minute after he put the call in.

20              MR. REXRODE:  Same objection, Your Honor.  The

21   question wasn't answered.  Whether it came through -- into a

22   computer console in his squad car is different than whether he

23   viewed it.  And I would say if he is on -- on radio

24   communication at 10:20 saying, hey, do you have any record,

25   then he is probably not looking at this on his screen at the
```

```
 1    time.
 2            THE COURT:  I will overrule the objection at this
 3    point, and I'll allow to you cross-examine on the point.  It is
 4    subject to a motion to strike.
 5            MR. REXRODE:  Thank you, sir.
 6    BY MS. ROXAS:
 7    Q.  Officer Valdez, you recognize this document; correct?
 8    A.  Yes.
 9    Q.  Okay.  And what do you recognize this document to be?
10    A.  This is the -- basically it is -- it describes --
11    Mr. Nguyen, his name, his birthday, you know, physical
12    descriptor, and that there was a restraining order issued to
13    him.
14    Q.  And was this document generated as a result of your
15    background check request?
16    A.  It would have been, yes.
17    Q.  And what type of restraining order came up as a result of
18    this request?
19    A.  Domestic protective order.
20    Q.  What does that mean to you?
21    A.  It means that he -- that someone is a protected party
22    listing Mr. Nguyen as the -- as the, I guess, the plaintiff,
23    the person to be protected from.
24    Q.  Protected from what?
25    A.  I'm sorry.  Domestic protective orders, you have your
```

1  relationship, your man and woman, so the woman is the protected

2  person in this party, so -- I'm sorry.  I am missing my words

3  here.

4  Q.  It is okay.

5  A.  That it is a protective order for a domestic incident

6  protected order -- the name is crossed out -- a listed person

7  that he knows or has a relationship or something like that was

8  issued by the Court.

9  Q.  Why would a protective order or domestic violence

10  protective order generally be issued?

11        MR. REXRODE:  Objection, foundation.

12        THE COURT:  Sustained.

13  BY MS. ROXAS:

14  Q.  Moving on, Officer, if you turn to the second page, is

15  there any other information that this search revealed with

16  respect to Mr. Nguyen?

17        THE COURT:  Counsel, are you asking him about what is

18  in the document as opposed to -- these questions now, the last

19  question is what is in the document, so you are asking him to

20  testify what is in the document.  The document is not in

21  evidence.

22        MS. ROXAS:  Okay.  I'm sorry, Your Honor.

23  BY MS. ROXAS:

24  Q.  Does the document refresh your recollection as to any other

25  information that was given to you with respect to Mr. Nguyen's

1   background?

2   A.  No, not that I recall.

3           MS. ROXAS:  I have no further questions, Your Honor.

4           THE COURT:  All right.  Thank you.

5                   REDIRECT EXAMINATION

6   BY MR. REXRODE:

7   Q.  Officer, you still have that exhibit in front of you?

8   A.  Yes.

9   Q.  You don't recall when you first looked at that exhibit;

10  correct?

11  A.  I was with Mr. Nguyen by my police car, so I would have

12  looked at it at some point, yes.

13  Q.  But you don't know when you did?

14  A.  I don't recall specifically when I did, no.

15  Q.  And there -- although you testified and there is, indeed,

16  the time of 10:18; correct?

17  A.  Yes.

18  Q.  Okay.  Two minutes later, you were calling dispatch; right?

19  A.  Yes, around that time, yes.

20  Q.  Well, two minutes later, at 10:20?

21  A.  According to the other timestamp that you have there, yes.

22  Q.  Let's play the audio.

23          THE COURT:  What exhibit is this, "I"?

24          MR. REXRODE:  This is "I," and unfortunately they are

25  not in order.  This is channel ten, which is 12:34.

1            THE COURT:  And J -- J -- there is a transcript in J

2   that relates to this; is that right?

3            MR. REXRODE:  There is.  I am going to play one of the

4   six audio clips from Exhibit A.  The corresponding transcript

5   is J, Bates Stamp 23.

6            THE COURT:  Wait a second, please.

7            THE WITNESS:  Is this my radio transmission that you

8   are going to play back?

9            THE COURT:  And so -- the corresponding transcript, is

10  that on J, page 23?

11           MR. REXRODE:  Yes, sir, and it is about halfway down

12  the page.  You'll notice the transcript has the channel and

13  time.

14           THE COURT:  All right.

15      (Audio playing.)

16           MR. REXRODE:  That was the wrong one.

17      (Audio playing.)

18           MR. REXRODE:  And I am very sorry.  I didn't notice

19  that.  If I could make an oral motion to redact the Social

20  Security, if the court reporter transcribed it, but I don't

21  believe that she did, so we don't have an issue.

22           THE COURT:  The recording is not being reported.

23           MR. REXRODE:  Okay.  I didn't know if the court

24  reporter was taking it down.

25           THE COURT:  No.

```
 1            MR. REXRODE:  And I'll redact it from the transcript
 2   before putting in the official one.
 3   BY MR. REXRODE:
 4   Q.   Okay.  So that was you on that recording?
 5   A.   Yes.
 6   Q.   And you are asking for a criminal history run for
 7   Mr. Nguyen?
 8   A.   Yes.
 9   Q.   Okay.  And that is at 10:20?
10   A.   Yes.
11   Q.   According to the recording?
12   A.   According to the recording.
13   Q.   Okay.  The exhibit that the city attorney showed you
14   earlier, just to be clear, you don't have a recollection of
15   when you had that information in terms of the timeline of your
16   interaction with Mr. Nguyen?
17   A.   I do not, no, but --
18   Q.   I'm sorry.
19   A.   But one thing that is normal practice for me on inquiry --
20   which is what that is, waiting to, you know, do a records check
21   on somebody -- is if I have picture ID, I'll go into my
22   computer system in the police car and type in that information,
23   and some information will come up then.
24   Q.   Okay.
25   A.   I may have done that beforehand.
```

1   Q.   May have?

2   A.   Yes.

3   Q.   Have no recollection of when you received or saw the

4   information in the Government's exhibit about the restraining

5   order during your interaction with Mr. Nguyen?

6   A.   Yes.

7   Q.   What we do know from the recording, though, is you called

8   in for a criminal history check at 10:20; correct?

9   A.   Yes.

10   Q.   You received a response that there were no wants; correct?

11   A.   Yes.

12   Q.   And you did not receive information about the domestic

13   violence restraining order in that audio recording?

14   A.   Not that audio recording, no.

15   Q.   Okay.  You mentioned when you were talking with the city

16   attorney that you -- that when you were observing Mr. Nguyen,

17   he didn't strike you as the kind of person you could walk up to

18   and talk calmly to.  Do you remember saying that?

19   A.   Yes.

20   Q.   But you did walk calmly up and talk to him calmly or tried

21   to?

22   A.   Tried to, yes.  He did not respond to us at all.

23   Q.   Okay.  And you used the word incoherent a few times, and I

24   just want to tack down what you mean by incoherent, okay, when

25   you use that word.

1  A.  Yes.

2  Q.  All right.  So if I say the statement to you, "From,

3  minutes, pretty, now, history," would you consider that

4  incoherent?

5  A.  I would say it is a set of words.  What I implied by

6  incoherent, is that they were loud and fast together to where I

7  couldn't make out what he is saying specifically.

8  Q.  Okay.  So when you say incoherent -- and correct me if I'm

9  wrong -- but what I am hearing is when you say incoherent, you

10  don't mean nonsensical phrases, just phrases that are shouted

11  at such speed that you can't understand what is being said?

12  A.  I would say both, yes, nonsense -- nonsequential [sic] --

13  I'm sorry -- and very loud words that I can't make out what is

14  being said.

15  Q.  Okay.

16  A.  Just a lot of emotion behind the words where you just can't

17  understand it.

18  Q.  Perfect.  Do you recall that Mr. Nguyen has a very thick

19  accent when he speaks?

20  A.  I don't recall that now.

21  Q.  Okay.  Let's talk about that, the difference between

22  nonsense and incoherent.  Okay.  You mentioned that -- your

23  description of him being incoherent was because of the speed he

24  was talking and the nonsense that he was talking?

25  A.  The speed, yes.  The speed had a lot to do with it, yes.

```
 1   Q.   Okay.  But also the nonsense is what you said?

 2   A.   The nonsense --

 3           MS. ROXAS:  Objection, Your Honor, misstates testimony

 4   in evidence.  He used it as a hypothetical, not as the witness'

 5   testimony.

 6           THE COURT:  Overruled.  You can continue.

 7           MR. REXRODE:  Thank you.

 8   BY MR. REXRODE:

 9   Q.   When we were discussing what you mean by the word

10   incoherent, in this situation you were talking about the speed

11   with which Mr. Nguyen was talking; correct?

12   A.   Yes.

13   Q.   And also the nonsense that he was saying?

14   A.   You say nonsense, what do you mean by nonsense?

15   Q.   That is what I am asking you.  You said nonsense?

16   A.   I think I was repeating what you said about nonsequential

17   statements where you were saying different words that kind of

18   didn't seem to match up.

19   Q.   Let me ask you it this way, you don't recall Mr. Nguyen

20   shouting nonsensical statements in the sense of random words

21   put together?

22   A.   I don't recall -- well, yes, where it was kind of -- kind

23   of loud, fast, you know, just kind of like a broken record, you

24   know.  I wish I could recall specifically the words.  That

25   would probably help you out better, help me out better with
```

1    answering your questions.

2    Q.  I wish you could, too, but it has been a long time; right?

3    A.  Yes.

4    Q.  So no big deal.  We'll get there.  You just said a broken

5    record.  To my mind a broken record refers to the same thing

6    over and over and over again.  Is that how you meant to use the

7    term broken record?

8    A.  Yes.

9    Q.  So Mr. Nguyen was shouting very quickly, the same phrase

10   over and over and over and over again?

11   A.  At some point I did recognize that to be what was

12   happening, yes.

13   Q.  And you don't recall -- I'll just do -- this is -- this is

14   an example -- okay --

15   A.  Okay.

16   Q.  -- of what I would consider a nonsense sentence, "Three,

17   get, sidewalk, you."  Would you agree with me that is a

18   nonsensical sentence?

19   A.  Yes.

20   Q.  It doesn't mean anything to you?

21   A.  Yes.

22   Q.  Okay.  Would you agree with me that "CIA is demon" is not a

23   nonsensical statement?  It means something.

24   A.  The way you say it, yes.

25   Q.  Okay.  I am not asking whether you agree that the CIA is

1   the equivalent of a demon, but it is not nonsensical in the

2   sense of random words put together.  Would you agree with that?

3   A.  Yes.

4   Q.  Okay.  Do you have any recollection that Mr. Nguyen was

5   yelling things that were similar to what was written on his

6   sign?

7   A.  I don't recall specifically what he was saying, no.

8   Q.  Okay.

9            MR. REXRODE:  Thank you, sir.

10            THE WITNESS:  Thank you.

11            THE COURT:  Any additional examination, Counsel?

12            MS. ROXAS:  Just quickly, Your Honor.

13                        CROSS-EXAMINATION

14   BY MS. ROXAS:

15   Q.  Officer Valdez, this -- the result of your background check

16   on Mr. Nguyen, do you know whether or not the timing on that

17   specific report is synced with the timing of the radio

18   transmission that has been previously admitted as Exhibit J?

19   A.  No.  The fact that they are two minutes apart seems very

20   close, and I could see that being, you know, timestamps being

21   wrong.

22            MR. REXRODE:  Objection, move to strike, speculation.

23   I think the answer was, no, he didn't know.

24            THE COURT:  Overruled.

25   BY MS. ROXAS:

1   Q.  Do you recall using the information that you received as a

2   result of that background search in evaluating the situation

3   that was with respect to Mr. Nguyen?  Do you recall using that

4   information?

5           MR. REXRODE:  Objection, vague as to background

6   search.  We've been discussing two of them.

7           THE COURT:  Sustained.  Just clarify exactly what the

8   information is and who you are referring to.

9           MS. ROXAS:  Sure.

10  BY MS. ROXAS:

11  Q.  The information about his outstanding domestic violence

12  order, do you recall using that information when coming to your

13  assessment of Mr. Nguyen?

14  A.  No.  As I stated earlier, it is primarily to make sure that

15  that -- the information that I have of this person, that they

16  give me the picture ID, when I conduct a records check on the

17  dispatch, and they have the computer systems, so they can

18  verify who that person really is -- and in addition, if they

19  have criminal history that I need to be aware of for my safety

20  and public safety.  It is more for that reason.

21          MS. ROXAS:  Thank you.  No additional questions.

22          THE COURT:  Any additional direct examination?

23          MR. REXRODE:  No, sir.

24          THE COURT:  May the witness be excused?

25          MR. REXRODE:  Yes, sir.

1           THE COURT:  You may step down.  Please call your next

2   witness.

3           MR. REXRODE:  Thank you.  Thomas Nguyen.

4           THE COURT:  Please come forward, sir.

5      (Oath administered.)

6           THE CLERK:  Please state your name and also spell it

7   for the record.

8           THE WITNESS:  My name is Thomas Nguyen, T-H-O-M-A-S,

9   N-G-U-Y-E-N.

10                   THOMAS NGUYEN,

11                 DIRECT EXAMINATION

12   BY MR. REXRODE:

13   Q.  It is almost afternoon.  Good afternoon, Mr. Nguyen.

14   A.  Yes.

15   Q.  Where were you born, sir?

16   A.  I was born in Hue City, middle of Vietnam.

17   Q.  And what year were you born in?

18   A.  Pardon me?

19   Q.  What year were you born in?

20   A.  1965.

21   Q.  And when did you leave Vietnam to come to the United

22   States?

23   A.  I leave Vietnam in 1995.

24   Q.  So am I correct, 1995 was the last year that you lived in

25   Vietnam?

1    A.   Yes.

2    Q.   And how did you emigrate here to the United States?

3    A.   My wife was American children.  Her dad, American soldier.

4    Her mom, a Vietnamese.

5    Q.   And did you emigrate here, with the permission of the

6    United States Government?

7    A.   I follow ICE program, the USA program of the Government.

8    Q.   Okay.  I want to talk to you a little bit about your

9    education.  Did you go to school in Vietnam?

10   A.   Yes.  I got a BS degree in physics, and after that I taught

11   physics for five years.

12   Q.   Now, when you say that you taught physics for five years,

13   was that in Vietnam?

14   A.   Yes.

15   Q.   When you came to the United States, what kind of work did

16   you start out doing?

17   A.   The first year I worked in a factory, make furniture in New

18   York.  The next year I moved to San Diego and came back to

19   Grossmont College to study English.

20   Q.   Okay.  So did you get a degree from Grossmont College?

21   A.   No.

22   Q.   Okay.  That was just to study English?

23   A.   Yeah, and some classes to transfer to SDSU.

24   Q.   Did you transfer to SDSU?

25   A.   Yes.

1    Q.   What year was that?

2    A.   1999.

3    Q.   And did you get a degree from -- I'm sorry -- SDSU, do you

4    mean San Diego State University?

5    A.   Correct.

6    Q.   Did you get a degree from SDSU?

7    A.   Yes.  After two years I got master degree in physics.

8    Q.   Any other degrees from SDSU?

9    A.   I continued to study computer science, and I got a second

10   master degree in computer science in 2006.

11   Q.   Now, while you were in school at Grossmont College and

12   SDSU, what type of work would you do?

13   A.   At Grossmont I worked math tutor.

14   Q.   Did you say you were a mathematics tutor?

15   A.   Yes.  And later when I was three years there, I came back

16   and taught mathematics at Grossmont College, and I taught

17   calculus.

18   Q.   At Grossmont College?

19   A.   Yes, for three years.

20   Q.   All right.  When did you stop being an instructor at

21   Grossmont College, a teacher?

22   A.   In spring of 2007.

23   Q.   I want to talk to you a little bit about your family.  Are

24   you married, sir?

25   A.   Currently, I am single.

```
1    Q.   And -- but I think you mentioned that you emigrated to the

2    United States based on your wife's --

3    A.   And my daughter.

4    Q.   And your daughter?

5    A.   Yes.

6    Q.   Are you divorced from your wife?

7    A.   My wife divorced me.

8    Q.   And when did that happen?

9    A.   In 2007.

10   Q.   Do you have any children?

11   A.   I have four children.

12   Q.   And what are their ages, sir?

13   A.   The first daughter is 22 years old, and she graduated from

14   UCSD, and she got a job before she graduated.  The second

15   daughter currently in Miramar College, and two boys, twin boys,

16   12 years old, study at Challenge Middle School.

17   Q.   Now, where are you currently living today?

18   A.   Today I am living with my ex-wife and my children.

19   Q.   Now, you mentioned that you divorced in 2007.  Where did

20   you live following the divorce?

21   A.   2007 my wife filed -- filed the paper, it is not in

22   dissolution yet, and I am moving out, and I stay in a small

23   room, and I live alone for two years.

24   Q.   So -- I'm sorry to interrupt.  Would that take you to about

25   2009?
```

1   A.   Yes.

2   Q.   And in 2009 where did you begin living?

3   A.   In 2009 my wife let me back home to live with her, so I am

4   back home and lived with her about six months, and because we

5   not agree on -- on the CIA problem, she did not want me to

6   protest against CIA, so we had argument, so I move out again,

7   in April 2010.

8       And I decided to live in downtown to protest CIA every day,

9   so from April 2010 until December 2010 I protest around the

10   county, San Diego County so many times with the same poster.  I

11   even protest a lot in front of Hall of Justice.

12       And everything is fine, you know.  Nobody complain about my

13   protesting, and nobody complain about my poster.  It is

14   peaceful, yeah.

15   Q.   If you don't mind, I am going to try to go back to 2010 in

16   April.  You said that you left your wife's home again?

17   A.   Yes.

18   Q.   And decided to live downtown?

19   A.   Yes, in my van.

20   Q.   Okay.  That is what I was going to ask you.  So when you

21   lived downtown -- when you began living downtown in April of

22   2010, where exactly were you living?

23   A.   The most common place, Chase Bank at 101 Broadway, Chase

24   Bank, 100 meters from here.

25   Q.   When you say the most common place you lived was Chase Bank

1    at 101 West Broadway, do you mean that you were living in your

2    van outside of that bank?

3    A.  Yes.  I choose to display in front of the bank because it

4    had many camera, so I thought that camera make me safer, so

5    that is why I picked that place.

6    Q.  Can you explain to me, why would the cameras surrounding

7    the bank help you?

8    A.  Because CIA always, you know, hurt me, torture me in so

9    many ways.  They send homeless and all the people to harass me.

10   Living my -- in my sleep van -- they send people to hit my van

11   when I sleep.  They hit my van.  They run skateboard around in

12   the middle of the night, so they did not let me sleep, and even

13   they threaten me with this, (indicating).

14       Can you read this one, ma'am?

15          THE COURT:  Okay.  No --

16          THE WITNESS:  It start with I -- I am --

17          MR. REXRODE:  Mr. Nguyen -- Mr. Nguyen, if you can

18   give me a second.  Okay.  I'll do my best here.  Okay.

19   BY MR. REXRODE:

20   Q.  Before we move onto the photographs that you would like to

21   show, you mentioned that the CIA would send -- did you say

22   homeless or homeland?  I was a little --

23   A.  Homeless people.

24   Q.  Homeless people to harass you in your van?

25   A.  Yes.

1   Q.   Okay.

2   A.   And all the people, not only homeless, a lot of people.

3   Q.   Now, how long did you live in your van from April 20, 2010,

4   until when?

5   A.   Five years in the road, five years.

6   Q.   Why didn't you get an apartment?

7   A.   Because I didn't get -- SSI is only about $800 a month.  If

8   I rent a room, at least $400, and the money for that, money for

9   that, money for all the things.  I could not live with that

10  amount of money, so I must live in my van to save money to buy

11  food and everything.

12  Q.   Now, before we get to the photographs you would like to

13  show, I want to go back a little bit to around 2006 in your

14  life.  Okay?

15  A.   Yes.

16  Q.   Is it fair to say that 2006 was the beginning of your

17  problems with the CIA?

18  A.   Yes.

19  Q.   Okay.  Could you explain as best you can to the judge how

20  those problems with the CIA began.

21  A.   In March 2006 I had been set up to go to Sharp Memorial

22  Hospital for about one week, and during that time the CIA

23  investigated me.

24  Q.   I'm sorry.  Did you say infected or investigated?

25  A.   No.  Investigated.

```
1   Q.   Investigated.   Thank you.

2            THE COURT:   Could you move the microphone?   You can

3   sit closer or move the microphone closer to you.

4            THE WITNESS:   Yes.

5            THE COURT:   Thank you, sir.

6            THE WITNESS:   And after that they discharged me from

7   the hospital after one week, and they libel me, asked the

8   mental unit to cover up what they had done on me in the Sharp

9   Memorial Hospital.

10  BY MR. REXRODE:

11  Q.   Could you describe what happened to you at Sharp Memorial

12  Hospital that they were trying to cover up?

13  A.   They send the psychological team, surround my room, and in

14  front of my room, every day, and they do the psychological

15  stuff.   They drug me, you know, make me tired, so tired that I

16  lay down on the bed, and they send another patient into my room

17  on the second bed, and that person is undercover.

18      Now, at that time I did not know it, so that man try to

19  talk with me a lot and asked me about my family, everything

20  about me, so I thought he took a patient like me, but later on

21  I realize that he was a member of the psychological team.

22           THE COURT:   All right.   Next question.

23           MR. REXRODE:   Thank you, sir.

24  BY MR. REXRODE:

25  Q.   During these tests, did the CIA ask you to join their
```

1    organization?

2    A.   Yes.   They say that they need to test my brain to see I am

3    qualified enough to be a member of their team, you know.   I am

4    looking for a job, so I was happy.   I agreed with them to be a

5    specimen for the mind reading machine.

6    Q.   A specimen for the mind reading machine?

7    A.   Yes.

8    Q.   Thank you.   Did you ever join the CIA?

9    A.   Never.   They lied to me.

10   Q.   What was the lie that they told you?

11   A.   They lied to me.   If I am qualified, I work for them, but

12   actually they just wanted to use me.   Why me?   Because I am a

13   musician.   I am two master degree in physics and computer

14   science, and I am -- taught calculus, and I played chess.

15       I had so many talents.   I invented a mathematic operation.

16   I invented music notation, different way to write music and to

17   learn music, so I am the best candidate for that kind of mind

18   reading machine.

19   Q.   So after the CIA tricked you and didn't offer you a

20   position, did the CIA continue to be in contact with you?

21   A.   Yes.   They continued to torture me because when I left the

22   hospital, I was so afraid of them, so I did not sign the

23   discharge papers.   I called -- I called my niece and took me

24   home, and tomorrow -- that next day, tomorrow morning, I was

25   home with my children, and I hear somebody knock on my door.

1    Q.   Could I stop you there for a second.  I thought you said

2    tomorrow morning.  Do you mean the morning after you left the

3    hospital?

4    A.   Yes, the next day.

5    Q.   Okay.

6    A.   Yes, the next day.

7    Q.   Please go ahead.

8    A.   And I went to the door to open.  My children follow me.

9    When I open the door, I almost had a heart attack.  Three

10   policemen with gun on hand and point into me, the two men at my

11   door, one woman back, you know, about five feet away.  Three of

12   them pointing it at me and my children.  So I was so very

13   scared.  My children much more scared than me.

14        And they saw my children so scared, so tried to calm down

15   my children, and the problem that they asked me why I did not

16   sign the hospital discharge paper yesterday, yes.

17   Q.   Okay.  And just so we're clear, these are events that took

18   place in 2006?

19   A.   Yes.

20   Q.   Okay.  From these events in 2006 up to 2010, was there ever

21   a time period that the CIA left you alone?

22   A.   I don't think so.  I have been tortured every day in

23   different ways.  The most common torture is because I had to go

24   to dialysis center, CIA order medical staff at dialysis center,

25   torture me every time I went there.

1  Q.  And how many times a week did you have to go to the --

2  A.  Three times a week, Monday, Wednesday, Friday, for four

3  hours inside the clinic.

4  Q.  And this was at a dialysis center?

5  A.  Yeah, and they torture me, both physical and mentally.

6  Q.  Let's talk about the dialysis just very briefly, if we

7  could.  Was there a point where you were kicked off of a

8  transplant list?

9  A.  Yes.  That was Sharp Memorial Hospital.  That is -- not

10  surprised, but later I transfer to Green Hospital, Green --

11  Scripps Green Hospital, and I have a lot of paper here.

12  Q.  Yes.

13  A.  This is the psychiatric --

14  Q.  Hold on, Mr. Nguyen.  I just want to ask you a few

15  questions about Green Hospital.

16  A.  Yes.

17  Q.  When you transferred to Green Hospital, were you put back

18  on the transplant list?

19  A.  Yes.

20  Q.  Did you successfully get a transplant?

21  A.  I got a kidney transplant more than three months ago.

22  Q.  And things are going well with that?

23  A.  Yeah.  The kidney work very well.

24  Q.  Now, from the time in 2006 up until December of 2010, was

25  it your practice -- you know what, actually this might help.

1         THE COURT:  Actually, Counsel, at this time it is

2    noon, so we're going to take a break at this time, and so we'll

3    be in recess until 1:15.

4         So you can step down, Mr. Nguyen.

5         MR. REXRODE:  Thank you.  And we had a scheduling

6    question of the Court, how long the Court wanted to go.  There

7    is one witness that we're trying to not to take up their time,

8    and we don't know whether to bring them back this afternoon.

9    Do you know how long it will be?

10        THE COURT:  I usually go to 4:30 or so, so -- you can

11   step down, Mr. Nguyen and sit at your table, if you would like.

12        MR. REXRODE:  You can come down.

13        THE COURT:  Mr. Rexrode, just by way of planning, do

14   you have a guess as to how many more witnesses you have?

15        MR. REXRODE:  This is my final witness, Your Honor.  I

16   have a report to move into evidence.  It will take a minute.

17   There is no objection from the city.

18        THE COURT:  How about the city?  Do you have an idea,

19   Counsel?

20        MR. STUTLER:  Yeah.  I think we have -- we have a

21   total of four witnesses, four witnesses.

22        THE COURT:  All right.

23        MR. STUTLER:  And I think we'll probably be done

24   certainly tomorrow, maybe by midday tomorrow.

25        THE COURT:  All right.  And so my inclination is to go

```
 1   to about 4:30 today, maybe 4:45.

 2            MR. REXRODE:  Okay.

 3            THE COURT:  And we'll be in recess until 1:15.  We

 4   will take a midday break around 3:00 or 3:30, but if at any

 5   time anybody needs to take a break, you know, other than those

 6   times and you need a break for any reason, just let me know,

 7   and I can shift the break around, so it is not set in stone.

 8            If people need to take a break, I am more than happy

 9   to give you one, but typically what we do is to break until

10   about 1:15, and around 3:00 we'll have another break, and we'll

11   go to 4:30, and I expect we'll start tomorrow morning at 9:00.

12            MR. REXRODE:  Okay.  Thank you.

13            THE COURT:  Enjoy your break.  We'll see you back at

14   1:15.

15       (Lunch recess ensued from 12:06 p.m. to 1:15 p.m.)

16       THE COURT:  All right.  Mr. Nguyen, you may resume the

17   witness stand.

18            MR. REXRODE:  Thank you, Your Honor.  Before

19   Mr. Nguyen comes back up, I believe the city is requesting to

20   take a witness out of order.

21            THE COURT:  Okay.

22            MR. REXRODE:  Which we have no objection taking a

23   witness out of order, but I do have an objection to the

24   relevance of the witness.

25            THE COURT:  Okay.
```

```
 1              MR. REXRODE:  I can lodge it now or later.

 2              THE COURT:  Why don't we do it -- why don't I hear it,

 3    and you can move to strike after the testimony is in.

 4              So please call your witness, Counsel.

 5              MR. STUTLER:  Your Honor, at this time the defense

 6    calls Thomas Spriet -- John.  Excuse me.

 7         (Oath administered.)

 8              THE CLERK:  If you could please state your name and

 9    also spell it for the record.

10              THE WITNESS:  John Spriet, Jr., J-O-H-N, S-P-R-I-E-T,

11    J-R.

12                        JOHN SPRIET,

13                     DIRECT EXAMINATION

14    BY MR. STUTLER:

15    Q.  Good afternoon, Mr. Spriet.

16    A.  How are you, sir?

17    Q.  Good.  Did you work at the Big Balloon Parade on

18    December 30th, 2010?

19    A.  I did.

20    Q.  Would you tell the Court what your job was.

21    A.  That particular event I was stage manager at that event.

22    Q.  What does a stage manager do?

23    A.  Stage manager is controlling sets itself, make sure the

24    ties on the set are straight, safe, clean.  Make sure that the

25    talent has what it needs.
```

1   Q.   You are a stage manager for Cox Channel Four, is that what

2   it is called?

3   A.   That particular event, yes, sir.

4   Q.   When are you talking about the talent, who are you talking

5   about?

6   A.   Jane Mitchell and Dennis Morgigno.

7   Q.   And they were the talent for the Big Balloon Parade?

8   A.   Yes.

9   Q.   I put on the monitor in front of you a map of the Big

10  Balloon Parade.  Can you see that?

11  A.   Yes, sir.

12  Q.   This is not to scale, but does this accurately and fairly

13  depict the route of the Big Balloon Parade that year?

14  A.   Yes.

15  Q.   Let's blow up to the top and start sign up to --

16       That is fine.  I've blown up part of it.

17       Your Honor, offer this, Exhibit E.

18            THE COURT:  Any objection?

19            MR. REXRODE:  Subject to a motion to strike, no

20  objection.

21            THE COURT:  All right.  Received.

22       (Exhibit E was admitted.)

23  BY MR. STUTLER:

24  Q.   On here I see a couple things.  It says "start," and I see

25  "grandstand" and "television area."  What was the grandstand,

1   first, just to put it all in context?

2   A.   Right in front of the Star of India they have a set of

3   grandstands, temporary grandstands set up.

4   Q.   Is that where the spectators or some of the spectators sit?

5   A.   Yes, sir.

6   Q.   You are talking on the water side of Harbor there is some

7   seats --

8   A.   Yes.

9   Q.   -- for viewers?

10  A.   Yes, sir.

11  Q.   And where is the television stand?

12  A.   This map isn't totally correct.  Right at the -- I would

13  say right in front of the Bumble Bee start, there is a street

14  right there, and across the street from the Holiday Inn was a

15  set of scaffolding which is where we build our set at.

16  Q.   Let's put Exhibit BN up, please.

17      We put on the monitor Exhibit BN.  Does that fairly and

18  accurately depict the parade route or part of the parade route

19  on December 30th, 2010?

20  A.   Yes, sir.

21  Q.   And can you see the television stand that you were

22  referring to?

23  A.   At the bottom of the picture in the center, roughly --

24  there is a set of scaffolding with plywood on top, which we use

25  as a TV set.

```
1   Q.  I circled a part now of what appears to be the scaffolding

2   at the center bottom.  Is that the scaffolding?

3   A.  Yes, sir.

4   Q.  And the grandstand, is that across the street from that?

5   A.  Yes, sir.

6   Q.  Erica, would you please erase that.  Why don't we go ahead

7   and enlarge the television stand.

8       Do you see yourself in this photograph?

9   A.  Yes.  I am on the left side of the set, with my hands on

10  the railing there, ball cap, blue jeans.

11  Q.  This guy here, (indicating)?

12  A.  Yes, sir.

13  Q.  So there are two fellows standing on the left side of the

14  platform, and you are the guy with your hand on the railing?

15  A.  Yes, sir.

16  Q.  And what you call the talent, where are they?

17  A.  The top of the enlarged photo, there at the table.

18  Q.  These two figures there that look very dark?

19  A.  Yes, sir.

20  Q.  All right.  Let's put Exhibit BM on there, please.

21          THE COURT:  Are you going to move that in?

22          MR. STUTLER:  Yes.  Thank you, Your Honor.  Offer

23  Exhibit BN in.

24          MR. REXRODE:  Subject to motion to strike, no

25  objection.
```

```
1              THE COURT:  All right.  Received.

2         (Exhibit BN was admitted.)

3    BY MR. STUTLER:

4    Q.  I put on the monitor there BM, bravo Mike.  Does this

5    accurately depict the parade route where the TV stand was on

6    December 30th, 2010?

7    A.  Yes, sir.

8    Q.  Is that the grandstand in the upper right-hand corner?

9    A.  No.  That is the TV set.

10   Q.  The TV set or TV stand, do you see yourself there?

11   A.  Yeah, same photo --

12   Q.  I'm sorry.  Say again?

13   A.  Yeah.  My hand appears to be on the railing right there,

14   ball cap, headset on.

15   Q.  This guy right here, that is you?

16   A.  Yes, sir.

17              MR. STUTLER:  Offer Exhibit BM.

18              MR. REXRODE:  Unqualified no objection.

19              THE COURT:  All right.  Received.

20        (Exhibit BM was admitted.)

21   BY MR. STUTLER:

22   Q.  Let's take a look at Exhibit BL, please, and blow up the

23   photograph itself.

24        Do you recognize the two individuals in Exhibit BL?

25   A.  The talent to the left of the picture there is Jane
```

1   Mitchell, and the talent on the right is Dennis Morgigno.

2   Q.   And these were the anchors or broadcasters of the

3   December 30th, 2010, Holiday Bowl Parade?

4   A.   Two of the three, yes.

5   Q.   The third one was down in the street?

6   A.   Yes, sir.

7   Q.   What was that person's name?

8   A.   Corey Voss.

9           MR. STUTLER:  Offer Exhibit BL.

10          THE COURT:  Any objection?

11          MR. REXRODE:  I'm sorry, Your Honor.  No objection.

12          THE COURT:  Received.

13      (Exhibit BL was admitted.)

14   BY MR. STUTLER:

15   Q.   Exhibit G, please.

16      Does Exhibit G fairly and accurately depict the portion of

17   the parade route near the Star of India which shows some sort

18   of green lift on the right side?

19   A.   Yeah.  It is a scissor lift which we elevate our cameras

20   with to get an aerial shot of the balloon parade.

21          MR. STUTLER:  Offer Exhibit G.

22          MR. REXRODE:  No objection, Your Honor.

23          THE COURT:  Received.

24      (Exhibit G was admitted.)

25   BY MR. STUTLER:

1    Q.   Let put BN back on there, please.

2         This -- we put Exhibit BN back up there, and you can see

3    the TV -- what did you call it, the TV station?

4    A.   The TV set stage.

5    Q.   That is on a scaffolding type of platform; is that correct?

6    A.   Very accurate, building scaffolding with plywood on top.

7    Q.   How many years have you worked the Big Balloon Parade?

8    A.   Five to six that I can recall, off the top of my head.

9    Q.   Have you ever seen the talent at the time that you worked

10   there put on a scissor lift like the green one we just looked

11   at?

12   A.   No, sir.

13   Q.   Why is that?

14   A.   Stability and room.  Their scissor lifts aren't large

15   enough to withstand the crew, camera, and talent.

16   Q.   How many scissors lifts were used in the December 2010

17   parade?

18   A.   Two.

19   Q.   Where were those located?

20   A.   From this picture there would have been one to the left of

21   the street corner and one to the right of this picture, showing

22   the start of the parade.

23   Q.   Do either of those look similar to a scaffolding platform,

24   like the TV station?

25   A.   No, sir.

1   Q.  And I also noticed down here in the lower left-hand corner,

2   what appears to be a long pole.  What is that?

3   A.  That is a jib camera.

4   Q.  And a jib camera is what?

5   A.  It is a -- it is a device, a long boom on wheels that they

6   can move back and forth on the street to show sweeping shots of

7   the band there.  It gives a different look at the show.

8   Q.  You say that is on wheels.  Does it actually move around

9   back and forth during the show?

10  A.  They can.  With help, yeah, it can be moved, you know, from

11  that location out closer to the center and brought back.

12  Q.  What about these lifts, these scissor lifts, those have

13  wheels on them also?

14  A.  They are motorized.

15  Q.  Do they move during the show?

16  A.  No, sir.

17  Q.  Why not?

18  A.  Safety primarily.  Our TV -- our camera guys at that point

19  are harnessed in, and there is a camera on there, so the camera

20  would be left in the air, brought back down before they would

21  move it.

22  Q.  Was Dennis Morgigno on a scissor lift at any time during

23  the December 30, 2010, show?

24  A.  No, sir.

25          MR. STUTLER:  At this time, Your Honor, I would like

 1  to play a portion of Exhibit X, a portion of the parade video,

 2  the very beginning.

 3            THE COURT:  This is Exhibit X?

 4            MR. STUTLER:  Exhibit X.

 5            THE COURT:  Any objection?

 6            MR. REXRODE:  No objection to the admission.

 7            THE COURT:  And you have this on a separate CD?

 8            MR. STUTLER:  Yes.

 9            THE COURT:  All right.  Received.

10       (Exhibit X was admitted.)

11       (Video playing.)

12  BY MR. STUTLER:

13  Q.  That video that we just played, Exhibit X, does that fairly

14  and accurately show the weather conditions that day?

15  A.  Based off the scarf and being in long sleeves, yes, it was

16  definitely windy that day.

17  Q.  Was it hot or was it cold?

18  A.  It appears off of the video it was chilly, and also I was

19  in a long-sleeved shirt and pants.  That is a rare occasion.

20  Normally I am in shorts and a T-shirt.

21  Q.  That is consistent with your memory, it was cool?

22  A.  Yes, sir.

23  Q.  What were the noise conditions that day?

24  A.  A cheerful moment, you know, lots of hooting and hollering

25  bands playing, you know, noisy outside, windy outside.  It is a

1  noisy day.

2  Q.  While you were at the December 30th, 2010, parade, did you

3  see or hear a man carrying a sign?

4  A.  Yes, sir.  I had radioed to the TV truck.

5  Q.  Just tell me what you -- let me ask the question.  What did

6  you see?

7  A.  At that point there was a sign waving and loud cussing at

8  that point that I was worried about the microphones picking it

9  up, and I called into the truck, you know, to get some help

10  over to the stage.

11  Q.  So you actually heard somebody cussing?

12  A.  Yes, sir.

13  Q.  Where were you when you heard the cussing?

14  A.  I was on top of the platform.

15  Q.  Where was the -- did you see the person who was cussing?

16  A.  Did not see the exact person.  Did see the sign, but did

17  not see the person.

18  Q.  Did it appear that the cussing was coming from the person

19  with the sign?

20  A.  Couldn't answer that fairly.

21  Q.  Was it from the same area?

22  A.  Yes, sir.

23  Q.  And do you remember what this person was saying, the

24  cussing person?

25  A.  The "F" word, the CIA, a lot of stuff towards the CIA.

1    That is all I can recall.

2    Q.  Just to make the record clear, the person was saying, "fuck

3    the CIA"?

4    A.  Yes, sir.

5    Q.  And when, in relation to beginning of the parade, did you

6    hear this?

7    A.  This was right off the top, right in the start of our show.

8    Q.  Let's put Exhibit BN back up and enlarge the TV stand,

9    please.

10       I've enlarged on the monitor the TV stand on Exhibit BN.

11   You indicated that is you standing with your hand on the

12   railing?

13   A.  Yes, sir.

14   Q.  Can you tell me -- perhaps mark on there with your finger

15   -- where was the man with the sign?

16   A.  Could not give you an exact location.  Best of my memory,

17   though -- and for this purpose, you know, I was keeping people

18   off the stairs here because the set wasn't that stable -- but

19   it was in this area, close to the bottom of the stairs.

20   Q.  Is there any question in your mind that he was saying,

21   "fuck the CIA"?

22   A.  Best of my memory, yes, sir.

23   Q.  Can you describe his demeanor or -- excuse me -- his tone?

24   A.  Just not happy, but like I said, I didn't have any

25   interaction.  All I could see -- I had my job going.  We were

```
 1  in the middle of the show, so --

 2  Q.  So you were working?

 3  A.  I was working.

 4  Q.  What about his volume?

 5  A.  Can you restate that question, sir?

 6  Q.  Was he loud?  Was he quiet?

 7  A.  He was very loud.

 8  Q.  Loud enough to be heard over the ambient noise?

 9  A.  And the microphones.  That is what my biggest concern was.

10          MR. STUTLER:  Thank you.  No further questions.

11          THE COURT:  Any cross-examination, Counsel?

12          MR. REXRODE:  Yes.  Thank you.

13                      CROSS-EXAMINATION

14  BY MR. REXRODE:

15  Q.  What time did the broadcast begin?

16  A.  Early afternoon, if my memory serves.  The times have

17  changed, but I think it was right around lunchtime, 1:00.  I

18  apologize.  I don't recall exactly.

19  Q.  Do you see the two gentlemen seated to your right on that

20  table?

21  A.  Yes, sir.

22  Q.  Have you ever met either?

23  A.  I have not.

24  Q.  Did you ever speak with either of those gentlemen on

25  December 30th, 2010?
```

1   A.   Not that I recall.

2   Q.   Did you ever convey anything that you saw or heard about

3   the person with the sign to those two gentlemen?

4   A.   No, sir.

5           MR. REXRODE:  I move to strike his testimony, Your

6   Honor.

7           THE COURT:  At this point I'll overrule it, but I'll

8   give it -- I'll give it additional consideration through -- at

9   the end of the trial.

10          MR. REXRODE:  Nothing further.

11          THE COURT:  May the witness step down?

12          MR. STUTLER:  Yes, please.

13          THE COURT:  You may step down.  Thank you, sir.

14          Are we ready for Mr. Nguyen?

15          MR. REXRODE:  We are.

16          THE COURT:  Please resume the stand, sir.

17                  THOMAS NGUYEN,

18              CONTINUED DIRECT EXAMINATION

19   BY MR. REXRODE:

20   Q.   All right.  Mr. Nguyen, if I remember correctly, we left

21   off with you describing what the CIA had done to you between

22   2006 and 2010.

23       I would like you to take a look at the monitor, if you

24   could.  Do you recognize what is there?

25   A.   Yes.

1   Q.   And what is that?

2   A.   That is my van, and I parked on the one direction on the

3   right side of San Diego County home.

4   Q.   When you say that is your van, is that the van that you

5   lived in?

6   A.   Yes.

7   Q.   Now, there are a number of signs around your van, on your

8   van.  Were those signs put there specifically for the Holiday

9   Bowl Parade or were they normally there?

10  A.   That is normal.

11  Q.   And I guess the construction thing on top that says CIA

12  demon, was that put on your van specifically for the Holiday

13  Bowl, or was it normally on your van?

14  A.   Normal.

15  Q.   Okay.  From the time that you were first contacted by the

16  CIA up until the Holiday Bowl, did you your van look like that?

17  A.   At first it looked like this, but later on CIA send people

18  to destroy the side and on the top and tore up the paper around

19  the van, but I continued to put a new one in, and they tore up,

20  and I continue to put new one in.

21  Q.   Okay.  Let me ask you this, why did you put all that stuff

22  on your van?

23  A.   I want everybody know that I am innocent victim of CIA.  I

24  put the signs so people pass by, they can read it, and they

25  will know that I am telling the truth.  As, for example, I put

1   this picture around my van.  This picture say, I am Mr. Sam,

2   and where did it come from?  It come from the Jeep parking

3   behind my van, and this is the license plate.  I am Mr. Sam.

4        And what is up here, on the mirror -- let me zoom in --

5   Q.   Mr. Nguyen --

6   A.   -- that is the handcuffs.

7             THE COURT:  Excuse me, Mr. Nguyen.  We need to stop

8   for a second.

9             Mr. Rexrode, would you mark these photographs that

10  have --

11            MR. REXRODE:  Yes, sir.  I certainly will.

12  BY MR. REXRODE:

13  Q.   Mr. Nguyen, you just showed three photographs to the Court.

14  I am going to mark those in sequence, that you referenced them,

15  Defense 2, 3, and 4.

16            MR. STUTLER:  Plaintiffs.

17            MR. REXRODE:  I'm sorry.  Plaintiffs 2, 3, and 4, and

18  I would move them in as examples of the types of information

19  that Mr. Nguyen puts on his van.

20            THE COURT:  Any objection?

21            THE WITNESS:  That is --

22            THE COURT:  One at time.  Mr. Nguyen, you just have to

23  wait.  Mr. Rexrode will give you an opportunity to finish your

24  responses.

25            THE WITNESS:  Thank you.

1          MR. STUTLER:  I think they are already in evidence.

2     We can do it again, however you want to do it.

3          THE COURT:  Which -- those photographs that Mr. Nguyen

4     showed are in, as what exhibits?

5          MR. REXRODE:  I don't think that they are in.

6          MR. STUTLER:  Right, right.

7          MR. REXRODE:  They are marked.

8          THE COURT:  All right.  So 2, 3, and 4; is that right?

9          MR. REXRODE:  Plaintiffs 2, 3, and 4, move in.

10         THE COURT:  Mark those then, Counsel.

11         MR. REXRODE:  I certainly will.

12         MR. STUTLER:  What ones?

13         THE COURT:  He'll show us.  When you mark it,

14    Mr. Rexrode, you can have the witness describe it.

15    BY MR. REXRODE:

16    Q.  Mr. Nguyen, I am showing you what I marked as Plaintiff's

17    Exhibit 2.  Is that the photograph that you showed the judge

18    with the license plate with the letters "Sam I am"?

19    A.  And the most important one is the day I took the picture is

20    December 1st, 2010, 30 days before the arrest.  So it is not a

21    one -- it is a signal to let me know they want to arrest me,

22    and 30 days later I had been arrested.

23    Q.  So Mr. Nguyen, is that a photograph of a license plate with

24    the words "Sam I am," if you switch the letters?

25    A.  "I am Mr. Sam."

```
 1   Q.   "I am Mr. Sam"?

 2   A.   Yes.

 3   Q.   And if you can take a look at what I just marked as

 4   Plaintiff's Exhibit 3, this one --

 5   A.   This --

 6   Q.   -- is that a photograph of --

 7   A.   This is my van parking before the Chase Bank, 101 West

 8   Broadway.  And the Jeep, it park right behind my van with the

 9   license plate, "I am Mr. Sam," and the handcuffs in the front

10   mirror.

11        You see the handcuffs, ma'am?

12   Q.   Mr. Nguyen, if you could hold up the last photograph that

13   you have, and is that marked Plaintiff's Exhibit 4?

14   A.   Yes.

15   Q.   Okay.

16   A.   The handcuffs.

17   Q.   That is the photograph of the handcuffs hanging from the

18   rear-view mirror of the truck?

19   A.   Yes, December 1st, 2010.

20   Q.   Okay.  Now, if I could, you said that -- going back to the

21   photograph that is up to the screen, you mentioned that you --

22   you put these things on your van to let people know what had

23   happened to you?

24   A.   Yes.

25   Q.   Okay.  Was there another reason?  Was there an issue of
```

```
 1   safety for you for putting these things on your van?

 2   A.   At that time, I did not worry about my safety.   That later,

 3   after the arrest.   I am -- I was so oppressed, so I did not

 4   want to protest outside my van.

 5   Q.   Okay.

 6   A.   So I just stay in my van and let the paper talking.

 7   Q.   Okay.   Let me see if I have got you here.   The photograph

 8   -- and I'm sorry -- is that in evidence?

 9           MR. STUTLER:   Yes, it is -- it is not in evidence.

10           MR. REXRODE:   I would offer, Your Honor, the

11   photograph that is up on the screen.   It is Defendant's BP.

12           THE COURT:   BP?

13           MR. REXRODE:   BP.

14           THE WITNESS:   All right.   Received.

15           MR. REXRODE:   Thank you.

16       (Exhibit BP was admitted.)

17   BY MR. REXRODE:

18   Q.   Looking on the photograph on the screen, the information

19   that you put on your van, that is one way that you tell people

20   what happened to you?

21   A.   Yes.

22   Q.   Were there other ways that you tried to communicate what

23   happened to you to people, aside from what you put on your van?

24   A.   Yes.   I ask people for help.

25   Q.   Okay.
```

1    A.   For helping me, and to bring the CIA to justice.

2    Q.   How would you go about asking people for help, in addition

3    to putting things on your van?

4    A.   Because it explain why I became the victim of CIA.  That is

5    what I put on my sign, musician, two master degrees in physics

6    and computer science --

7    Q.   Just so I am clear --

8    A.   -- inventor.

9    Q.   Just so I am clear, you would put on your sign, musician,

10   two masters degrees, and what else?

11   A.   And I am an inventor.  I invented musician notation.  I

12   invented mathematics operation, and many things else.  I taught

13   calculus for three years.  Some people know that I am a victim

14   of CIA because I was so talented.

15   Q.   Okay.  Now, you mentioned that you would put this

16   information on signs?

17   A.   Yes, on the sign.

18   Q.   Where would you go with these signs?

19   A.   I go everywhere.  Especially the event, just like Balboa

20   Park, Convention Center, Comic-Con, Sea World, and right before

21   Thanksgiving or Memorial Holiday and travel ships.  The

22   Splendor had broken -- had a fire --

23   Q.   I'm sorry.  I didn't understand that.

24   A.   The last one is the travel ship named Splendor.

25   Q.   Splendor?

1    A.   Yes, Splendor.  And it had been towed to San Diego Harbor.

2    That it was a big event, so I would assemble --

3    Q.   Just so I am clear, one of the places you went was a cruise

4    ship called Splendor that had a fire and was towed back to San

5    Diego?

6    A.   That was in December, so I went everywhere.

7    Q.   Why was it important to you to go out with signs to where

8    there would be crowds in these public places?

9    A.   Because that is only way I can tell the public that I am

10   innocent.  I am a victim of CIA, because I am alone, and I had

11   to live with the most evil organization in the world, so only

12   one way for me to show these people to know the truth is I am

13   living in front of public eye so they can observe me how I am

14   living, how I am being here, and day by day they will recognize

15   I am innocent victim and CIA is evil.

16   Q.   Did your protests or did your -- I'm sorry.  Strike that.

17   That was a loaded term.

18        Was your carrying of signs at public events, was that done

19   by you to keep yourself safe from the CIA?

20   A.   Yes.

21   Q.   How so?

22   A.   Because more people know about me and my story, it more

23   difficult for CIA to kill me.

24   Q.   Since you were arrested on December 30th of 2010, have you

25   gone out to public events with signs?

1    A.   No more.

2    Q.   Why not?

3    A.   Because I was so oppressed by policeman.  I knew that they

4    are a liar.  They can make up evidence to lie.  I am saying

5    fucking CIA, a dirty liar.

6         And my stick had the pointed end to be used as a weapon,

7    why you take the picture of the pointed end?  Why you not take

8    a picture of the flat end?  Why have to take the picture of the

9    side and the broken thing?  Why --

10             THE COURT:  Mr. Nguyen, you can't ask questions.  You

11   can only respond to questions.  Mr. Nguyen, do you understand?

12   You can only respond to questions.

13             THE WITNESS:  I'm sorry.  I am emotional.

14             THE COURT:  I understand that, Mr. Nguyen, but you are

15   just not allowed to ask the questions.  Witnesses have to

16   respond to questions.

17             THE WITNESS:  Yes.

18             THE COURT:  All right.  You can continue, Counsel?

19             MR. REXRODE:  Thank you, Your Honor.

20   BY MR. REXRODE:

21   Q.   So since your arrest on December 30th of 2010, you still

22   have signs on your van, yes?

23   A.   Yes.

24   Q.   Do you still keep websites?  Do you still create websites

25   that tell what happened to you?

1  A.   Yes.

2  Q.   But you no longer go out in public with signs?

3  A.   Never.

4  Q.   I am going to ask you a very rude question, and I apologize

5  in advance.  Do you have a mental illness?

6  A.   Never.  I don't think I am mental unit any time.  I think I

7  am a smart person.

8  Q.   The last subject I would like to talk to you about is what

9  exactly happened when officers approached you on December 30th.

10  Okay?

11  A.   Yes.

12  Q.   Where were you standing when the officers first -- when you

13  first realized that officers were there, where were you

14  standing that day?

15  A.   I stand under the TV stand, and I never talked to any

16  security before except the Lieutenant Cessena, a police

17  supervisor at the parade, and before the parade, he threatened

18  me.  He squeezed my arm and say that I dare you to mess up the

19  parade.

20  Q.   And just so that we are clear --

21  A.   That is before.  He threatened me.

22  Q.   Just so we're clear, that is acting-Lieutenant Cessena that

23  we heard earlier when the officers were testifying?

24  A.   Yes.  And I think that he order Officers Valdez and Lopez

25  to arrest me.

```
 1   Q.  And I believe Cessena is spelled C-E-S-E-N-A.

 2       So when -- let's just talk a little bit about your

 3   interaction with Officers Valdez and Lopez.  When you first

 4   came into contact with them, do you remember where you were

 5   standing?

 6   A.  I stand straight up to the TV stand, and certainly my arm

 7   had been grabbed in the back, and I had been grabbed backward

 8   across the grass, across the bush and go behind the bushes,

 9   so -- the bushes cover from the ground, so the crowd did not

10   see what they had done on me.

11   Q.  So it was your impression that you were dragged --

12   A.  So never --

13           THE COURT:  Mr. Nguyen, you have to finish -- you have

14   to allow your lawyer to ask the next question.

15           THE WITNESS:  Yes.

16   BY MR. REXRODE:

17   Q.  Just to clarify, it was your impression that you were

18   dragged through bushes to take you out of sight from the public

19   who was watching the parade?

20   A.  Yes.  That is what they did.

21   Q.  All right.  Now, when you were grabbed, were you -- were

22   you in the middle of the street blocking the parade?

23   A.  No.

24   Q.  Where were you?

25   A.  So I and a lot of people surround me, and certainly my arm
```

1    had been grabbed, so I never talked with Officer Valdez or

2    Lopez before, so I even did not see their face.  So they were

3    lying when they say they came to me and asked me to leave.

4    That is a lie.

5                MR. STUTLER:  Objection, Your Honor, improper

6    characterization.

7                THE COURT:  Sustained.  And I'll sustain -- you can't

8    give your opinion, Mr. Nguyen, of the testimony of other

9    witnesses.  Do you understand?

10               THE WITNESS:  I'm sorry.  I am not a lawful man, so --

11               THE COURT:  That's fine.  So you just have to -- just

12   listen closely to the questions that your lawyer asks you, and

13   then only answer what he asks you.

14               MR. REXRODE:  Thank you.

15   BY MR. REXRODE:

16   Q.  I just want to clarify something real quick.  You said you

17   were not a lawful man.  Do you mean you are not a lawyer?

18   A.  I mean I don't have much knowledge in the law.

19   Q.  Thank you.

20   A.  I have knowledge in computer science and physics and

21   mathematics.

22   Q.  Now, when you first came into contact with the two officers

23   over there, were you holding your sign?

24   A.  Yes.

25   Q.  Were you yelling?

```
 1  A.   At the time they arrest me?

 2  Q.   Yes.

 3  A.   Yes, I did, and I --

 4  Q.   Do you remember --

 5  A.   They said that I spit.

 6  Q.   Actually, I don't want us to get confused here.  I am

 7  talking about right before they grabbed you, what were you

 8  doing, holding your sign?

 9  A.   I did not hold both hand on the sign.  I just -- I am right

10  handed.  I had used my right hand to hold the sign.

11  Q.   Okay.

12  A.   And I say, "CIA is demon.  CIA is evil.  CIA is stupid.

13  CIA train bin Laden," and I just repeated it, repeat it.  I

14  never used the word they said "fuck," so both government were

15  liars.

16          THE COURT:  Mr. Nguyen --

17          MR. REXRODE:  We're going to go over what happened.

18          MR. STUTLER:  Excuse me, Your Honor.  Move to strike.

19          THE COURT:  I'll grant that.

20          Mr. Nguyen, you cannot give your opinion of the

21  testimony of other witnesses.  Do you understand?  You can only

22  respond to the questions that you are asked.

23          And so everybody in a trial has strong views about

24  what other people say, but they can't express that, so you

25  can't say up here who you believe and who you don't believe,
```

1  just like they can't say -- nobody from the defense side can

2  get up and say whether you told the truth or not.  Witnesses

3  can't do that.

4          And so all you have to do is just listen closely to

5  what your lawyer asks you, and then just respond to the

6  question that he asks you, but only, only answer what he asks

7  you.  Do you understand, sir?

8          THE WITNESS:  Your Honor, I am sorry, but I just

9  worried that I will not have a chance to talk everything I want

10  to talk.

11          THE COURT:  That is up to your lawyer, so your

12  lawyer -- he has to ask you the questions, and so that is up

13  to -- you only can respond to the questions that you are asked,

14  and so there might be some things you want to say but that you

15  are not allowed to say because it is not -- it is not relevant

16  to the lawsuit.

17          So you have to rely on your lawyer.  Your lawyer is a

18  very trained, skilled lawyer, and allow him to ask the

19  questions, and then you can only answer what he asks you.

20          Do you understand, sir?

21          THE WITNESS:  Yes, I understand.

22          THE COURT:  Okay.  And so I will strike that comment

23  that Mr. Nguyen made about the credibility of the defendants.

24          MR. REXRODE:  Thank you, sir.

25  BY MR. REXRODE:

```
 1  Q.  So I guess what I heard is you were holding your sign with

 2  one hand?

 3  A.  Yeah.

 4  Q.  And you were yelling, "CIA is demon"?

 5  A.  Yes.

 6  Q.  "CIA is evil"?

 7  A.  Yes.

 8  Q.  "CIA is stupid"?

 9  A.  Yes.

10  Q.  And "CIA trained bin Laden"?

11  A.  Yes.

12  Q.  And did you say that you repeated those phrases over and

13  over again?

14  A.  More over times.

15  Q.  Why were you doing that where you were?

16  A.  Because I -- I don't have -- my story is too long.  If --

17  from 2006 to 2010 I did not have time to tell everybody the

18  whole -- my story, so I could hope they read my sign, and my

19  sign is summary about me and my story, why I protest here, yes,

20  so I did not have a lot of time to sit face to face to tell my

21  entire story, so I could focus on a short sentences.

22  Q.  Are you saying that you wanted to focus on short sentences,

23  concise sentences?

24  A.  Yes, like, "CIA demon."  That is all.  "CIA is stupid."

25  That is all.  "CIA train bin Laden," and that is -- notify that
```

```
1   CIA is stupid because CIA trained bin Laden and CIA spend
2   $100 million, even billion dollar, to find bin Laden and to
3   kill him, so that is stupid.
4   Q.  You also mentioned that at some point the officers grabbed
5   you from behind?
6   A.  Yes.
7   Q.  And dragged you through some bushes?
8   A.  Yes.
9   Q.  Can you explain what happened after you were dragged
10  through the bushes?
11  A.  And they jerked the stick out of my arm, and they used
12  their knee to break it.
13  Q.  Just so we're clear, you made a gesture of snapping
14  something over your knee?
15  A.  No, no, not my knee, but their knees.
16  Q.  Okay.
17  A.  And they locked me up in the back, and then stuck me in the
18  police car for more than one hour in the police car.
19  Q.  At some point were you taken to a hospital?
20  A.  Yes.  That is when Clinician Alban talked with me inside
21  the Michael Moran police car, and I asked her to release me and
22  I swear that after they release me, I will leave the parade.
23      And I need to come back to my music band to practice at
24  1:00 PM, so I am a musician.  My band needs practice for the
25  upcoming event that is Valentine Day in February, and I am a
```

1   leader of the band, and I told her like that, so I will -- I

2   would leave the parade if they released me.

3       But she said no, no, I need to talk -- to take you to a

4   hospital to take care of your finger bleeding.

5   Q.   Let's talk about the finger bleeding just a little bit.  Do

6   you know how your finger got cut?

7   A.   Yes, because the stick -- the police jerk the stick out too

8   quick and too strong, and the stick had some small tong on them

9   and so it tear my finger.

10  Q.   I missed one part of that you said.  The stick had small

11  what?

12  A.   They lie -- not smooth, you know.  It had some small like

13  tong.

14  Q.   Like a tong?

15  A.   My English is not perfect, so I don't know how to use

16  correct word.

17  Q.   Are you familiar with the word splinter?

18  A.   Maybe.

19  Q.   I was just hoping -- are you saying that the stick was not

20  smooth?

21  A.   Yes.

22  Q.   Okay.

23  A.   So the stick in the -- it had a square bottom, but on the

24  four side, the four vertical sides, it was not smooth.

25  Q.   So the four vertical sides, it was not smooth?

1    A.   Yes.   When they jerked it, it cut my finger.

2    Q.   Were you taken to the hospital?

3    A.   I was taken to Scripps Mercy, and nobody take care of my

4    finger.

5    Q.   When you say Scripps Mercy, was this the same hospital that

6    you were in in 2006?

7    A.   No.   That is a Sharp Memorial.   It is Scripps Mercy.

8    Q.   Okay.   So this time you went to Scripps Mercy and no one

9    took care of your finger?

10   A.   Right.

11   Q.   What happened at the hospital?

12          MR. STUTLER:   Objection, relevance.

13          THE COURT:   Overruled.

14          THE WITNESS:   So Ms. Kathryn Alban explained to the

15   medical staff why they should keep me here because I threatened

16   women and children at the parade.   I disturbing the parade, and

17   that I was a mental unit, and Ms. Alban told the medical staff

18   that.

19   BY MR. REXRODE:

20   Q.   How long was it before you left the hospital?

21          MR. STUTLER:   Objection, Your Honor, relevance.

22          THE COURT:   Overruled at this point.   It is all

23   subject to a motion to strike after I hear the evidence.

24          THE WITNESS:   On the paper they said that I had to

25   stay 72 hours, but after two days, the psychiatrist released

1  me.

2  BY MR. REXRODE:

3  Q.  So the psychiatrist released you after two days?

4  A.  Yes.

5  Q.  So you spent two days at the hospital; is that true?

6  A.  Yes, more than two days a little bit.

7  Q.  Were you in a mental ward in the hospital?

8  A.  Yes, that is --

9  Q.  How do you know that?

10      MR. STUTLER:  Excuse me, Your Honor.  I am not sure if

11  the Court wants me to continue objecting or if that is just

12  understood.

13      THE COURT:  You object to anything that occurred at

14  the hospital?

15      MR. STUTLER:  Yes.

16      THE COURT:  And the relevance, Counsel?

17      MR. REXRODE:  It will go to damages.

18      THE COURT:  Overruled.  I think it does, though -- is

19  that relevant?  Wouldn't it go to damages?

20      MR. STUTLER:  No.  The decision was not made by the

21  defendants to put him under a 5150 hold.  It was made by

22  Ms. Alban.

23      THE COURT:  At this point I'll allow it in, subject to

24  a motion to strike.

25      MR. STUTLER:  Thank you, Your Honor.

```
 1  BY MR. REXRODE:
 2  Q.   How did you know that you were being kept in a mental unit?
 3  A.   Because I -- when I left through the front door, I can read
 4  the sign.
 5  Q.   What did it say?
 6  A.   The sign BSC, Behavior Psychiatric Center, and they have to
 7  keep the mental people there, and when I went inside, I just
 8  look at the people pacing around me, and then I certainly knew
 9  that they were in mental unit there by the way they look.
10  Q.   Sometimes you have to ask stupid questions.  Did you like
11  being there?
12  A.   Never.
13  Q.   Why not?
14  A.   Because it is very scary and dangerous to live with about
15  20 mental ill patients, and I had to live with them, eating
16  with them, sleeping with them, and play activity with them.
17  They can beat me any time or stop me any time or choke my neck
18  when I am sleeping, and they have, so I was really scared for
19  my safety.
20         MR. REXRODE:  I have nothing further, Your Honor.
21         THE COURT:  Cross-examination, Counsel.
22         MR. STUTLER:  Yes, Your Honor.  Thank you.
23                    CROSS-EXAMINATION
24  BY MR. STUTLER:
25  Q.   Good afternoon, Mr. Nguyen.
```

1   A.   Good afternoon, Mr. Stutler.

2   Q.   Let me ask first, because I know everybody is pronouncing

3   your name differently, how do you pronounce your name, Nguyen?

4   A.   Yeah.

5   Q.   I'll try to get that right.

6       I need to ask you some questions about your ability to

7   perceive, understand, and interpret reality.  My first question

8   is, do you believe that the CIA can transmit messages to your

9   brain that nobody else can hear?

10  A.   I believe that.

11  Q.   Do you believe that the CIA has control of your brain?

12  A.   Sometime, not completely, because if CIA can control

13  completely my brain and I would not protest CIA around town.

14      If the CIA could control my brain and why then I went

15  around the town to protect CIA?  So yes, show that CIA could

16  control my brain just sometimes and some places, just like

17  inside hospital, inside the psychiatric clinic.

18  Q.   Now, the CIA first became involved with you in 2006; is

19  that correct?

20  A.   Yes.

21  Q.   And you said they offered you a job; is that correct?

22  A.   Yes.

23  Q.   Did they --

24  A.   Not offer yet.  They just asked me to be detective by them.

25  If I would qualify and then I would work for them.

1  Q.  All right.  And since that time, do you believe the CIA has

2  been using you as a specimen for human brain control studies?

3  A.  For human mind reading machine.

4  Q.  Human mind reading machine?

5  A.  Yes.

6  Q.  And you believe that the CIA has been using you as a

7  specimen for that?

8  A.  Yes.

9  Q.  And you believe that the CIA studies your brain every

10  night?

11  A.  Most nights in the hospital.

12  Q.  Most nights in the hospital.  And when you are sleeping in

13  your van?

14  A.  Sleeping in my van, some nights.

15  Q.  And you believe that the CIA makes you dream about sex?

16  A.  Yes, yeah, one time, yes.

17  Q.  And they do that by beaming --

18  A.  I dream about sex every night, about four, five a day, and

19  it make me so tired, and I never -- that is the first time in

20  my life I had that phenomenon.

21  Q.  And you believe that the CIA does that by beaming rays into

22  your head?

23  A.  As you know --

24  Q.  Is that a yes?

25  A.  -- in modern technology now a day is so advanced that there

1  is a way for CIA to do that on me.

2  Q.   Is that a yes?

3  A.   Yes.

4  Q.   All right.  And your evidence of that is that you never had

5  sexual dreams before; is that correct?  That is why you believe

6  that?

7  A.   Not for four or five day in a row, sir.

8  Q.   So based on that, you concluded the CIA must be beaming

9  rays into your head and giving you sex dreams?

10  A.   That is just one example, in the thousand examples.

11  Q.   And you believe the CIA can read your mind?

12  A.   I answered that question already.

13  Q.   Is that a yes or a no?

14  A.   Sometime.  Not all the time.

15  Q.   And you believe that the CIA plays dirty tricks against

16  you?

17  A.   A lot of dirty tricks.

18  Q.   One of the dirty tricks they play is simulating flatulent

19  sounds to give you gas?

20  A.   Can you repeat that?

21  Q.   CIA pretends it is farting so that you fart?

22  A.   Yes, few times.

23  Q.   And you believe the CIA makes you see things that are not

24  actually there; is that correct?

25  A.   No.

2           THE COURT:  Is that marked as an exhibit, Mr. Stutler?

3           MR. STUTLER:  It is not.  We can mark it next in

4   order, if you like.

5           THE COURT:  All right.  What number is that?  What is

6   the number?

7           MR. STUTLER:  It is BX.  We'll mark the March 5th,

8   2015, volume, which is volume one, as BX, and we'll mark the

9   March 10th volume, which is volume two, as BY.

10  BY MR. STUTLER:

11  Q.  Do you remember having your deposition taken in this case,

12  Mr. Nguyen?

13  A.  It was many years ago, you know.  I am human.  I am not

14  perfect.  I don't think -- I don't think that any man can

15  remember exactly what happened in several year in the past.

16  Q.  Well, let me probe your mind back to March.  Do you

17  remember you were deposed in March of 2015?

18  A.  Yes.

19  Q.  And you were deposed in two days in March; correct?

20  A.  Yes.

21  Q.  March 5th and March 10th?

22  A.  I don't remember exactly what day, but two days in a row.

23  Q.  I would like you to take a look -- I am going to go ahead

24  and stick some stickers on -- I think I have the originals

25  here.

1     I am showing your attorney.  I am going to swap out -- I

2   think I gave you the copies of the depositions.

3     In front of you I put Exhibit BX and BY, your two

4   deposition transcripts, and I would like you to turn now to

5   Exhibit BX, which is the one dated March 5th of 2015.

6     That deposition was taken in my office, right?  Yes?  You

7   have to answer out loud for the court reporter.

8          THE COURT:  Is that yes, Mr. Nguyen?

9          THE WITNESS:  I remember that on the 11th floor.

10   BY MR. STUTLER:

11   Q.  Yes, yes?

12   A.  Okay.

13   Q.  And your attorney represented you at the deposition?

14   A.  Yes.

15   Q.  You understood when the deposition started that you were

16   testifying under oath?

17   A.  Yes.

18   Q.  And there was no reason that you could not give your best

19   testimony on the 5th; correct?

20   A.  I don't understand that question.

21   Q.  Was there any reason that you couldn't give your very best

22   testimony at your deposition?

23   A.  What do you mean?

24   Q.  Why don't you take a look at volume one, page nine.  Let's

25   go ahead and skip that.

1      I told you if you didn't understand a question, you should

2  just tell me; correct?

3  A.  Okay.

4  Q.  It is not on that page.  I am skipping that.  Can you close

5  that, please.

6      And I told that you if you didn't understand a question,

7  you should let me know; correct?

8  A.  I am not sure.

9  Q.  Take a look at page 13 of volume one, lines 9 through 15,

10  and I'll read that.

11      Good.  I'll assume that you understand my questions unless

12  you first tell me.  Sometimes I'll stumble over my words.

13      Answer:  Yeah.

14      Question:  It won't be on purpose, but if you don't

15  understand something, please let me know, okay?

16      Answer:  Yes, again, I will ask because -- unintelligible.

17      Were you asked those questions and did you give those

18  answers?

19  A.  I don't recall.

20  Q.  And I also told you if you don't remember something to tell

21  me; right?

22  A.  So according to the paper --

23  Q.  Yes?

24  A.  -- yes, it seem like that, but I am not sure.

25  Q.  Okay.

1   A.   And you know what, if you --

2   Q.   There is no question pending, sir.

3        Now, the question that I asked you earlier was, do you

4   believe the CIA makes you see things that are not actually

5   there, and you said no; is that correct?

6        You won't find it on that page.  That is correct?

7   A.   No.

8   Q.   And I want you to turn to volume two of that, and

9   specifically 198, page 198, and I am going to be reading lines

10  1 through 15.  Are you on the page, Mr. Nguyen?

11  A.   Yes.

12  Q.   Okay.

13       Question:  On page two of Exhibit 30, at the bottom, there

14  is a paragraph five that says, quote, lowered eye sight, visual

15  temporarily and back to normal, attackers beamed into victims,

16  visual cortex, a CIA dirty trick, unquote.

17       Did the CIA -- has the CIA ever made you see things that

18  weren't there?

19       Answer:  Right, and I have study Internet so much and so

20  many victim had go through, you know, these impairment and

21  these symptoms, so I understand it.  I -- I got it right away.

22       Question:  What do you mean?  Oh, you understand that they

23  were making you see things that weren't true?

24       Answer:  Right.

25       Were you asked those questions, and did you give those

1   answers?

2   A.   What I mean is different.

3   Q.   Were you asked those questions, and did you give those

4   answers?

5   A.   I am not sure today.

6   Q.   And the reason that you believe that they were making you

7   seeing things, you thought they did it by beaming rays onto

8   your visual cortex; is that correct?

9   A.   Let me give you an example.

10   Q.   Can you answer the question?

11          THE COURT:  Excuse me, Mr. Nguyen.  At this point you

12   just have to answer the question.  I know you want to give an

13   explanation or give background.

14          Under the system the lawyers ask the questions, and

15   you have to answer the questions, so your lawyer will have an

16   opportunity to ask you questions again, so that might be an

17   area that he may or may not go into.

18          But at this point, just like when your lawyer asks,

19   you have to answer the question that is asked.

20          So please restate your question.

21          MR. STUTLER:  Yes.  Thank you, Your Honor.

22   BY MR. STUTLER:

23   Q.   Mr. Nguyen, you believe that the way the CIA made you see

24   things was by beaming rays onto your visual cortex; is that

25   correct?

1    A.   Yes.

2    Q.   And you also believed that the CIA can insert thoughts into

3    your brain using invisible rays; is that correct?

4    A.   A few times.

5    Q.   A few times they did that.  You believe that the CIA uses

6    transmitters that turn you into a magnet?

7    A.   Magnet?

8    Q.   Yes.

9    A.   I did not have the magnet.  I am cool guy, cool man,

10   patient.  You can ask my friend about it, because I play and

11   music band manager, and my band members know my characteristic.

12   So magnet, I don't think I am a magnet man.

13   Q.   I would like to you turn to page 207 of volume two of your

14   deposition, please, sir, 207.  Are you there, Mr. Nguyen?

15   A.   Yes.

16   Q.   I'll be reading lines 16 through 25.

17      Question:  It says, quote, many days after driving -- after

18   driving, my body becomes a magnet.  Things such as paper cups,

19   clothes, et cetera, can be stuck in my hands.  This shows there

20   is a transmitter in my car, electromagnetic rays from the

21   transmitter cover my head, and they can make me a magnet.  Is

22   that all true?

23      Answer:  That is what happened, and I just repeat report to

24   me what happened, yes, so the phenomenon happens to me, and I

25   think a little weird.

1      Were you asked those questions, and did you give those

2  answers?

3  A.   Oh, I'm sorry.  I mixed up between two words.  The word you

4  meant in magnet, but I talk and you said madness,

5  M-A-D-N-E-S-S, so that is two different words.

6  Q.   Okay.  So you believe the CIA did use transmitters that

7  turned you into a magnet; is that correct?

8  A.   Magnet, correct.

9  Q.   And as a magnet, you attracted ferrous metals but also

10  things like cloth and paper?

11  A.   Right.

12  Q.   You believed the CIA sent a three-legged dog as a message

13  to you?

14  A.   You know, a dog has four legs, and they bred a dog without

15  the leg, so only a front one and the back -- two of the back.

16  And my father, same thing.  My father was a South Vietnam

17  soldier, so he lost his left arm.

18      So when I protest in front of Hall of Justice, they send

19  some people, let the dog in front of my face, and they laugh,

20  and the dog -- the physical of the dog, you know, the left,

21  this left, just like my father lost his arm, so they bring the

22  dog in front of me and laugh at me.

23      So I understand they meant that -- they meant that my

24  father like that dog.  It is just a dog.

25  Q.   So if I understand, you were downtown and a three-legged

1  dog came by?

2  A.  It not came by.  Several people let the dog over there, and

3  I am -- stand next to the tree in front of Hall of Justice, and

4  they just sit on the step with the dog in front of my face for

5  a long, long time.

6  Q.  So there were several people with a three-legged dog and

7  they are sitting on the steps; is that correct?

8  A.  On the step of the Hall of Justice.  I am standing --

9  Q.  The Hall of Justice.

10  A.  -- next to the tree, next to the tree along the street.

11  Q.  So these --

12  A.  So I am facing up to the Hall of Justice, and they in front

13  of me.

14  Q.  Okay.  So you saw a group of people, a three-legged dog,

15  and you assume these people were sent by the CIA --

16  A.  Yes.

17  Q.  -- because your dad is missing a limb.  That is what you

18  assume?

19  A.  Yes.

20  Q.  Did these people show you --

21  A.  And why they laugh at me?

22  Q.  Did these people show you badges?

23  A.  Pardon me?

24  Q.  Did these people show you badges, CIA badges?

25  A.  Badges?

```
 1  Q.  Yeah, did they --
 2  A.  No, no, no secret agent.  They just look like normal
 3  people.
 4  Q.  It is because they were laughing at you, you assumed they
 5  are CIA?
 6  A.  Not only laugh, but used conversation.
 7  Q.  What was their conversation?
 8  A.  I don't remember exactly what -- the conversation had
 9  something about my father.
10  Q.  So you --
11  A.  So it led to my thinking -- got me thinking about my father
12  just like the dog, and they want to bring that dog to make me
13  upset.
14  Q.  What was the message they were trying to send you?
15  A.  They said that my father was a South Vietnam soldier just
16  like a dog to them.
17  Q.  And you read all of that from this exchange with these -- a
18  crowd of people with a three-legged dog.  That is what you --
19  A.  I did not talk with them.  I just listened, and that is my
20  thinking.  I did not have a word with them.
21  Q.  Let's go back to the beginning, let's say 2006, when the
22  CIA first approached you.  You were in the hospital for
23  something at the time?
24  A.  An emergency.
25  Q.  Was it for your kidney?
```

1   A.   Removed the front kidney.

2   Q.   Prior to removing your kidney and having dialysis, you

3   never had any problems with the CIA; right?

4   A.   Can you repeat that?

5   Q.   Did you ever have any problems with the CIA before you had

6   your kidney removed and started dialysis?

7   A.   What do you mean "problem"?

8   Q.   Did you ever have any interaction -- did the CIA ever deal

9   with you at all?

10   A.   No.

11   Q.   And it was only after you started the kidney dialysis that

12   you started realizing the CIA is doing things to me; is that

13   accurate?

14   A.   Mostly accurate.

15   Q.   Okay.  Have any doctors told you that losing a kidney and

16   going through dialysis can lead to psychosis?

17   A.   Pardon me?

18   Q.   Have any of your doctors told that you losing a kidney and

19   starting dialysis can cause psychosis?

20   A.   No.

21   Q.   All right.  But you never had any problems with CIA before

22   you lost your kidney; is that correct?

23   A.   No.

24   Q.   All right.  When you were in the hospital and the CIA first

25   contacted you, did they talk to you face to face?

```
 1  A.   No.

 2  Q.   Did they send you a letter?

 3  A.   No.

 4  Q.   Did they send you an e-mail?

 5  A.   No.  They talked with me directly in my ear with a low and

 6  clear voice.

 7  Q.   It was a telepathically communicated to you?

 8  A.   Yes.

 9  Q.   How did you verify that it was the CIA and not somebody

10  else?

11  A.   Only CIA had the high technology.

12  Q.   How do you know that?

13  A.   Because I am a scientist.  I am a physicist.

14  Q.   So the Soviets or the British, you are saying that you know

15  they don't have that kind of thing?

16  A.   Long times ago, you know, about 30 years ago, you know,

17  they already invented the mind reading machine that was very

18  advanced --

19            THE REPORTER:  Wait.  I didn't understand.

20            THE WITNESS:  (Unintelligible.)

21  BY MR. STUTLER:

22  Q.   Your reading machine was very advanced?

23  A.   After 30 year --

24            MR. REXRODE:  I believe it was mind reading machine.

25            MR. STUTLER:  Okay.
```

```
 1   BY MR. STUTLER:
 2   Q.  Did you say mind reading machine was very advanced after
 3   30 years?
 4   A.  Yes.
 5   Q.  All right.  In this case they weren't reading your mind.
 6   You were hearing what they were telling you telepathically;
 7   correct?
 8   A.  I don't understand you.
 9   Q.  You were reading messages that they were sending you
10   through the air, not through sound, but by some other means?
11   A.  Yeah.
12   Q.  And your only reason for believing that they were the CIA
13   is your belief that only the CIA has this technology?
14   A.  Only CIA can access the hospital.  Only CIA can send the
15   psychiatric team to my room.
16   Q.  But you don't think other countries have intelligence
17   agencies or anybody in the world -- you think nobody else can
18   do this stuff?
19   A.  This is America, you know, and America has the most, you
20   know, security, most in the world.  So you think that your
21   country can easily get into the hospital and conduct the tests
22   on my mind reading machine inside American soil.  Do you think
23   that?
24   Q.  Have you told me all your reasons for believing that it was
25   the CIA who communicated into your brain when you were in the
```

1  hospital in 2006?

2  A.   I want to convince you only CIA can have the ability --

3  Q.   Right.

4  A.   -- to access the medical staff to access the hospital.

5  Q.   My question to you is, have you told me all your reasons

6  for believing that it was the CIA who was sending those

7  messages to your head in the hospital in 2006?

8  A.   That is just one example, and I have many, many different

9  reasons to make me believe that.

10  Q.   This is your chance to tell the judge all your reasons for

11  believing that the CIA was the one that transmitted those

12  messages to you in 2006?

13  A.   Thank you for that question, because it is just clear

14  example, who is Mr. Sam?  Everybody in the world know who is

15  Mr. Sam; right?

16  Q.   I don't know who Mr. Sam is.  Who is Mr. Sam?

17  A.   Uncle Sam.

18  Q.   Where does that say Uncle Sam?

19  A.   I am Mr. Sam.  That is very clear to the people.  Mr. Sam

20  is Uncle Sam.

21  Q.   That is why you believe that that car --

22  A.   This is just another sample.

23  Q.   We have to make sure we don't talk over each other.

24      So you told me that only the CIA is capable of getting into

25  hospitals, and another reason you believe the CIA talked to

1    your brain in 2006 was somebody parked behind you with a

2    license plate that says "Sam I am."  Any other reasons?

3    A.   I am Mr. Sam.  You read wrong.

4    Q.   There is only one "am" in there?

5    A.   I am Mr. Sam.

6    Q.   Okay.  Any other reasons?

7    A.   Yeah, another reason, who can control medical staff in all

8    different clinic to torture me for so long?

9    Q.   So you were tortured in more than one dialysis clinic?

10   A.   I changed three different dialysis companies, Davita, FMC,

11   and another small company, but Davita and FMC, two big company

12   in America.  I changed seven different clinics, and everywhere

13   I went I have been tortured by the same way, very first day.

14   Q.   So in seven different clinics you were tortured; is that

15   correct?

16   A.   Tortured the same way, and the same way.

17   Q.   And the CIA controlled all seven clinics, is that what you

18   are saying?

19   A.   Yeah, only CIA have that power.

20   Q.   How do you know that?

21   A.   Because all companies are different, and who can control

22   all the different companies in the world?  FMC is a big

23   company, the biggest company in the world.  Who has that power?

24   Who has the power to control the company?

25   Q.   So my question to you is, how do you know that only the CIA

1    can control?  And your answer was, who else can do it?

2        Do you have any other reasons for believing that the CIA

3    controlled all seven dialysis clinics, other than what you

4    already told me?

5    A.  And I -- I know I don't remember every other example, but

6    that three examples already, right?

7    Q.  And that's all you can remember?

8    A.  Right now.

9    Q.  Okay.

10   A.  Later I will remember, today.

11   Q.  You had a teaching position at Grossmont College, I believe

12   you were telling Mr. Rexrode; is that correct?

13   A.  Yes.

14   Q.  And one year after your first contact with the CIA -- and

15   we're in 2007 -- you lost that position at Grossmont College;

16   right?

17   A.  I quit the job.

18   Q.  You quit your job after they kicked you off the campus?

19   A.  Yes.

20   Q.  And they told you not to come back on the campus without

21   permission of the dean; right?

22   A.  Not come back unless they permit, you know, they give me

23   the permit to come back.

24   Q.  And they told you they didn't want you anywhere near the

25   students and the buildings on campus; correct?

1   A.   They said that I cannot come back to the campus unless they

2   allow me.

3   Q.   And then they put you on a mandatory leave of absence?

4   A.   They put me on sick leave, sick leave.  That means they

5   still pay money for me on sick days.

6   Q.   Would you tell the judge why you were kicked off the campus

7   at Grossmont College?

8   A.   Yes.  I send a letter to my chairman, mathematics chair,

9   and I asked for her -- I told her my story that I had been

10   tortured every time in the dialysis clinic, so I need time to

11   prepare for my lecture, but they always bother me, torture me,

12   so I asked her for help, and she was -- talked with the dean,

13   the dean --

14   Q.   Would you say that.  I didn't understand?

15   A.   Dean, dean, chair of mathematics, talked with the dean.

16   Q.   Thank you.

17   A.   Dean of the science, and the dean talk with Cuyamaca and

18   Grossmont College District, and they call me to meet the

19   manager -- risk management, R-I-S-K, risk management, and the

20   risk man told me that I need to be -- accept my medical doctor

21   before they let me teach in spring 2007.

22   Q.   In spring of 2007?

23   A.   Yes.  And the fall 2006 I taught the calculus three.

24   Q.   Let me stop you there, because I think you answered the

25   question, but let me ask a follow-up.

1      Do you believe that the Grossmont College District did all

2  of these things to you because it is controlled by the CIA?

3  A.  Yes.

4  Q.  You also believed that Scripps Mercy Hospital is controlled

5  by the CIA; correct?

6  A.  No, Sharp Memorial.

7  Q.  Let's turn to page 192 of your deposition transcript,

8  please, and I'll be reading from lines 15 through 20, 192.

9      Question:  Do you believe that Scripps Mercy Hospital is

10  also controlled by the CIA?

11      Answer:  They had been controlled by San Diego Police

12  Department, you know, directly and indirectly by CIA, so

13  Michael Moran and Alban, you know, convinced them that I was

14  like this.

15      Were you asked that question and did you give that answer?

16          THE COURT:  Did you find the pages, Mr. Nguyen?

17          What were the pages?

18          MR. STUTLER:  I'm sorry.  192.

19          THE COURT:  Get to page 192, Mr. Nguyen.

20          What volume?

21          MR. STUTLER:  Volume two.

22          THE COURT:  Okay.  So volume two, page 192,

23  Mr. Nguyen.

24  BY MR. STUTLER:

25  Q.  And I'll read it again.  I apologize.  I thought you were

1   there.

2   A.   Okay.

3   Q.   Lines 15 through 20.

4       Question:  Do you believe that Scripps Mercy Hospital is

5   also controlled by the CIA?

6       Answer:  They had been controlled by San Diego Police

7   Department, you know, directly and indirectly by CIA, so

8   Michael Moran and Alban, you know, convinced them that I was

9   like this.

10      Were you asked that question, and did you give that answer?

11  A.   Yes.  That is a change, so San Diego Police can control the

12  hospital.

13  Q.   And the police are controlled by the CIA?

14  A.   And they are in control by CIA.

15  Q.   And the reason that you believed that Scripps is controlled

16  by the CIA is that Scripps diagnosed you as delusional and

17  psychotic; correct?

18  A.   No.  The Scripps Mercy mental hospital just repeats what

19  Kathryn Alban talked to her.  Yes, I was disturbing --

20  disturbing, yeah, and I yell at women and children, so they

21  just repeated what Kathryn Alban told them.

22  Q.   Is that the reason that you believed that Scripps is

23  controlled by the CIA?

24  A.   It is controlled directly by the police department.

25  Q.   Is that the reason that you believed Scripps is controlled

1   by the CIA?

2   A.   Indirectly.

3   Q.   Through the police department?

4   A.   Yes.

5   Q.   Okay.  And you are saying that when Scripps -- first, did

6   Scripps diagnose you as delusional and psychotic?

7   A.   That is what they wrote in the paper.

8   Q.   Okay.  And you are saying they only did that because

9   Kathryn Alban told them to do that?

10  A.   Because they did not check me at all, so how did they know

11  me as delusional and blah, blah, so they -- her -- Kay Alban

12  told them, and they decided to keep me in the mental jail.

13  Q.   So you are saying Alban ordered them to diagnose you?

14  A.   Alban talked to them and convinced them, you know,

15  convinced them to keep me in hospital, so I can not be at the

16  parade any more.

17  Q.   How long did this parade go on?

18  A.   I did not know, because about 11:30 AM I was asked

19  emergency, so I did not know how long the parade lasted.

20  Q.   Do you think it was 72 hours?

21  A.   Huh?

22  Q.   Do you think it went on for 72 hours, the Big Balloon

23  Parade?

24  A.   That 72 hours they kept me in the mental jail.

25  Q.   And you are saying they did that to keep you away from the

1   parade?

2   A.   Under the assessing 5150.

3   Q.   Okay.

4   A.   Yes.   So it is not 72-hour the parade last.   That doesn't

5   make sense.

6   Q.   Is it correct that the CIA spread the word that you are

7   delusional and psychotic to cover up its own evil; is that

8   correct?

9   A.   I think so.

10   Q.   And what is the evil that you are referring to?

11   A.   I am a normal person, and if you are a normal person, if

12   you are normal and you have been kept into a mental jail, that

13   is an evil thing.   That is evil thing.   It is true.   So why you

14   put a normal person in to a mental jail for a 72-hour?   Do you

15   think that is not evil?

16   Q.   Is that the only evil you are referring to?

17   A.   Anything else.

18   Q.   You also believed the CIA caused your wife to get a

19   restraining order against you; is that correct?

20   A.   Yes, because I protest in front of Hall of Justice long

21   time, and they want to torture me more, so they take the

22   change, and my wife want to divorce me, and they took that

23   change to not allow me to see my children for one year, so I

24   think that CIA order the family court to commit me because I

25   protest in front of Hall of Justice.

1   Q.  And you say you've moved back in with your wife?

2   A.  Yes.  Right now I am living with my ex-wife and my

3   children.

4   Q.  So you believe that the CIA is permitting that?

5   A.  No.  That is -- my wife allow me.

6   Q.  But I thought --

7   A.  It is not CIA.  She not a CIA magnet.

8   Q.  CIA is no longer her overlord; is that correct?

9   A.  What?

10  Q.  The CIA no longer controls your wife; is that correct?

11  A.  No.  They check, you know, send a customer because my wife

12  is a mail worker, so they send the agent to be my wife's

13  customer, and they could talk with my wife.  They ask my wife

14  about the family, her husband, the children, and they lie --

15  they give advice to my wife to destroy my family, to separate

16  me from the family.  That is the first time, and second step is

17  they will destroy my financial -- (unintelligible).

18          THE REPORTER:  Wait.  I didn't understand the last

19  part.

20  BY MR. STUTLER:

21  Q.  So your wife works as a nail person?

22          THE COURT:  Just wait.  Mr. Nguyen --

23          MR. REXRODE:  I would like the rest of the answer in.

24          THE COURT:  Mr. Nguyen, you said your second step is

25  what they will destroy.  Repeat that.  You said the second step

1   is they will destroy --

2          THE WITNESS:  My financial situation.  I explain why,

3   because two year, 2008 and 2009, I live alone, and I am a

4   mathematics private tutor, so I came to my -- I came to my

5   student's house to tutor my students around town.

6          You know, I'm sorry.  I think that Mr. Stutler

7   understood me very well.

8   BY MR. STUTLER:

9   Q.  I didn't --

10  A.  And then, you know --

11         THE COURT:  Okay.  There is no question pending now,

12  so you can ask --

13  BY MR. STUTLER:

14  Q.  All right.  Let's get back to the restraining order that

15  your wife got.  Do you believe that the judge who issued the

16  order was acting on orders of the CIA?

17  A.  Can I finish my thought?

18  Q.  No.  Answer the question.

19  A.  Okay.  Could you please repeat the question?

20  Q.  Yes, sir.  Do you believe that the judge who issued a

21  restraining order against you was acting on orders of the

22  Central Intelligence Agency?

23  A.  Yes.  Susan Huguenor.

24  Q.  Susan Huguenor?

25  A.  Yes.  Susan Huguenor at the family court.

```
 1   Q.  And you believe the officers involved in the Big Balloon

 2   Parade incident are also controlled by the CIA; correct?

 3   A.  Of course, they had planted this.  This is one month

 4   before, and that is the plant.

 5   Q.  Because somebody parked a car behind your car within a

 6   month before that said "Sam I am R," that is why you believe

 7   that the police officers in this case are controlled by the

 8   CIA?  That is why?

 9   A.  And handcuffs.

10   Q.  That's why?  That is it?

11   A.  That's it.  I told you I had so many reason to believe.

12   Q.  Do you have any more reasons than what you already told me?

13   A.  Right now let me think about it a couple minutes.

14   Q.  If your attorney can -- if you think about it when he comes

15   up, he can ask you.

16   A.  Okay.

17        MR. REXRODE:  Your Honor, actually if we could take a

18   five-minute break, perhaps -- I could use a restroom break,

19   maybe five minutes, and maybe that will give Mr. Nguyen a

20   chance to collect his thoughts.

21        THE COURT:  Well, it is a little early.  We'll take a

22   break.  We'll take a break at this point.  We'll be in recess

23   until five of 3:00.

24        MR. REXRODE:  Great.  Thank you, sir.

25        THE COURT:  All right.
```

1         (Recess ensued from 2:44 p.m. to 3:01 p.m.)

2              THE COURT:  You may resume your questioning,

3    Mr. Stutler.

4              MR. STUTLER:  Thank you, Your Honor.

5    BY MR. STUTLER:

6    Q.  Mr. Nguyen, let's talk about the events of December 30th of

7    2010 now.

8    A.  Yes.

9    Q.  You drove your van to the parade; correct?

10   A.  I drove it on a Wednesday night, so I slept over in my van

11   at that place in Harbor.

12   Q.  You parked it.  You slept in it where?

13   A.  I slept at the place you show on the picture with the

14   balloon.  I slept overnight, so before you saw that, Mr. Valdez

15   and Mr. Lopez came early during the day, and that was where I

16   was because I slept overnight over there.

17   Q.  And then you got out, and you walked the rest of the way to

18   the parade route; right?

19   A.  Yes.

20   Q.  Okay.  And you rallied at the parade route at 8:30 in the

21   morning?

22   A.  About that time.

23   Q.  You arrived before the parade started; correct?

24   A.  I arrived on last Wednesday, the day before the parade.

25   Q.  Let me make sure we're clear.

1    Can you put BP up there, please.

2    I put on the monitor in front of you Exhibit BP.  Now, is

3 this the -- were you parked on the actual parade route?

4 A.  I parked on Wednesday, the 29th.

5 Q.  Right.  I am asking where, not when.  Were you parked on

6 the parade route or a couple blocks away or what?

7 A.  Very close, this one way, it turned on the right side of

8 San Diego County Hall.

9 Q.  And at 8:30, around 8:30 you got out of your van, and you

10 started heading over to where the TV stand was; right?

11 A.  Not yet.  I just walk along crowd.

12 Q.  Within a minute or two after you arrived you say that

13 Sergeant Cessena confronted you?

14 A.  Yes.  He came face to face with me.

15 Q.  That is just a yes or no.  Thank you.

16 A.  Yes.

17 Q.  BU, please.

18    I put on the monitor Exhibit BU, which is -- was deposition

19 -- excuse me -- Exhibit 3 for identification from your

20 deposition.

21    Why don't we go ahead and enlarge the parts from county

22 health building down to where -- the Navy building, perfect.

23    And now at your deposition I asked you to mark up this

24 exhibit.  Do you recall that?

25 A.  The mark "X," that is what I marked, yes.

1    Q.   Now, take a look -- you see a blimp on there, a balloon

2    looking thing?

3    A.   Balloon, okay.

4    Q.   And I am going to draw a circle around it.  Do you see what

5    I just drew a circle around?

6    A.   But at 8:30 the balloons were not there.

7    Q.   Right, right, and I am not suggesting that.  It is just the

8    map.

9         What I drew a circle around, that is about the area where

10   Sergeant Cessena confronted you; is that correct?

11   A.   Yes, but not in the middle of the street.  It is on the

12   side of the street.

13   Q.   It is actually where you drew that "C" in the balloon;

14   right?

15   A.   That is in the middle.

16   Q.   That is where you say Sergeant Cessena confronted you?

17   A.   It is close to the County Administration grass area.

18   Q.   And after you saw Sergeant Cessena around 8:30 or 8:32 you

19   went to the TV stand; is that correct?

20   A.   No.

21   Q.   What did you do?

22   A.   I went along the street, and I went in front of the

23   restaurant named Anthony's.

24   Q.   All right.  I would like you to turn to page 85 of volume

25   one of your deposition, if you would, sir.

1   A.   85?

2   Q.   Yes, please.  This is volume one, which has a BX on the

3   front.  All right.  I'll be reading from lines 1 to 10.

4        Question:  All right.  And after Sergeant Cessena

5   confronted you, did you walk down that way any more?

6        Answer:  That way, I don't think so.

7        Question:  And did Sergeant Cessena's interactions with you

8   cause you to stop walking?

9        Answer:  No, because the parade started, so the TV stations

10  started, so I came in the TV station so no more walking around

11  any more, so when the parade started I was under the TV station

12  and no, no, nowhere else.

13       Were you asked those questions, and did you give those

14  answers?

15  A.   The parade started after 9:00.  Mr. Cessena talked to me

16  about around 8:30.

17  Q.   My question is --

18  A.   So --

19  Q.   My question --

20           THE COURT:  Excuse me.  Mr. Nguyen, you need to

21  respond to the question that is asked.

22           THE WITNESS:  Yeah, I am trying to respond and a

23  little bit explain so it is more clear.

24           MR. STUTLER:  Your attorney can bring that out of you,

25  if you would like to.

1  BY MR. STUTLER:

2  Q.  My question was very simple.  Did were you asked those

3  questions, and did you give those answers?

4  A.  Yes.

5  Q.  Thank you.  At the TV stand, Dennis Morgigno was up there,

6  right, on the stand?

7  A.  Right.

8  Q.  And that TV stand is on the same block where you say

9  Sergeant Cessena confronted you; is that correct?

10  A.  Yes.

11  Q.  And it is on the same side of the street where you think

12  Sergeant Cessena confronted you; right?

13  A.  Yes.

14  Q.  And in your mind the confrontation that you had with

15  Sergeant Cessena was around 8:31, 8:32?

16  A.  Yes, around that time.

17  Q.  And you said he said one thing to you, I dare you to mess

18  up this parade?

19  A.  Yes.

20  Q.  But you also believed that you walked -- didn't get over to

21  the TV stand until about 9:00?

22  A.  After 9:00.

23  Q.  So in your memory it took some 20 minutes to more than half

24  an hour to walk from Sergeant Cessena to the TV stand?

25  A.  No.  I told you I walked to Anthony's restaurant to see the

1    running -- 5K running race.

2    Q.   And you arrived in the area of the TV stand just about the

3    time that the parade was starting?

4    A.   The parade start, and I came back to the TV station, and

5    never leave until I had been arrested.

6    Q.   Okay.  You are getting ahead of me.

7        And you were at the TV station when the parade started;

8    right?

9    A.   Yes.

10   Q.   Okay.  And that TV station was on Harbor Drive between the

11   County Administration Building and the Star of India?

12   A.   I -- it started in there, had been removed to a different

13   place, and the place become the grandstand.

14   Q.   Are you saying in December 2010 the Star of India was not

15   moored along Harbor Drive?

16   A.   Along, but in different place because they need to build

17   the grandstand right in the place of the India Star.

18   Q.   We're locating the exhibit, and we'll put it up on the

19   monitor for a moment.

20       While we're looking for that, there was a large crowd on

21   Harbor Drive on both sides; right?

22   A.   Right.

23   Q.   And there were barriers separating the crowds from Harbor

24   Drive; right?

25   A.   Around the grandstand, nobody can get in unless they buy a

1    ticket.

2    Q.   Okay.  And I put up on the monitor Exhibit BN, which I

3    believe is in evidence.

4    A.   Yes.  You can see here the grandstand.

5    Q.   Hang on just a second.

6         MR. REXRODE:  It is subject to my motion to strike,

7    but yes.

8    BY MR. STUTLER:

9    Q.   All right.  And Exhibit BN, we had previous testimony about

10   this document, and the barrier on the grandstand side is this

11   white thing that has wording, San Diego -- looks like Big Bay

12   something, and that is what you are talking about?

13   A.   Yeah.  The grandstand was where the Star of India parked

14   before.  India --

15   Q.   Do you understand my question?

16   A.   The Star of India parked right there, and now they -- at

17   that time they build grandstand, so they had removed Star of

18   India off of the place.

19   Q.   Do you understand my question?

20   A.   Could you please repeat it?

21   Q.   Yes.  The barrier you are referring to in the grandstand,

22   that is that long white thing that extends across the picture

23   and has wording on it such as San Diego Big Balloon, that sort

24   of thing, is that the barrier?

25   A.   No.  The barrier, a fence along both sides of the

1    grandstand, so on the left side and the right side, it had

2    fence, and it had a fence, so people had to buy ticket to get

3    in that area, into the street, and I had no way to get in

4    there.

5    Q.   Let's go ahead and blow up the part I circled on Exhibit

6    BN.

7         All right.  Blowing up the lower right hand corner of

8    Exhibit BN, and you see on the lower right-hand corner of the

9    picture is an orange netting or fence.

10        Is it correct that there was a security fence separating

11   the grass from the -- and sidewalk from Harbor Drive on the TV

12   station side?

13   A.   I think you show wrong picture.

14   Q.   Do you understand the question, sir?

15   A.   The picture you show is not year 2010.

16   Q.   Well, we have testimony of that, but you don't believe that

17   this is what the parade looked like in 2010; is that correct?

18   A.   It just similar.  It is not exactly what in my mind.

19   Q.   So in your mind -- why don't we go ahead and show the full

20   picture here.

21   A.   In my mind the stand is --

22   Q.   No question pending.  Hang on a second.

23        All right.  I've blown up the entire -- I am showing the

24   entire Exhibit BN.  That in your mind is not the parade in

25   2010.  Is that what you are telling me?

1    A.   Right.

2    Q.   Okay.   Thank you.   And do you remember -- whatever you

3    remember the parade looking like, that there was an orange

4    security barrier between Harbor Drive and the grass on the TV

5    station side of Harbor Drive?   Do you remember that?

6    A.   Can you repeat that?

7    Q.   Sure.   On the east side of Harbor Drive near the TV

8    station, was there a fence or other security barriers

9    separating the street from the side of the street?

10   A.   Yeah.   A lot of security, lot over there, and nobody had

11   crossed that street.

12   Q.   Okay.   And nobody is supposed to get into the street unless

13   you have a pass; right?

14   A.   Yeah.

15   Q.   And did you have a pass or ticket to get into the street?

16   A.   No.

17   Q.   So you were not allowed into that area?

18   A.   No.

19   Q.   And you knew that before you went to the TV stand?

20   A.   But I can cross it if I go further to the Anthony's

21   restaurant, or I can go back to my van and cross the street,

22   and then I could.

23   Q.   But in the area of the TV station, you could not go into

24   the street; is that correct?

25   A.   No.

1    Q.   That is correct?

2    A.   Correct.

3    Q.   Okay.  Thank you.  And on that TV stand was a man and a

4    woman and a cameraman?

5    A.   Yes.

6    Q.   And the man was Dennis Morgigno?

7    A.   Yes.

8    Q.   You were standing right under the TV stand; is that

9    correct?

10   A.   But not on this stand.  This stand is so big.  In 2010 the

11   stand is smaller so I can face to face to him, to Mr. -- the TV

12   reporter.

13   Q.   Let's talk about --

14   A.   In this, here, the stand, I cannot see his face --

15   Q.   Let's go ahead and blow up --

16   A.   -- because I had two far.  I am on this side.  He farther.

17   We cannot look eye to eye.

18   Q.   Let me go and follow-up on that.  What you are saying is

19   that you are certain that the scaffolding stand that appears in

20   Exhibit BN was not the stand that Dennis Morgigno was on, on

21   December 30th, 2010?

22   A.   Right.  It is too big.

23   Q.   What you are saying is that it was a scissor stand?

24   A.   Right.

25   Q.   One of those green things?

1  A.  And I could look up and I saw mister reporter, TV reporter.

2  For this one I stand on the side.  I cannot see his face eye to

3  eye.

4  Q.  So you were standing two to three meters away from the

5  stand that Dennis Morgigno was on; is that correct?

6  A.  About one meter.

7  Q.  You were really close to it.  So if it had been

8  scaffolding, then you would have been able to see that; right?

9  A.  Because it is so big, it is so big so I think you have the

10  wrong picture.  The parade happen every year, so it happen many

11  time.  You picked the wrong picture.

12  Q.  So you are saying on one of those scaffolding stands, they

13  put the TV news anchors, the cameraman, and the man who

14  testified this morning, Mr. Spriet, all four of them fit on

15  there?

16  A.  I never know him.

17  Q.  But you are saying that all the TV people in there and

18  associated crew fit on one of those scissor stands?

19  A.  Yes.

20  Q.  That is your testimony?

21  A.  Yes.

22  Q.  Okay.

23  A.  Could you please move back and forth, the picture, so I can

24  select the picture and show you --

25  Q.  You want me to show you the scissor stand?

```
 1   A.   No.  I show you the difference between the two picture --
 2   Q.   No.  Your attorney can do that for you.
 3   A.   -- to show you.  Can you move the picture?
 4   Q.   In fact, you were so close that you were looking right up
 5   in Dennis Morgigno's face; right?
 6   A.   I can look at eye to eye with him, and I can hear him say,
 7   "crazy man."
 8   Q.   How did that make you feel?
 9   A.   I knew he order police to arrest me.
10   Q.   Because he said "crazy man," you knew he was asking you to
11   be arrested?
12   A.   He ask me, and he talked on the phone.  I did not hear the
13   whole sentence, but I hear, "crazy man."
14   Q.   You assume that because you heard "crazy man," that Dennis
15   Morgigno --
16   A.   While he was talking, he looked into my eyes, so I can
17   hear.  He said "crazy man."
18   Q.   You assumed that he ordered the police to come and arrest
19   you?
20   A.   And it took one or two minutes later two officers, Valdez
21   and Lopez, arrested me.
22   Q.   Other than what you just told me, do you have any reason to
23   believe that Dennis Morgigno was a CIA operative?
24   A.   The reason is my arrest had been planned --
25   Q.   Your what?
```

1   A.   My arrest had been planned, had been planned.

2   Q.   The event had been planned, the arrest?

3   A.   Because is -- the one minute from Lieutenant Cessena,

4   before the parade, and the third is the two officers lied about

5   the arrest.  They lied.

6        MR STUTLER:  Excuse me, Your Honor.  I move to strike.

7   The entire answer is nonresponsive.

8        THE COURT:  I'll strike the last part about what his

9   understanding was about the defendants were not honest.

10       MR. REXRODE:  Your Honor, actually, as I understood

11  the Court's rulings before, and I think they were proper.  In

12  this case, though, it is in response to a specific question

13  where Mr. Nguyen is asked the reasons that he believed Dennis

14  Morgigno is doing something.  And his belief about the

15  officers' testimony is another -- is a reason.

16       I don't think we have to -- I don't think we have to

17  pick sides on who --

18       THE COURT:  No.  I'll allow you to explore the issue

19  on -- in your case or -- on your redirect.

20  BY MR. STUTLER:

21  Q.   So, Mr. Nguyen, is it correct that you actually did not

22  hear Dennis Morgigno refer to the police; is that correct?

23  A.   I heard, "crazy man."

24  Q.   Those are the only two words you heard out of Dennis

25  Morgigno mouth is "crazy" and "man"?

1   A.   "Crazy man."

2   Q.   Why don't you put up the Exhibit BL.  Go ahead and blow

3   that up.

4        And Exhibit BL, that is the Dennis Morgigno that we're

5   talking about; right?

6   A.   Right.  And this is a correct picture in 2010.

7   Q.   This is the 2010 picture?

8   A.   Yes.

9   Q.   And you see he's wearing a microphone so that he can

10  broadcast to the public.  Do you see that?

11  A.   Yes.

12  Q.   And do you believe that that microphone actually fed into

13  the San Diego Police Department?

14  A.   I think that they can control it, just like if they want to

15  control the police, they cut the line and they connect to

16  another line.

17  Q.   Let me make sure I understand who they is.  Who is "they"?

18  A.   So they, the two people, so these two TV reporter, if they

19  want to talk with police, they would cut the line to the TV and

20  they talk to the police.

21  Q.   Tell me, how do you come by this knowledge?  How do you

22  know this?

23  A.   Just like your train, you know, your train go, and it has

24  several different branches.  So if you want the train to go

25  this way, you can control it.

1    Q.   And if you want it to go that way, you control it?

2    A.   Just like they can control the train direction.

3    Q.   So the reason that you believe that they can feed into the

4    police department is because you want it to feed into the

5    police department.  Is that what you are saying?

6    A.   So I believe that he order police to get rid of me from his

7    station.

8    Q.   Let me make sure I am clear.  You did not hear him refer to

9    the police at all; correct?

10   A.   I guess, guessing.

11   Q.   You are guessing?

12   A.   Yes.

13   Q.   Let's put Exhibit G on, please.

14        I put Exhibit G up on the monitor.  I am afraid that I

15   don't have a picture -- a complete picture of the scissor lift.

16   But the thing on the right, the green thing, is that what you

17   are referring to?

18   A.   There you can see Star of India now, and it had now been

19   removed to here.

20   Q.   Focus on my question.  Focus on my question.

21        What I am asking you is, is the stand that Dennis Morgigno

22   was on, did it look like the green scissor stand to the right

23   of the picture?

24   A.   I don't remember the color.

25   Q.   So you were standing one meter from this thing, and you

```
 1  don't remember if it was green like that?

 2  A.   I don't remember.

 3  Q.   What were you looking at?

 4  A.   Very similar, the stand is similar.

 5  Q.   Okay.  What were you looking at?

 6  A.   It was like this, like this.

 7  Q.   Were you looking at the scissor stand?

 8  A.   I believe so.

 9  Q.   And you don't have any recollection of what color it was?

10  A.   That is not important for me to remember.  I just --

11  Q.   But you are certain in your mind that there is no way --

12  A.   In my mind it is just TV reporter.

13  Q.   You are certain in your mind there is no way that the stand

14  that Dennis Morgigno was on was a scaffold stand; correct?

15  That is impossible?

16  A.   Scaffold?

17  Q.   Scaffold stand, like we saw on the previous --

18  A.   I think so, the previous one.

19  Q.   The previous one.

20  A.   I think so.  That scaffold stand was small.  In later

21  years, they build a bigger stand.

22  Q.   Let me ask you, how do you differentiate between things

23  that you see as real and what the CIA is putting in your brain?

24  How can you tell the difference?

25  A.   Why you come back to the question --
```

```
 1    Q.  Because I want an answer.  How can you tell the difference

 2   between what the CIA has put in your brain and what is actually

 3   real?

 4   A.  I give you example.  One day during my dialysis, I did not

 5   watch any TV.  I used my pen and my paper to write an essay.

 6   The essay is about how the universe was created, and I used the

 7   words, sometime in future the whole universe will be squinting

 8   into a single point, and I used the word "squinting," and after

 9   I finish the essay, I gave it to medical staff.

10        So my action that day was very real, because usually I kept

11   watching the TV during my dialysis, but that day I write a

12   scientist essay, and after that I hand it to the medical staff

13   to read.  After reading, you know, my paper, the whole clinic,

14   all the medical staff seemed very happy.

15        Later, I think --

16   Q.  Excuse me.

17        Your Honor, I am going to object.

18   A.  That is the example of --

19             THE COURT:  Mr. Nguyen, one second, please.

20             Mr. Stutler.

21             MR. STUTLER:  I am going to object to the response as

22   nonresponsive and ask that it be stricken.

23             THE COURT:  It seems to be a narrative.

24             Counsel.

25             MR. REXRODE:  Your Honor, I would ask that you allow
```

1   Mr. Nguyen to finish.  I don't know if he is nonresponsive.

2          THE COURT:  I don't know whether he's answered the

3   question.

4          Mr. Nguyen, have you finished your answer?

5          THE WITNESS:  I almost finished, Your Honor.

6          So I think that day the CIA inject the idea into my

7   brain and thought me to write out the essay and thought me to

8   give the paper to the medical staff.  They are happy because

9   they know that the experiment was successful.

10          So CIA can inject the talking into my brain during the

11  dialysis.

12          MR. STUTLER:  I will withdraw the objection.

13          THE COURT:  All right.

14  BY MR. STUTLER:

15  Q.  So you are saying that the CIA can not only make you see

16  things but they can inject thoughts into your brain?

17  A.  In some special place, like dialysis clinic or in hospital

18  only.

19  Q.  And my question to you is, how do you know that what you

20  observed or think you observed on December 30, 2010, was real,

21  as opposed to something that the CIA put in your head?

22  A.  Several of my examples.  That is an example of how CIA

23  inject the idea into my brain.

24  Q.  Yeah.

25  A.  The 2010 is different, because CIA warned and

1    (unintelligible.)

2           THE REPORTER:  I'm sorry.  I didn't understand.

3           THE WITNESS:  (Unintelligible.)

4           MR. REXRODE:  Warned and threatened me first, I

5    believe.

6           THE WITNESS:  Yes.  And then Lieutenant Cessena

7    threatened me second, and then Officer Lopez and Valdez lie

8    about the reason to arrest me.  I have the proof to show they

9    lied.  This is letter of my witness.  He is a parade watcher,

10   and he wrote me this letter to say the San Diego Police

11   Department lied.

12          MR. STUTLER:  Your Honor, I move to strike.  This is

13   nonresponsive.  My question --

14          THE COURT:  I will strike the portion about the -- I

15   understand Mr. Nguyen's testimony to be, then Officers Lopez

16   and Valdez lied, and he is referring to the conduct in court.

17          Is that your understanding?

18          MR. REXRODE:  Yes.  With the one qualification that he

19   may -- and you can inquire of him -- he may be referring to

20   police reports as well.

21          But I would object to moving to strike that.  Again,

22   it is directly responsive to the question as to why the 2010

23   event is different than the times that Mr. Nguyen had thoughts

24   put into his mind by the CIA.  That's his explanation.

25          THE COURT:  Explain that to me again, as to why one

 1   witness can comment that --

 2         Mr. Nguyen, when you said that the officers are being

 3   dishonest, are you commenting on what they said here in court?

 4   What are you referring -- what are you referring to?

 5         THE WITNESS:  I have the witness letter.

 6         THE COURT:  I understand.  But when you said a few

 7   minutes ago that they had lied, are you referring to what they

 8   said earlier today in court?

 9         THE WITNESS:  Yes, entirely what they said a lie.

10         THE COURT:  Okay.  That is what you are referring to

11   is their testimony today?

12         THE WITNESS:  I don't understand your question, Your

13   Honor.

14         THE COURT:  All right.  Well -- you can't have one

15   witness -- I am not going to allow one witness to testify as to

16   they think another witness was dishonest during the trial, in

17   the proceedings.  To the extent that you want that testimony to

18   stand, I am not inclined to do so.

19         MR. REXRODE:  I agree.  With this qualification:

20   Mr. Nguyen was asked a question as to why these events on this

21   day under dispute, December 30th, 2010, how he knows that

22   these -- his memories were not the product of an implantation

23   by the CIA.

24         His explanation answers that question.  He has three

25   reasons, the last of which goes to the testimony of these

1    officers.  I ask you to keep it in the record.  And I am

2    perfectly fine -- it is a little bit easier without a jury

3    because can you do this -- you can limit that to the only

4    reason it is relevant is that is a reason why he believes that

5    he was not -- he did not have these thoughts implanted by the

6    CIA.

7         I am not asking you to let in as substantive evidence

8    that these officers were less than truthful because Mr. Nguyen

9    says it.

10        THE COURT:  All right.  So you are asking me, then,

11   that I not consider any comments that he's made concerning

12   whether that officers were truthful or not for the truth of the

13   matter asserted, that I should consider his testimony as any

14   evidence as to whether or not the officers were honest in their

15   testimony; is that correct?

16        MR. REXRODE:  That is correct, because I think you are

17   dead bang right.

18        THE COURT:  So with that qualification, Mr. Stutler,

19   go ahead.

20        MR. STUTLER:  The problem is that the answer has no

21   logical nexus to the question.  You know, if I ask why do you

22   believe the sun came up, because ducks are in the pond or

23   something else, it is just -- he is just making speeches and

24   brings in things that don't make any sense.

25        THE COURT:  I understand.  I'll give it the weight

1    that I think it deserves, and with respect to the comments or

2    the testimony concerning whether the officers were truthful or

3    not in this proceeding, I will not consider that testimony for

4    the truth for the fact of whether the officers were truthful or

5    not truthful.

6            MR. STUTLER:  Thank you, Your Honor.

7            MR. REXRODE:  Thank you.

8    BY MR. STUTLER:

9    Q.  I do need to probe into -- this might be a little bit

10   quicker on some of the other things that the CIA has made you

11   see that we are were not true.

12       You went to get gas at a filling station at one point where

13   the CIA put visions in your head that weren't true; correct?

14   A.  I remember that this number but not the real number.  It is

15   a different number.

16   Q.  So basically, you want to the put money into a particular

17   pump, and you told the guy at the filling station, I want to

18   put so many dollars into this pump; right?  Is that correct?

19   A.  No.  Let me explain.

20   Q.  No.  Just answer the question.

21           THE COURT:  Excuse me, Mr. Nguyen.  I know you would

22   like to explain, and a lot of witnesses do, so what you want to

23   do is not unusual.  Most witnesses do.  They want to give their

24   side of the story, or they want to explain it because it puts

25   it in better context.  It is better to understand.

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  But in this system, the lawyer get to pick

 3    the question, so the lawyer asks the question, and so you have

 4    to respond, even though you may want to give a more complete

 5    answer, you want to give an explanation, and so you just have

 6    to answer the question as asked.

 7              And so some of these questions are yes or no.  If you

 8    can answer the question yes or no and the answer calls for

 9    that, then just answer it yes or no, and we understand that you

10    might want to give an explanation or give more background, but

11    just listen closely to the question, and do your best to answer

12    the question.

13              Although, it certainly is not unusual -- the same

14    struggles that you are having, many witnesses have.  It is

15    common because in our life we normally -- we don't just answer

16    yes or no, we give an explanation or we give background, and so

17    most witnesses have the same issues that you have, that you

18    want to give more and you want to say other things.

19              So just listen to the question, and you can answer it,

20    and if your lawyer wants to go back into these areas, your

21    lawyer can.  It is up to your lawyer, so your lawyer gets

22    another opportunity to ask questions.

23              THE WITNESS:  Your Honor, what if the question is not

24    100 percent true?

25              THE COURT:  Well, you -- if you don't understand the
```

1    question, you can -- you can ask to have -- you can indicate

2    you don't understand the question, and then if that issue comes

3    up that you just explained, in your answer you can -- you can

4    reflect -- you can state what you -- if that is your view.  If

5    you think the question is not true, then you can -- you can

6    indicate that, and then that is up to the lawyers to object.

7           Do you understand?

8           THE WITNESS:  Okay.

9           THE COURT:  All right.  So why don't we start.

10          Mr. Stutler, why don't you ask your question.

11          And Mr. Nguyen, listen closely to the question, and

12    respond as best you can.

13          MR. STUTLER:  Thank you, Your Honor, and I apologize

14    to Mr. Nguyen and the Court for being curt.

15    BY MR. STUTLER:

16    Q.  Let me go ahead and start over with the question.

17       There was an instance during which you were at a gas

18    station and the CIA made you see things that weren't real; is

19    that correct?

20    A.  That question is not correct, sir.

21    Q.  All right.  Let me see if I can narrow it down.  You went

22    to get gas at a gas station; correct?

23    A.  And I --

24    Q.  Is that a yes?  Is that a yes?

25    A.  And I read --

1    Q.   And you read the number, and it turned out that the number

2    that you read was not a real number; is that correct?

3    A.   That was a real number under my eye.

4    Q.   In your eyes?

5    A.   And I went into the cashier, and I say I want $20 for that

6    number, but when I came out, that number was not the number I

7    saw.

8    Q.   That number -- do you think somebody came out and switched

9    the numbers?

10   A.   No.  I -- I knew that the first number I saw is the wrong

11   one, so why in my eye had that affect?  So I think that is

12   because my brain had been deterred.

13   Q.   The only logical interpretation that you came up with is

14   that the CIA must have beamed rays into your head to make you

15   see something that was not there; is that correct?

16           MR. REXRODE:  Objection, argumentative.

17           THE COURT:  Overruled.  In this context, overruled.

18           THE WITNESS:  I have to answer it?

19   BY MR. STUTLER:

20   Q.   Yes.

21   A.   Please repeat it.

22   Q.   In your conclusion is the reason that you saw the number is

23   the CIA had beamed rays into your visual cortex?

24   A.   Correct, using my eye lashes before I go to that gas

25   station.

1    Q.   So how long did these rays have an effect after they are

2    beamed into your brain?

3    A.   So after I came out from the gas station, I knew, and my

4    vision back to normal.

5    Q.   So how long do these beams in your brain remain effective?

6    A.   One or two minute, you know, when I go in to cashier and

7    come back, one or two minutes.

8    Q.   Okay.  And they beamed the ray in your head at the dialysis

9    center; right?

10   A.   Yes, somewhat long before that.

11   Q.   And how many minutes before you saw the number did they

12   beam that ray into your head?

13   A.   I left the dialysis about 30 minutes.

14   Q.   So the effect of that ray lasted for 30 minutes?

15   A.   Yes.

16   Q.   And why didn't -- are they restricted to beaming these rays

17   to dialysis centers, or can the CIA beam these rays to you at

18   other places?

19   A.   I think they were in my dialysis -- inside the dialysis

20   clinic.

21   Q.   But the CIA beams other types of rays at you when you are

22   in your van; right?

23   A.   Maybe inside the clinic because it is easier to install

24   equipment inside the clinic.

25   Q.   And you think that the CIA has beamed rays at you from

1   other cars; is that correct?

2   A.   Other cars, what you do you mean "other cars"?

3   Q.   Other cars or other buildings, the CIA beams rays in you

4   from those things?

5   A.   I think it is able for them to do it.  It is easy for them

6   to do it inside hospital and inside the clinic.

7   Q.   All right.  Why don't we talk about what happened at the TV

8   stand in 2010.  You remember saying three things before the

9   police arrived; is that correct?

10   A.   Can you recall three things?

11   Q.   Yeah.  I am pausing, because I was thinking maybe it was

12   four.  What you said is CIA is demon, right?

13       You have to speak.

14   A.   Yeah.

15   Q.   And you said CIA is stupid because CIA trained bin Laden?

16   A.   Yeah.

17   Q.   And you said CIA destroyed my life.

18       During the time that you were at the police -- or let me

19   ask you first, that that last one is correct also, that is

20   something that you said?

21   A.   Yes.

22   Q.   Okay.  Other than those things, did you say anything else

23   during the time that you were at the TV stand before the police

24   got there?

25   A.   I think if I had few different sentences, but those

1    sentences, "CIA demon, CIA evil, CIA stupid, CIA trained bin

2    Laden," I repeated much.

3    Q.   Now, did the CIA's efforts to capture Osama bin Laden have

4    any effect on your life?

5    A.   No.  I just say that CIA spend tax money of the American on

6    this stupid thing, billion of dollar to fight bin Laden and to

7    kill bin Laden.

8    Q.   Do you also believe that when the CIA couldn't capture

9    Osama bin Laden that it tortured you more?

10   A.   No.  It is not related to my case at all.

11   Q.   All right.  So you never said, "fuck the CIA," while you

12   were at the --

13   A.   No.  I am an educated person.  I had no use the dirty word.

14   Q.   Are you telling me that educated people don't curse?

15   A.   Sometime, but not all the time.

16   Q.   And did I understand you to say earlier that smart people

17   can't have mental illness?  Is that what you believe?

18   A.   That is what Alban told me.  Alban talked to me during the

19   investigation in Michael Moran car.

20   Q.   So do you believe that?

21   A.   No.

22   Q.   Okay.  So you understand that even brilliant people can be

23   mentally ill?

24   A.   No.  That is Alban belief, not mine.

25   Q.   Do you believe that even brilliant people can be mentally

1    ill?

2    A.   No.

3    Q.   Have you ever heard of Ted Kaczynski?

4         MR. REXRODE:   Objection, Your Honor, relevance.

5         THE COURT:   Sustained.

6    BY MR. STUTLER:

7    Q.   Okay.   So you never curse.   And you talked about the CIA

8    demon, stupid because it trained bin Laden, and destroyed my

9    life.   That is all you said before the TV stand?

10   A.   That I am not 100 percent, as I explained to you before.

11   Q.   That is all you remember?

12   A.   Yes.

13   Q.   That is what you said over and over again?

14   A.   Yeah, more times.

15   Q.   And the only thing you remember doing at the TV stand was

16   raising your poster; is that correct?

17   A.   I just hold it one arm, yes, and sometime I lose it.

18   Sometime I put it on the ground to rest my arm.   I am -- I

19   would not doing like this, (indicating), all the time, no.

20   Q.   Okay.   And you don't remember doing anything else at the TV

21   stand, other than saying those words and occasionally lifting

22   up your poster with one hand; is that correct?

23   A.   Nothing else.

24   Q.   Okay.   And the only thing you heard anybody say the entire

25   time you were at the TV stand was "crazy man"; right?   That is

```
 1   the only thing you heard anybody else say?

 2   A.  No.  From the TV reporter, not from all the people.

 3   Q.  Right, right.  I was getting to that.

 4        The only person you heard speak was Dennis Morgigno while

 5   you were at the TV stand; right?

 6   A.  Right.

 7   Q.  And he said one thing, "crazy man"; correct, yes?

 8   A.  Not one thing.  He made a sentence, long sentence, but what

 9   I can hear is "crazy man."

10   Q.  And you didn't hear anybody else say --

11   A.  I did not hear the whole sentence.

12   Q.  You didn't hear the whole sentence, and you also didn't

13   hear anybody else say anything the entire time you were at the

14   TV stand before the police got there; right?

15   A.  Yeah, somebody -- yeah, one man told me that he had two

16   kids next to him, and he said, get away, no more by my

17   children, and I answer him, and then who care about my

18   children?  My children, same as your children.  Right now they

19   stay home alone after school.

20   Q.  I didn't ask what you said.

21        What was the first part of what the man said to you?

22   A.  Go away.

23   Q.  Go wait?

24   A.  Go away.

25   Q.  Go away?
```

```
 1   A.   Because I was there.

 2   Q.   Did he seem happy that you were there?

 3   A.   Pardon me?

 4   Q.   Was he happy that you were there?

 5   A.   Happy?

 6   Q.   Was he happy?

 7   A.   No.

 8   Q.   Was he mad?

 9   A.   A little bit mad.

10   Q.   Was he raising his voice?

11   A.   No.

12   Q.   Did he seem threatening at all?

13   A.   No.

14   Q.   What happened after you responded to him what about my kids

15   and all?

16   A.   My kids stay home alone after school because that is a

17   short day.  After 12, my kid out of school and went home alone.

18   Nobody take care of my two boys.

19   Q.   What does that have to do with you being at the parade?

20   A.   So he cared about his children.  Did he care about my

21   children?

22   Q.   Did he ever come to your house and start cursing in front

23   of your children?

24   A.   Not his house.  That is a public place, sir.

25   Q.   So that makes it okay?
```

```
 1  A.   That is public.  Everybody can go over there.

 2  Q.   All right.

 3           MR. REXRODE:  Your Honor, at this point it is

 4  argumentative.

 5           THE COURT:  The last question was.  The question, did

 6  he come to your house, was argumentative.

 7           MR. REXRODE:  Yes.

 8           THE COURT:  Do you object to that, the question about

 9  his house?

10           MR. REXRODE:  Yes.

11           THE COURT:  The question, did he ever come to your

12  house, is argumentative.  I'll sustain the belated objection

13  because that is argumentative.

14           MR. STUTLER:  Thank you.

15           MR. REXRODE:  Thank you.

16  BY MR. STUTLER:

17  Q.   Let me back up.  So you heard two people speak while you

18  were at the TV stand, correct, other than yourself; right?

19  A.   Just one, one man.

20  Q.   Well, you heard Dennis Morgigno speak.  He is a man.  And

21  you heard the father of the children speak; right?

22  A.   Yes.  Only man complain to me.

23  Q.   I'm sorry.  I didn't understand that.

24  A.   So he is the only man that -- only man in the parade

25  watcher.
```

1   Q.   Right.   So I am talking about the whole universe of people

2   that you heard speaking while you were at the TV stand before

3   the police got there.   That universe includes Dennis Morgigno

4   and the father?

5   A.   Yes.

6   Q.   And nobody else?

7   A.   Nobody else.

8   Q.   Okay.   And in your mind right after Dennis Morgigno said

9   "crazy man," right after that the police grabbed you; right?

10  A.   A few minutes later.

11  Q.   You don't remember anybody on the TV crew saying anything

12  to you other than Dennis Morgigno; right?

13  A.   No.

14  Q.   All right.   You didn't see any security personnel around

15  you; right?

16  A.   I did not see, and I never talked with any security because

17  they did not come to me, only Lieutenant Cessena.

18  Q.   You are absolutely certain of that, that never happened;

19  correct?

20  A.   Only Lieutenant Cessena.

21  Q.   Sergeant Cessena?

22  A.   Yes.

23  Q.   But that was before the parade started; right?

24  A.   Yes.

25  Q.   And that was not at the TV stand; right?

```
 1   A.   So no Officer Valdez, no Officer Lopez talk to me, no.

 2   Q.   Okay.  So no security people talked to you; correct?

 3   A.   Correct.

 4   Q.   No crew members from Channel Four --

 5   A.   No.

 6   Q.   -- Cox Cable talked to you; correct?

 7   A.   No.

 8   Q.   No police talked to you at the TV stand before these

 9   officers grabbed you; right?

10   A.   Yes.

11   Q.   And you never said anything to the crew members -- the TV

12   crew members?

13   A.   No.

14   Q.   And you never said anything to security personnel?

15   A.   No.

16   Q.   In fact, you don't even remember seeing any security

17   personnel there?

18   A.   No.

19   Q.   All you remember is standing near a scissor lift with

20   Dennis Morgigno on it; correct?

21   A.   Two person, two TV reporters.

22   Q.   And the two -- and then the cameraman and then the lady

23   reporter; right?

24   A.   Yes.

25   Q.   Okay.  And you were completely focused on that TV stand?
```

```
 1   A.   Yes.

 2   Q.   Now, the police, you didn't see them at all before the

 3   moment they touched you; is that correct?

 4   A.   Sergeant Cessena?

 5   Q.   Right.  I'm sorry.  I am speaking to the time that you are

 6   at the TV stand.  And when Sergeant Cessena talked to you, that

 7   was not at the TV stand; right?

 8   A.   No.

 9   Q.   Okay.  Is that correct?

10   A.   Correct.

11   Q.   Okay.  So I'll be clear, while you are at the TV stand, you

12   never saw any police officers until the moment that Officers

13   Valdez and Lopez touched you; is that correct?

14   A.   Correct.

15   Q.   Do you wear glasses?

16   A.   Right now.  At that time, I don't think so.

17   Q.   Was there anything wrong with your eyesight in 2010?  Any

18   reason that you couldn't see them if they were there?

19   A.   I think I am getting old very fast, so my eye too, so I

20   have to wear these glasses to read.

21   Q.   That is for nearsighted or farsightedness?

22   A.   Nearsighted.

23   Q.   Are those reading glasses?

24   A.   Maybe at that time I wear the glasses, not the near side

25   glasses, just normal glasses.
```

1  Q.  Did you have your grasses on at that time?

2  A.  I don't recall it.  I don't remember.

3  Q.  If somebody who is standing about this distance, let's say

4  20 feet from you, without your glasses in 2010, would you be

5  able to see them?

6  A.  Yes.

7  Q.  And if they were back 30 feet, could you see back here,

8  say, 50 feet, could you see somebody at that distance without

9  glasses?

10  A.  I focus and I can see, but if I focus at the TV reporter

11  and then I kind of did not focus on in anything else.  Unless

12  somebody talking right to me, like that man, he talked to me

13  face to face to me, and I answer.  If not, I did not care.  I

14  just care the TV.

15  Q.  And did you have any idea that the police were anywhere in

16  the vicinity before the moment they touched you?

17  A.  I did not pay attention to them.

18  Q.  Now, you suddenly became aware of your surroundings when

19  you were touched; right?

20  A.  After the aggress, after the aggress, and I be aware of

21  police.

22  Q.  After they aggressed against you, is that what you are

23  saying?

24  A.  Yes.

25  Q.  So you became aware of your surroundings when the police

1    became aggressive with you; is that accurate?

2    A.   Part of it.   They arrested me with the whole thing.   They

3    kept me in the car.   They transferred to -- me into mental

4    hospital.

5    Q.   I just want to know --

6    A.   So that is the whole thing, so after that event --

7    Q.   I just want to know when you became aware of your

8    surroundings again.   Was it when they touched you?

9    A.   Yes, and I pay attention to where they drag me away.   I

10   look around the crowd, and I yelled, "freedom of speech," and I

11   look at the reaction of the people.

12   Q.   Sir, I am not asking that yet.   All right.   I am just

13   asking you when you became aware of your surroundings again.

14   And it was the moment that they touched you; is that correct?

15   A.   At that time I was so surprised.   I did not, you know, pay

16   attention to anybody.   I just pay attention to the people.   The

17   police arrested me behind my back.

18   Q.   All right.

19   A.   It happened so fast.

20   Q.   You claim that you were holding onto the sign when they

21   grabbed you; right?

22   A.   Yes.

23   Q.   Let's take a look at BR.   I believe Exhibit BR is already

24   in evidence.   And this is the sign that you were holding onto;

25   right?

```
 1   A.  Yes.

 2   Q.  And that sign, the sign itself, is about two-foot by

 3   three-foot; correct?

 4   A.  Yes.

 5   Q.  And it is attached to a stick; right?

 6   A.  Yes.

 7   Q.  And the stick was about two meters long?

 8   A.  Two-meter, yeah.

 9   Q.  And the stick extended down about one meter beyond the

10   bottom of the poster; right?

11   A.  Maybe longer than one meter.

12   Q.  Maybe longer than a meter?

13   A.  Yes.

14   Q.  Did you say that right before they grabbed you, you were

15   holding onto the two-meter stick with just one hand; is that

16   right?

17   A.  Yes.

18   Q.  You were actually holding it with two hands though?

19   A.  No. I was --

20   Q.  I want you to turn to your deposition --

21           THE COURT:  One at a time.  Let Mr. Stutler finish his

22   statement completely before you begins yours.  He has to do the

23   same thing.  He has to wait until you finish before he speaks.

24           THE WITNESS:  Yes.

25   BY MR. STUTLER:
```

 1  Q.  Were you done with your answer?

 2  A.  I can answer now?

 3  Q.  Well, I think you answered.  Let me ask the next question.

 4  A.  Yes.

 5  Q.  I would like you to turn now to your deposition of volume

 6  one, at page 88.

 7          MR. REXRODE:  Your Honor, actually, I object.  If

 8  we're going to impeach, we should make sure that there is an

 9  answer.

10          THE COURT:  Well, what is the -- is that for

11  impeachment?

12          MR. STUTLER:  Yes.  I can ask the question again, if

13  -- that is fine, if the Court would like.

14          THE COURT:  Certainly.  Please do.

15          THE WITNESS:  What page?

16  BY MR. STUTLER:

17  Q.  Let me ask you another question.  Just for procedural -- we

18  have to go in a certain order.

19      You were actually holding onto that sign with two hands

20  when the police grabbed you; correct?

21  A.  I think one hand, one hand.

22  Q.  Turn to page 88, if you would, of your deposition.  You

23  know what, I have the wrong page marked here.  All right.

24  We're going to come back to that.

25      You were raising the stick up and down when they grabbed

1    you?

2    A.   I don't remember.

3             MR. STUTLER:   All right.   At this time, Your Honor, I

4    would like to play from his deposition, volume one, time

5    12:42:30 to 12:42:39.

6             THE COURT:   What is the purpose?

7             MR. STUTLER:   This is to show that he was raising the

8    poster up and down at the time that he was grabbed.

9             THE COURT:   And so is this -- is there a reason why

10   you are not having him read it?

11            MR. STUTLER:   Yes.   I want to show the gestures on the

12   screen.

13            THE COURT:   Is it videotaped?

14            MR. STUTLER:   Yes, Your Honor.

15            MR. REXRODE:   Before we play it, can I get a page

16   number to correspond?

17            MR. STUTLER:   Yes.   Page 88, 8 to 11.

18            THE COURT:   Because this is not going to be

19   transcribed.

20            MR. STUTLER:   No.   I'll describe it and ask --

21            THE COURT:   All right.   So the deposition, what pages

22   are those?

23            MR. STUTLER:   Pages -- page 88, 8 through 11.

24            THE COURT:   Page 88, line 8 through 11, and this is

25   volume one?

1          MR. STUTLER:  Yes, Your Honor.

2          THE COURT:  You are going to play the clip from this

3   deposition?

4          MR. STUTLER:  Yes, and actually the exhibit is BX.  It

5   is the deposition.

6      (Video played.)

7          MR. STUTLER:  Your Honor, may the record reflect that

8   in the deposition, the deponent was using both hands to make a

9   gesture of raising them up in the air?

10          THE COURT:  Do you agree, Counsel?

11          MR. REXRODE:  No, I don't.  While both hands did raise

12   in the air, what I saw was Mr. Nguyen indicating that he was

13   holding the sign with one hand.

14          I would object because it is just not impeaching.  I

15   thought the purpose of this impeachment was to show the gesture

16   of going up and down, and that certainly wasn't --

17          THE COURT:  I've seen it as well, and I'll draw the

18   conclusions that I have seen, and perhaps we all looked at the

19   same clip and we do not all draw the same conclusions, which is

20   not surprising.  So I've seen it and with your input -- both of

21   your inputs as to what you see, and I'll draw the conclusions

22   from it that I believe are appropriate.

23          MR. REXRODE:  Very well.  Thank you.

24          MR. STUTLER:  Thank you, Your Honor.

25   BY MR. STUTLER:

```
 1   Q.  And when the police officers arrived, you claim that they
 2   suddenly pulled your arms into your back; is that correct?
 3   A.  Yes.
 4           MR. STUTLER:  And, Your Honor, I would now like to
 5   play the deposition video, which is a demonstration -- his
 6   demonstration of how he was pulled in, after which I'll
 7   describe it for the record.  And this is from deposition volume
 8   one, page 92, lines 3 through 8.
 9       (Video playing.)
10           MR. STUTLER:  Your Honor, may the record reflect that
11   in the video sequence, the witness places his hands behind his
12   back with his arms bent between a 45- and 90-degree angle.
13           THE COURT:  Do you agree?
14           MR. REXRODE:  Yes, but again, I object to the playing
15   of the clip.  It is not impeaching.  It is not -- it is just an
16   out-of-court statement.  We can ask the question.
17           THE COURT:  Wouldn't it also be an admission?
18           MR. REXRODE:  No, because it has to be an admission to
19   something.  It is a statement by Mr. Nguyen, but I don't see
20   how that would possibly qualify as an admission.
21           THE COURT:  I'll overrule your objection.
22           MR. REXRODE:  Thank you.
23   BY MR. STUTLER:
24   Q.  And you claim that the officers actually twisted your arms
25   up behind your back; is that correct?
```

1    A.   Yes.

2    Q.   And your hands, when they twisted your hands up behind your

3    back, your arms were actually touching each other?

4    A.   I don't remember that touching.

5         MR. STUTLER:  All right.  I would like to play now a

6    video, deposition volume one, page 93, lines 13 through 16.

7    And for the record, the deposition is time 1249 and 51 seconds

8    to 1250 and 45 seconds.

9         (Video playing.)

10        MR. STUTLER:  Your Honor, may the record reflect that

11   the deponent was touching his hands behind his back during the

12   demonstration in the deposition?

13        THE COURT:  Mr. Stutler, it would seem that it would

14   be best that these clips be put on a CD, and so that the CD can

15   then be placed into the record.

16        MR. STUTLER:  Okay.

17        THE COURT:  And so with respect to each clip that you

18   have played that is off the videotaped deposition, then just

19   have a clip made of those portions.  Show it to counsel.  And

20   then, you know, before the trial is over, we can -- you should

21   move to receive that.

22        Because I think it is important that, you know, for

23   the record that the record be clear as to exactly what images

24   that I have seen, what, you know -- so to the extent that this

25   is a video, I am looking at a video, that should be in the

 1   record for somebody else to look at if -- so the record is

 2   clear.

 3        Just have those reduced to a video -- excuse me -- to

 4   a CD.  You can put them all on one CD.  Show it to Mr. Rexrode

 5   so that you can get some agreement that these are the clips

 6   that you played during Mr. Nguyen's cross-examination.

 7        MR. REXRODE:  Thank you, sir.  I appreciate that.

 8        And I also would under the Rule of Completeness ask

 9   the city attorney to read from the same deposition, same page,

10   the next three lines, 17 through 19.

11        MR. STUTLER:  I believe he is referring to Rule 36

12   which gives the Court the discretion to require the counsel to

13   read it in at the time of his unless it is necessary for -- in

14   the interest of fairness.

15        THE COURT:  And what -- I don't see -- can you put the

16   next lines up?  I have to rule on it to see what they are.

17        MR. STUTLER:  What are the lines?

18        MR. REXRODE:  17 through 19.

19        MR. STUTLER:  On page 93, was it?

20        MR. REXRODE:  Yes.

21        MR. STUTLER:  I don't have a problem with that.  I am

22   going to read from page 93, lines 17 through 19.

23   BY MR. STUTLER:

24   Q.  Let's go back put in context we'll start at line 13.

25        So they -- did they grab your wrists too or just hold your

1    arms?

2        Answer:  I don't know how in English to describe it, but my

3    arms were in my back.

4        Question:  And where was your stick?

5        Answer:  So I hold the stick in my right hand.  I am right

6    handed.

7        So did I read that -- did I read that correctly?

8    A.  Yes.

9    Q.  So when your hand was up behind your back, the stick was in

10   your hand; is that correct?

11   A.  Yes.

12   Q.  And we're talking -- how tall are you, sir?

13   A.  Five-eight.

14   Q.  Five-eight?

15   A.  Yes.

16   Q.  And you said the stick was about two meters long; is that

17   correct?

18   A.  Yes.

19   Q.  And two meters in feet, that is little bit longer than

20   five-eight?

21   A.  Yes.

22   Q.  And did you touch the officers with the stick when they

23   brought that arm around?

24   A.  I don't remember.

25   Q.  All right.  We'll go back to that in a moment.

1       The officers told you not to struggle; is that right?

2   A.  Right.

3   Q.  But you tried to escape anyway; right?

4   A.  That is a natural action of anybody.

5   Q.  I don't care if it is natural.  Did you try to escape?

6   A.  Yes.

7   Q.  And you thrashed your arms around?

8   A.  You look at two officer and compare to my body, whatever I

9   did during that time doesn't matter to them.  They are took

10  power over me.

11  Q.  I don't care about that.  Did you thrash your arm around?

12          THE COURT:  Excuse me, Mr. Stutler.  No

13  editorializing.  You can't say what you care about.  What you

14  don't care about.  Just like Mr. Nguyen has to only answer the

15  questions that are asked, you only get to ask the questions, so

16  you can't editorialize, and he can't add to his answers also.

17  Just ask the questions, and Mr. Nguyen, you give the answers.

18          MR. STUTLER:  Apologies.  My apologies, Mr. Nguyen.

19  BY MR. STUTLER:

20  Q.  My question to you, did you thrash your arms around when

21  the officers grabbed you?

22  A.  Did I?

23  Q.  Thrash your arms?

24  A.  Thrash?  Yes.

25  Q.  Okay.  And one officer had a grip on each arm?

1  A.   Yes, I think so.

2  Q.   And either when you were swinging the stick around or when

3  you were trying to escape, did you touch the officers with the

4  stick?

5  A.   It happened so fast, I don't remember.

6  Q.   Let's turn to page 101 of your deposition, please, lines 7

7  through 9.

8      Question:  Did you touch the officers when -- with the

9  stick when you were moving around?

10     Answer:  No.

11     Did I ask that question, and did you give that answer?

12  A.   I don't remember.

13  Q.   All right.

14         MR. REXRODE:  Your Honor, again, I would object.  I

15  don't know the purpose of reading it, but it doesn't impeach

16  the last question.  The question of Mr. Nguyen was did he hit

17  the officers -- I'm sorry.  The question to Mr. Nguyen was, did

18  the sign hit the officers?  His answer was, I don't remember.

19         The deposition is a different question.  The question

20  in the deposition is did you touch the officers to which he

21  answered no.  There is no contradiction between the two, so it

22  is improper impeachment.

23         THE COURT:  Your objection is hearsay otherwise, if it

24  is not used to impeachment?

25         MR. REXRODE:  Yes.

```
 1              THE COURT:  Your response to the hearsay objection.

 2              MR. STUTLER:  It is not hearsay.  It is deposition of

 3   a party opponent.

 4              THE COURT:  The objection is overruled.

 5   BY MR. STUTLER:

 6   Q.  You knew there were police officers at the time that you

 7   try tried to escape; correct?  You have to answer verbally,

 8   please.

 9   A.  Yes.

10   Q.  So you were not surprised that after you tried to escape

11   the officers handcuffed you, were you?

12   A.  After they drag me about from here to there, so pulling me

13   a long way, I am yelling, "freedom of speech," and they drag me

14   behind the bush and grab the stick out of my arm and lock me

15   up.

16   Q.  My question is simply this, were you surprised after you

17   tried to escape that you were handcuffed?

18              MR. REXRODE:  Objection, form of the question,

19   argumentative.

20              THE WITNESS:  Yeah, I was.

21              THE COURT:  Overruled.  You can answer.  You can

22   answer that.

23              THE WITNESS:  Yeah, I was surprised I had been

24   arrested.

25              MR. STUTLER:  Your Honor, may I approach the witness?
```

```
 1            THE COURT:  Yes.
 2  BY MR. STUTLER:
 3  Q.  Mr. Nguyen, I am going to hand you two documents.  Exhibit
 4  BB, which is Defendant Michael Moran's request for admissions,
 5  set one, and Exhibit BW, which is Plaintiff Thomas Nguyen's
 6  answers to Defendant Michael Moran's request for admissions,
 7  set one.
 8      I would like you to turn now first in Exhibit BV -- I'm
 9  sorry.  Let me ask you, first, sir, Exhibit BV, is this a
10  request for admissions that you received in this case back in
11  2012?
12  A.  Yes.
13  Q.  Okay.  And take a look, if you would, sir, at Exhibit BW,
14  and then I'll ask you a question about that.
15  A.  What was your question, sir?
16  Q.  I'm sorry?
17  A.  I did not hear your question.
18  Q.  I was just giving you a chance to take a look at it.
19      Have you had a chance to look at Exhibit BW?
20  A.  I am looking at it now.  So what part of it and what line
21  you want to talk?
22  Q.  My first question relates to page three on line 82.  Is
23  that your signature?
24  A.  Yes.
25  Q.  And is this a response to Officer Moran's request for
```

1   admissions, set one, that you signed on July 19th --

2   A.   Yes.

3   Q.   -- 2012?

4   A.   Yes.

5   Q.   Okay.  And did you type these out yourself?

6   A.   Yes.

7   Q.   Did you first read through the request for admissions and

8   then type them up?

9   A.   You know, my English is not so good, so I read it, but I

10   did not pay attention in word by word.

11   Q.   All right.  Now, when you received the request for

12   admissions, BV, did you read them all?

13   A.   I am not 100 percent, but about 80 percent.

14   Q.   Did you understand that Exhibit BV was an official document

15   in this litigation?

16   A.   You mean this side?

17   Q.   BV, yes, the stamp wasn't on there at the time that you

18   received it.

19       At the time that you received Officer Moran's request for

20   admissions, you understood those were being sent by his lawyer

21   in this lawsuit; is that correct?

22   A.   Correct.

23   Q.   And on the first page, line 21, you see where it says,

24   pursuant to Code of Civil Procedure, Section 2033.010, and then

25   it goes on.  Did you read that paragraph?

```
 1   A.   Which line, sir?

 2   Q.   Lines 21 through 25 on page one of Exhibit BV.

 3   A.   I read it.

 4   Q.   And did you have any questions about this paragraph when

 5   you read those?  Anything you didn't understand?

 6   A.   Well, I understand that detail and -- (unintelligible).

 7             THE REPORTER:  I'm sorry.  Detail?

 8             THE WITNESS:  Detain and arrest are different.

 9             MR. REXRODE:  I'm sorry.  If we could clarify for the

10   court reporter, I believe the answer was he understood that

11   detained and arrested are two different words.  I think that

12   was his answer.

13             THE COURT:  Is that what your answer is, sir?  Is that

14   what you meant to say?

15             THE WITNESS:  That is exactly what I am trying to say,

16   because the question say --

17             MR. REXRODE:  I think we're literally on different

18   pages.

19             THE WITNESS:  -- that on December 30, 2010, you were

20   only detained -- not arrested --

21             MR. STUTLER:  Okay.

22             THE WITNESS:  -- by San Diego police officer.

23   BY MR. STUTLER:

24   Q.   Okay.  I want you to focus on page one.

25   A.   Yes, page one.
```

```
 1  Q.  And where does it say anything about "detained" or
 2  "arrested" on that page?  You've lost me.
 3  A.  On line 21.
 4  Q.  On page one of Exhibit BV?
 5  A.  Yes.
 6  Q.  Line 21?
 7  A.  Yes.  Admit that on December 30, 2010, you were only
 8  detained -- not arrested.
 9          MR. STUTLER:  If I may approach, we're on different
10  documents.  Here is the problem.  I am asking you about this
11  one.
12          THE WITNESS:  Sorry.
13  BY MR. STUTLER:
14  Q.  You were reading from BW; correct?
15  A.  Yes.
16          THE COURT:  That is the one on the screen; correct?
17          MR. REXRODE:  Yes, sir.
18          MR. STUTLER:  Yes.  Let's put BV on there.
19  BY MR. STUTLER:
20  Q.  All right.  Let me ask the question again.
21      When you received Exhibit BV, you understood that it was
22  from Deputy City Attorney Brian D. Murphy; is that correct?
23  A.  Yes.
24  Q.  And you understood that Mr. Murphy is representing the
25  police officers in this case; correct?
```

```
1    A.   Yes.

2    Q.   All right.  And did you read the first paragraph, the

3    paragraph on page one, between lines 21 and 25?

4    A.   Yes.

5    Q.   Did you have any questions about what that meant?

6    A.   Actually, you know, Section 2033.010, I did not understand

7    those or Civil Procedure 33.  Yeah, I had no idea about these

8    words.

9    Q.   Yeah.

10   A.   I don't --

11   Q.   I see.  What you are saying.

12   A.   -- understand the law terms, and I am not good at it.

13   Q.   Did you ask Mr. Murphy about that?

14   A.   No.

15   Q.   Did you go to the law library and look it up?

16   A.   No.

17   Q.   And now you mentioned that you have a couple masters

18   degrees.  What were those masters degrees in?

19   A.   In physics and computer science.

20   Q.   And did you complete or take those programs here in the

21   United States?

22   A.   Yes, San Diego State University.

23   Q.   And they were all taught in English, these graduate level

24   programs; correct?

25   A.   Yeah, but I did not understand 100 percent what the
```

```
 1   professors said.
 2   Q.  Did you understand --
 3   A.  I understand about 70, 80 percent.
 4   Q.  Did you understand enough to obtain a masters of science
 5   degree in physics?
 6   A.  Yes.
 7   Q.  And what was the other degree, computer science?
 8   A.  Yes.
 9   Q.  Did you understand enough English in those courses to
10   obtain a master of science degree in computer science?
11   A.  I think that I understand enough not to be quite excellent
12   in English.
13   Q.  All right.  And did you have any trouble understanding any
14   of these requests in Exhibit BV?
15   A.  So what is the Civil Procedure 33?  I don't know what is
16   Civil Procedure 2033.010.  I don't know.
17   Q.  Let me direct your focus to the requests themselves.  Page
18   five, request number three, and that is on line four through
19   line six, and it reads, request for admission number three,
20   admit that on December 30, 2010, you were carrying a sign, a
21   pointed wooden sign, "ay" the San Diego Big Balloon Parade.
22       When you read the word "AY" you understood that to be the
23   word "AT"; is that correct?
24   A.  What you mean "AT"?
25   Q.  You see -- I am going to point -- I am going to circle it
```

1    on the monitor if you want to take a look at the monitor.

2        You see towards the end of the line it says "AY"?

3    A.  I saw it now.

4    Q.  At the time that -- at the time that you read this request

5    for admissions, you understood that that was a typo; correct?

6    A.  Actually, I did not pay attention to it.  I just read,

7    "carry a sign," yeah, so for me, yeah, I carry a sign, but I

8    did not pay attention to detail.  Like right now I know the

9    Mr. Brian Murphy put the "pointed" word in that sentence.  That

10   is a dirty trick.  I did not pay attention to that word at the

11   time I wrote this paper.  For me, I read that you were carrying

12   a sign at the San Diego Balloon.  Yeah, that I did.

13   Q.  When you wrote your response --

14   A.  I did not pay attention to the "AY" either.  I did not know

15   he meant a typo.

16   Q.  Okay.  When you typed out your response, which is Exhibit

17   BW, did you type it yourself or have somebody else do that for

18   you?

19   A.  I did the copy paper myself.

20   Q.  All right.  And would you turn to page two of Exhibit BW.

21   A.  Okay.

22   Q.  And particularly lines 38 through 40.  Line 38 reads,

23   three, admit that on December 30, 2010, you were carrying a

24   sign, a pointed wooden sign, at the San Diego Big Balloon

25   Parade.  Did you type each word in that sentence?

```
 1   A.   Yes.

 2   Q.   That includes the words "a pointed wooden sign"?

 3   A.   I just copy cat, you know, just look at the filing paper

 4   and copy cat.  I did not think what does "pointed" mean?  What

 5   is it used for?  I did not mention it.  I copy cat the whole

 6   sentence.

 7   Q.   Let me ask you, did you fill this out before or after you

 8   got your physics degree, your advanced physics degree?

 9            MR. REXRODE:  Objection, Your Honor.

10            THE COURT:  Sustained.

11            THE WITNESS:  I got physics degree in 2001.

12            MR. STUTLER:  You don't have to answer that.

13   BY MR. STUTLER:

14   Q.   All right.  So did you have any trouble comprehending this

15   sentence before you answered it?

16   A.   In the detail, I did not, but overall, yeah.  I did type it

17   but not in detail.

18   Q.   Did anybody tell you before you filled this out that you

19   should not read the request for admissions carefully before you

20   answer them?

21   A.   No.

22   Q.   And did you read through your answers before you -- that

23   you typed, before you signed your name on Exhibit BW?

24   A.   Yeah.  I think I did go over one sentence, but not in

25   detail.
```

1        MR. STUTLER:  All right.  Your Honor, at this time I

2   renew my motion in limine to exclude any evidence that the

3   stick attached to the sign was not pointed.

4        THE COURT:  Objection is overruled.  Your request is

5   overruled.

6        MR. STUTLER:  The motion is denied?

7        THE COURT:  Yes, yes.  The motion is denied.

8        It is 4:15.  We're going to end a little early today,

9   Mr. Nguyen.  We'll end a little early.  You can step down.  The

10  trial will resume tomorrow.

11       THE WITNESS:  I have one question, Your Honor.

12       THE COURT:  You can talk to your lawyer.  We're going

13  to resume tomorrow, so if you have anything you want to say,

14  you can talk to your lawyer, and your lawyer can answer your

15  question.

16       THE WITNESS:  I want to know if you read my witness

17  letter.

18       THE COURT:  Talk to your lawyer, and your lawyer can

19  address the questions with me directly.

20       THE WITNESS:  Yes.

21       MR. REXRODE:  We're coming back tomorrow, Thomas.

22       THE COURT:  You can go back and sit down with your

23  lawyer, and we'll talk about a few scheduling matters.

24       Mr. Stutler, do you have some estimate of how much

25  longer you think you have of cross?

1          MR. STUTLER:  Yes, Your Honor.  Right now I would say

2    45, after I whittle down maybe -- I will say 45.

3          THE COURT:  All right.  And Mr. Rexrode, is it your

4    tentative position that you think you may rest at the

5    conclusion of your client's examination?

6          MR. REXRODE:  Yes, Your Honor.  My tentative is my

7    redirect examination will be very brief.  I am going to talk to

8    Mr. Nguyen obviously, but right now that is my intention.  I

9    will be introducing a police report without objection and then

10   resting.

11         THE COURT:  All right.  And so that seems like, for

12   argument sake, maybe an hour, hour and a half in the morning

13   with Mr. Nguyen.

14         And if you elect to put on a case, do you have an idea

15   about how many witnesses you'll have?

16         MR. STUTLER:  We have two witnesses.  I anticipate the

17   direct of both witnesses will take a total of between 30

18   minute -- between 20 and 35 minutes.  They are fairly short.

19         THE COURT:  All right.  So we'll probably go into the

20   afternoon.  There is a decent chance we'll go into the

21   afternoon.  That is fine.

22         MR. STUTLER:  If I may, Mr. Rexrode and I have been

23   discussing, if the Court is amenable, I think our preference is

24   to do closing briefs rather than closing arguments.

25         THE COURT:  That is -- well, that is my preference,

1    and we can talk about it when the trial ends, but what I am

2    inclined to do is give you a briefing schedule, and then when

3    you submit the briefs, then I'll review them, and I'll give you

4    an opportunity to come and have oral argument after I have the

5    briefs.

6           So it is more -- it is probably -- it is more helpful

7    for me, once I get the briefs and if you want the oral

8    argument, I'll give you the opportunity.  And if you want to

9    submit it on the briefs and I don't have any questions, I

10   wouldn't have any oral argument maybe.

11          The briefing, I think, in a case -- in a trial to the

12   Court, a briefing is important.  So you can talk amongst

13   yourselves as to what you would like to have as far as a

14   briefing schedule.  When the trial concludes, can you let me

15   know, and we can see if we can agree on a briefing schedule.

16          And after the briefs are submitted, if either side

17   wants oral argument after the briefs are received, I'll give

18   it, and I may request it on my own, even if either side doesn't

19   want it.

20          Any other questions with respect to the procedures?

21          MR. REXRODE:  If I could have a moment.

22      (Off-the-record discussion.)

23          MR. STUTLER:  I forgot Ms. Alban, so --

24          THE COURT:  So you have three?

25          MR. STUTLER:  Three witnesses tomorrow.

1          THE COURT:  All right.  Anything else?

2          MR. STUTLER:  No.

3          THE COURT:  All right.  Then enjoy your evening.  See

4    everybody back tomorrow.  We'll resume tomorrow morning at 9:00

5    AM.

6          MR. REXRODE:  Sounds good.  Thank you, sir.

7       (Proceedings concluded at 4:22 p.m.)

8                          ---oOo---

9                 C-E-R-T-I-F-I-C-A-T-I-O-N

10

11          I hereby certify that I am a duly appointed, qualified
     and acting official Court Reporter for the United States
     District Court; that the foregoing is a true and correct
12   transcript of the proceedings had in the aforementioned cause;
     that said transcript is a true and correct transcription of my
13   stenographic notes; and that the format used herein complies
     with the rules and requirements of the United States Judicial
14   Conference.
                DATED:  February 3, 2016, at San Diego, California.

15

16                           /s/ Melinda S. Setterman

17                           _____
                             Melinda S. Setterman,
                             Registered Professional Reporter
18                           Certified Realtime Reporter

19

20

21

22

23

24

25