1                    UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    THOMAS NGUYEN,                      )
                                         )
5         Plaintiff,                     )  No. 11-CV-2594-WQH
                                         )
6              v.                        )  October 16, 2015
                                         )
7    SAN DIEGO POLICE DEPARTMENT, et     )  11:00 a.m.
     al,                                 )
8                                        )  San Diego, California
          Defendants.                    )
9    _____ )

10

11              TRANSCRIPT OF BENCH TRIAL - DAY THREE
                BEFORE THE HONORABLE WILLIAM Q. HAYES
12                 UNITED STATES DISTRICT JUDGE
                        (Oral Argument)
13
     APPEARANCES:
14
     For the Plaintiff:        Robert H. Rexrode, III
15                             Law Offices of Robert Rexrode
                               427 C Street, Suite 310
16                             San Diego, CA 92101

17   For the Defendant:        Timothy C. Stutler
                               Beverly Roxas
18                             San Diego City Attorney
                               1200 Third Avenue, Suite 1100
19                             San Diego, CA 92101

20

21

22   Court Reporter:          Melinda S. Setterman, RPR, CRR
                              District Court Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California, 92101
24                            melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer

1        SAN DIEGO, CALIFORNIA, OCTOBER 16, 2015, 11:00 A.M.

2                          * * * *

3        THE CLERK:  Number two, case 11-CV-2594, Nguyen vs San

4   Diego Police Department, on for oral argument hearing.

11:02   5        MR. REXRODE:  Good morning, Your Honor.  Robert

6   Rexrode for the plaintiff, Mr. Nguyen.  He is here.

7        THE COURT:  Good morning, sir.

8        MS. ROXAS:  Good morning, Your Honor.  Beverly Rojas

9   for defendants, and Timothy Stutler for defense as well.

11:02   10        MR. STUTLER:  One of our officers is ill today,

11   Officer Lopez, so he won't be here today.

12        THE COURT:  All right.  Thank you.  Thank you,

13   Counsel.  I've had an opportunity to review your briefs.

14        Mr. Rexrode, any comments that you would like to make,

11:02   15   sir?

16        MR. REXRODE:  Very briefly.  Thank you, sir.

17        I think it is pretty well briefed out.  I would like

18   to underscore, I think, maybe to a certain extent the parties

19   are talking past each other.  What really comes through in

11:03   20   defendant's brief is, look, we don't care about the CIA -- I'm

21   sorry -- the defendant's in this case don't care about the CIA,

22   don't care about Mr. -- what Mr. Nguyen thinks about the CIA.

23   It has nothing to do with what happened, but it was the fact of

24   him -- of Mr. Nguyen protesting where he was that caused the

11:03   25   officers to act, and that is enough to make it not content

1    neutral.  That is enough to make it motivated by Mr. Nguyen's

2    speech.

3         The defendants say over and over, it was Mr. Nguyen's

4    disruptive behavior that caused the officers to act.  The only

11:03   5    testimony the only evidence as to what Mr. Nguyen's actions

6    were holding a sign, yelling, and pacing to and fro on a

7    sidewalk.

8         There was affirmative evidence that he didn't touch

9    anybody, that he wasn't bumping into people, but the officers

11:04   10   seem to be motivated by the fact that people in the crowd were

11   reacting negatively to Mr. Nguyen's speech, and that means that

12   the officers were motivated by the speech.

13        I think I said in my final paper, it doesn't

14   necessarily make them bad guys, but that is why they acted, and

11:04   15   I just don't see how the Court can make a factual finding that

16   Mr. Nguyen's speech was not a significant motivating factor.

17   It doesn't have to be the only factor, just a significant one,

18   and it certainly was.  If he wasn't talking where he was, the

19   officers wouldn't have acted.

11:04   20        THE COURT:  Well, there is a -- and I know some of

21   this testimony is disputed from reading the briefs, but to the

22   extent that the Cox employees said, look, we had this -- they

23   called it a secured area -- to the extent that we had this area

24   that we had cordoned off around the TV platform for, you know,

11:05   25   for a variety of reasons, whether it was for the convenience of

1    employees or whether it was for, you know, we want to have some

2    space so we don't get crowd noises right behind the platform or

3    we don't have people trying to get in the -- in the camera

4    shot -- whatever it is -- we had this area that was cordoned

11:05    5    off, and you know, Mr. Nguyen was in the area, and that we --

6    one of the gentleman asked him, at least according to the

7    testimony, one of the witnesses, you know, we asked him to

8    leave, and he indicated that he wasn't leaving, and, you know,

9    might have been some displeasure shown by him by the fact that

11:05    10    he was asked, and then, well, I got a security person, and I

11    asked the security person to have him leave, and he wouldn't,

12    and then the police came and they encountered him, and they

13    encountered him in the context that, hey, we were called to

14    come there by people -- by the security who were contacted by a

11:06    15    citizen who said, hey, he's in a place he shouldn't be, and so

16    when we contacted him, he was agitated, we couldn't understand,

17    you know, what he was saying, and he was indicating he wouldn't

18    leave the area where he was.

19        Now, I understand, you know, there is a difference of

11:06    20    opinion on whether those -- what the facts are and where he was

21    and whether that occurred or didn't occur, but hypothetically

22    speaking if it did, if it did, does that change your analysis

23    that it is not the case that, you know, there was some kids

24    that were offended or parents that were offended by the fact

11:06    25    that there was, perhaps, that there was inappropriate language

1    being used so it wasn't that people were concerned about the

2    affect his speech would have on others in the vicinity or they

3    didn't want children to hear bad words so that is why they

4    called and that's why they wanted him to, you know, have to

11:07    5    move elsewhere, but it was, you know, the Cox employee who

6    contacted the security, who contacted the police, to say there

7    is a gentleman here in this area and we're requesting that he

8    leave the area, does that change the analysis at all?

9         MR. REXRODE:  No.

11:07    10         THE COURT:  Tell me why.

11         MR. REXRODE:  And here's why, I think my strongest

12    argument and I think it is true, too, granting the Court's

13    hypothetical, granting that we're going to credit that Cox

14    employees' testimony -- the other Cox employee described for

11:07    15    the Court what the security zone was, right where it was and

16    that it did not encompass the sidewalk.

17         The first statement, and we have a record of it -- I

18    forget if it is Exhibit I or L or J -- but it is the transcript

19    of one of the officers describing Mr. Nguyen, and he is

11:08    20    standing on the sidewalk, so we know that when the officers

21    first saw Mr. Nguyen, he was not in that secured zone because

22    he was on the sidewalk, and the Cox employee testified that the

23    sidewalk was not within the secured zone.

24         Second, there is no evidence that the call that came

11:08    25    to these officers indicated that Mr. Nguyen was refusing to

1    leave the secure area.  There is just not -- if you go back to

2    the dispatch tapes, the first call out is, hey, we've got some

3    guy causing a 415.  They don't say anything about, hey, there

4    is some guy in the Cox security area.  They don't say anything

11:08    5    about that.

6        THE COURT:  Although, would they be required to do

7    that?  Why would they --

8        MR. REXRODE:  I am not saying that they are required

9    to do it, but if the Court's hypothetical is based upon the

11:09    10   police responding to a complaint that someone is refusing to

11   leave the secured area, there is no evidence that that was the

12   complaint.  And we actually have real evidence -- I mean, this

13   was a long time ago, so the best evidence is the communications

14   that were happening at the time.  Memories fade.  There is

11:09    15   nothing wrong with that, memories fade.

16       But are they required to say, hey, there is someone in

17   a secured area, of course not, but the fact that they didn't

18   really undermines the Court's hypothetical.  He wasn't in the

19   secure area.  There is no reason to believe that the two

11:09    20   defendant officers were responding because he was in a secured

21   area, he was on the sidewalk pacing up and down.

22       And we also have affirmative evidence as to what the

23   security guard told the police.  Because if the Court will

24   recall on the dispatch tape, Elite said he was trying to get

11:09    25   into the street earlier -- but this is an officer talking, one

1    of the two defendant officers -- Elite said he was trying to

2    get into the street earlier, but now he is just on the sidewalk

3    yelling, trying to get attention.

4        So I think that the defendants' defense has shifted a

11:10    5    little bit since my first brief.  I mean, we all sat through

6    the day of testimony.  The whole thing was -- remember the

7    image of the police officer responding to the scene and

8    spectators walking by going, there is some crazy guy cursing

9    down there, my kids are here.  It was all about that.  It was

11:10   10    all about the profanity.

11       And, again, it doesn't necessarily make them bad guys, but

12    it is a violation of the First Amendment.  It just is.  The

13    case law is super clear on that.  So, no, to answer directly,

14    the answer is no because, one, he is not in the secured area

11:11   15    when these defendants show up, and two, there is really nothing

16    to indicate that anything about that secure area had anything

17    to do with these officers actions, because there is no evidence

18    that what happened in that secure area that didn't was known by

19    these officers.

11:11   20       Does that answer -- it may not be the best answer, but is

21    there anything --

22           THE COURT:  Well, as I understand your response, it is

23    two-fold.  A lot of it goes to the believability of the witness

24    testimony, that when you talk about the real evidence that it

11:11   25    is the tape.  Testimony is real evidence as well.  But it seems

1    that part of the argument is if it really happened the way that

2    some of those witnesses testified to, wouldn't it have been

3    reflected more in the dispatch tape, and one of the officers

4    wouldn't have said he was on the sidewalk because, you know,

11:11   5    the sidewalk wasn't in that orange fenced area, so you really

6    shouldn't conclude that it happened the way some people said it

7    happened because there is some other evidence that suggests

8    that it didn't happen that way?

9          MR. REXRODE:  Yes.  And then my second point is, it

11:12   10   doesn't matter if it did happen that way in terms of the

11   secured area because there is nothing really indicating that

12   these officers were acting on that or they even knew about it.

13         THE COURT:  Well, I guess it depends on what then --

14   that was really my question.  Doesn't it depend somewhat --

11:12   15   that point, doesn't it depend on what testimony is credited?

16   Because it -- is it a different case if, you know, the one

17   theory or the one version is that, hey, he is somebody who is

18   protesting, he is waving his sign, he is making a lot of noise,

19   people in the immediate vicinity are annoyed by it or

11:12   20   uncomfortable by it, and they don't like the profanity and they

21   don't want their kids to hear it, and so if the context is,

22   hey, you know, mister police officer, you know, we would all be

23   happier if he was removed, and that, in essence -- so there was

24   contact, and that is why the plaintiff was removed.  That is

11:13   25   sort of one scenario.

1       The other one is -- or one other one is that, you

2   know, somebody from Cox said you can't be here.  Then he

3   indicated he wasn't going to leave, and then they got security,

4   which would seem to be the logical thing.  You are not going to

11:13   5   try to force somebody out of an area yourself for a variety of

6   reasons, so you get the security and the security sees him and

7   says, well, I am not going to do it either.  I am not doing it

8   for a variety of reasons.  I am going to contact the police.

9   And the police come, and they say, okay, this area you can't be

11:13  10   in here and so we have to move you to another area.

11       Those seem to be like two different -- two different

12   versions that would seem to me to have, you know, a legally

13   significant difference.  Does it matter?

14       On the one context the police are called by a security

11:14  15   guard that says, hey, we need your assistance, come get

16   somebody out of this area, and in the other one, you know, the

17   police are encountering somebody on a public sidewalk who is

18   apparently making some other people uncomfortable.

19       It just seems like those are very -- those are

11:14  20   different to me, and it seems like there would be a legal

21   significance.  That is what I am asking, is there any legal

22   significance to those, one, where the police are called -- if

23   the police are called to an area by, in essence, you know,

24   indirectly by a citizen saying, hey, there is somebody in this

11:14  25   area that they can't be in this area versus someone who is in

1    an area that any member of the public can be?

2         MR. REXRODE:  Whether that would be legally

3    significant, I am hesitant to answer that because I haven't

4    thought it all the way through, and I certainly don't want to

11:15   5    do any disservice to my client.

6         At the risk of punting, I think it is -- I think it is

7    a valid punt, and here's why, I am not suing Cox, right?  I am

8    not suing Cox.  I am not suing Elite Security.  I am suing that

9    man and his ill co-worker.  Even if they do get a call that

11:15   10    says, hey, there is a guy in a secure area that can't be there,

11    right, even if that happened, there is no evidence that is what

12    the call was about or that those officers --

13         THE COURT:  I think the record may be different as far

14    as --

11:16   15         MR. REXRODE:  Okay.  I am recollecting.  I didn't take

16    notes on everything that was said by the officers.

17         THE COURT:  Sure.

18         MR. REXRODE:  But I do, again, think the best evidence

19    is actually the dispatch, the contemporaneous, but even if that

11:16   20    is the case, we know that when they arrived there, right --

21    even if an officer gets that call, okay, I am -- the reason

22    that I am being motivated to go to this location is there is

23    someone who is where they are not supposed to be.

24         THE COURT:  Right.

11:16   25         MR. REXRODE:  But if you show up at that location and

1    the person is exactly where they are allowed to be on a public

2    sidewalk, that should be the end of the encounter, right?

3           THE COURT:  Well, I guess if it is the case that --

4    under my hypothetical, what if when the officer arrives the

11:16  5    individual is in the area that -- and when you say "secured

6    area," and I understand that is, you know, the secured area was

7    not set up by, like, a government entity to say this is a

8    security area, but this is an area that certainly Cox thought

9    they had the permission, apparently they did, to block off an

11:17  10   area for whatever reasons.

11          And so if somebody -- if the officer shows up and the

12   person is in that fenced-in area, and they say, look, you just

13   can't be here, so you got to move outside that fenced-in area,

14   and if the response was, interesting, but I am not going

11:17  15   anywhere, I'll be staying right here, so go on about your

16   business, leave me alone, and I am staying right here, can --

17   under that hypothetical can the officer say, well, no, actually

18   you can't do that, you are going to have to move outside, or

19   does the officer have to take the position, all right, you

11:17  20   know, I asked and he is not going to move, so end of story?

21          MR. REXRODE:  It depends on the area, and even if --

22   even granting -- let's just grant that every area of the

23   hypothetical is true, if a motivating factor was moving

24   Mr. Nguyen out of -- away from the orange little flimsy fence,

11:18  25   right, it doesn't necessarily mean that his First Amendment

                1    rights weren't violated because if there was an additional

                2    significant motivating factor which was based on his speech,

                3    then that would suffice under the law.

                4          Second, I am trying to think back to the officers'

    11:18       5    testimony because that can be the only place where I can think

                6    of maybe there was testimony that maybe he was inside.  Can I

                7    address two things on that --

                8          THE COURT:  Sure.

                9          MR. REXRODE:  -- because I didn't do it in my

    11:18      10    briefing?

               11          It is not true, and here's why it is not true:  We

               12    have a contemporaneous recording placing Mr. Nguyen on a public

               13    sidewalk, and we know the sidewalk is not in the secure zone.

               14    We also have testimony -- here is another reason why it is not

    11:18      15    true:  We also have testimony that this secured area was of --

               16    it was a fence -- it may have been a flimsy orange material,

               17    but it was actually enclosed, and the testimony from the

               18    officers was they approached Mr. Nguyen and then they

               19    physically move him back towards the grass area.

    11:19      20          I am trying to think back.  There was no testimony

               21    about -- about moving him towards an opening in this fence.

               22    There is no testimony about pushing down the fence with a boot

               23    to get Mr. Nguyen out.  It is just inconceivable under this

               24    evidence that Mr. Nguyen was inside that secured area when the

    11:19      25    officers first approached him.

1              Did that answer your question?

2              THE COURT:  I believe so.

3              MR. REXRODE:  Okay.  If the Court doesn't have any

4    other questions, I did sort of leave it out there in the

11:19   5    briefs.

6              THE COURT:  And just one other point here.  You

7    mentioned in your brief on page 20 that you said a request for

8    damages that --

9              MR. REXRODE:  Yes, sir.

11:20   10             THE COURT:  -- that the damages are somewhere between

11   11 and $13 million.

12             MR. REXRODE:  Yes, sir.

13             THE COURT:  What evidence was introduced in the trial

14   that supports an amount of damages?

11:20   15             MR. REXRODE:  The evidence at trial that supports an

16   amount of damages is two-fold.  What happened to Mr. Nguyen

17   after the First Amendment violation including his eventual

18   captivity in a mental hospital for two days.

19             Second, what I consider is most important that I think

11:20   20   the Court should really hear is, look, you can credit

21   Mr. Nguyen's testimony or not credit it, but as that old

22   instruction says you can believe some, not, all, or none of it.

23   There were certain things that Mr. Nguyen testified about that

24   rang true.

11:21   25             And the one thing that he testified that I would ask

1   the Court to think about is since this day he no longer

2   protests outside of his van.  The van itself is a form of

3   protest, but he no longer goes out into public spaces with

4   signs.

5          And for a man whose whole purpose in life at this

6   point is to convey what he honestly believes happened to him by

7   the CIA, that is not just chilling speech, that is a horrible

8   consequence of what the officers did, without assigning any

9   sort of malice towards the officers, and by saying that, I

10  definitely don't think that punitive damages are appropriate

11  under this evidence.

12         But that is -- you can compensate for the fear that

13  Mr. Nguyen has because if there is a sufficient monetary award

14  in this case, Mr. Nguyen will take comfort in that and say, you

15  know what, they won't do it to me again.  They won't haul me

16  out of a public forum just for holding my sign and yelling.

17  That's the damage.

18         I wasn't trying to be facetious.  I am trying to walk

19  a line here between my client and what I think the evidence

20  shows.  Mr. Nguyen has consistently valued his losses at the

21  figure that I cited.

22         THE COURT:  Fair enough.

23         MR. REXRODE:  Thank you.  But I do think a monetary

24  award is important precisely for what I said.  I think that is

25  a real damage particularly to this gentleman, and if I remember

1    something from law school, they take Mr. Nguyen as they find

2    him.

3         THE COURT:  All right.  I'll give you a opportunity to

4    respond to counsel's argument.

11:22    5         Would you like to remain seated?

6         MS. ROXAS:  No.  It's okay.

7         THE COURT:  You can.  You sure?

8         MS. ROXAS:  Thank you.  Good morning, Your Honor.

9         THE COURT:  Good morning.

11:22   10         MS. ROXAS:  Just to address Mr. Rexrode's initial

11    statement that he believes that the defendant's brief is kind

12    of speaking around what the plaintiff's argument is.  Just to

13    be clear, as far as the case law is concerned, what the --

14    amongst other things, what the plaintiff must show in this case

11:23   15    to prove his prima facie case is that the deterrence of his

16    speech has to be a substantial or motivating factor in the

17    officers' conduct.

18         THE COURT:  Does it have -- it has to be "a"?

19         MS. ROXAS:  It has to be "a," but the deterrence of

11:23   20    the speech has to be a substantial or motivating factor, and

21    that motivating factor must be significant.

22         Now, in other words, what it means is that the intent

23    of the officer in their action, their intent has to be

24    essentially to silence him.  They took him out of this crowd.

11:23   25    He has a -- they have to show that they took him out of this

 1   crowd to silence him.  That simply wasn't the case.

 2         What they took him for which was the second prong --

 3   not the second prong -- plaintiff's second claim.  They took

 4   him under a 5150 hold.  That is why they took him out of there,

11:24  5   not to silence him, whatever it is he is talking about.

 6   Whether or not the officers care about the CIA, I agree with

 7   Mr. Rexrode, it is irrelevant.

 8         What is relevant here is that the reason why they took

 9   him out was because he was mentally ill or they had a very

11:24  10   strong suspicion that he was mentally ill and a danger to

 11   himself or others.  They did not take him out to keep him

 12   quiet.  That wasn't what happened here, Your Honor.

 13         What happened is these two causes of actions are

 14   overlapping, and the reason why they took him out was as the

11:24  15   officers -- the credible testimony in this case is that the

 16   officers reasonably believed or had a strong suspicion that he

 17   was, in fact, mentally ill and resulting that was a result of a

 18   danger to himself or to others.

 19         So the last prong of whether or not there was a First

11:25  20   Amendment violation, which was the deterrence of plaintiff's

 21   speech, has to be that motivating factor.  It has to be a

 22   motivating factor.  He has not shown that.

 23         He has just shown that essentially they recognized he

 24   used the foul language, it is inappropriate, and out of

11:25  25   context.  I don't think that anyone in this Court disputed

1    that.  They recognize that.

2         At the end of the day it doesn't matter.  Their

3    intention was not to silence him or to stop him from using that

4    inappropriate language but to get him out and evaluate him to

11:25   5    see whether or not he met the 5150 threshold.

6         THE COURT:  Although, a lot of people use poor

7    language in a public space, right, and they are not -- the

8    police don't come up and talk to them and ask them if they are

9    okay, right?

11:25   10        MS. ROXAS:  Agreed.  But that -- that wasn't all that

11   was going on here, Your Honor.  Respectfully, he was exhibiting

12   more behaviors that Officer Lopez and Officer Valdez believed

13   they needed to evaluate him.  They needed to see whether or not

14   he was, in fact, meeting that threshold to be detained under

11:26   15   the 5150 hold.

16        THE COURT:  And so what were the other factors?  I

17   mean, clearly there was language that he was using that

18   offended people near him.

19        MS. ROXAS:  It was offensive to people, and that is --

11:26   20   and the defendants concede that is not an issue here, in the

21   sense that you can offend people all you want.  What the

22   problem is you are taking this and you are putting it in the

23   context of a family-oriented parade with children with

24   balloons, that have Thomas the Train, and --

11:26   25        THE COURT:  But does that matter that it is a

1   family -- how is it relevant to what the officers did that it

2   was a family-oriented place versus say, you know, a Chargers

3   game --

4          MS. ROXAS:  Okay.

11:26  5          THE COURT:  -- at 8:00 at night?  Is there a

6   difference that the officers can consider?

7          MS. ROXAS:  Yes, Your Honor.  The difference is

8   context.  The difference is that when you take two officers who

9   have the common sense, life experience, and training, you put

11:26  10  them on the street and you see someone who is exhibiting these

11  behaviors with -- in front of children who have no idea what

12  you are talking about, who cannot appreciate any comment or any

13  opinion you have about the CIA or who are there a couple of

14  days before New Year's Eve -- one day before New Year's Eve to

11:27  15  cheer on balloons and marching bands, it is completely out of

16  context.

17          It is -- it is out of the norm, and the circumstances

18  are not appropriate, and that -- not that it is the cursing and

19  it is the loudness and it is the screaming, it is just that

11:27  20  that is a trigger that something is wrong here.  This man is

21  not -- there is something off here, and we've all come into

22  those circumstances where, okay, this, you know -- given

23  another situation that is, you know, that is fine, it is not

24  that big of a deal, but look at the context that we're in.

11:27  25          This is not a context where everyone in the crowd is

 1  loud and abrupt and cursing or even just yelling loudly at the

 2  top of their lungs.  They are not even doing that.  It is a

 3  very aggressive nature, and this is not an aggressive setting.

 4      A Chargers game can be an aggressive setting and

11:28  5  understandably so.  This is not that type of situation, and I

 6  think that plays a part in what made the officers reasonably

 7  suspect that something is wrong here, and I think that based on

 8  their actions, they acted reasonable under these circumstances.

 9      They see something is wrong here.  They don't just

11:28  10  haul him off and put him under a 72-hour hold.  They want to

 11  take him out so they can evaluate.  They took him out of the

 12  crowd.  They spoke with him.  Okay.  Something is off.  Doesn't

 13  seem right.  Let me speak to my supervisor.

 14      THE COURT:  In your view where did that happen?  Where

11:28  15  did the conversation occur?  Was he in this secure area, for

 16  lack of a better term, you know, the orange, fenced-off area?

 17  Was he on the sidewalk?  Where was he, in your understanding of

 18  the facts, as to when the first contact occurred between the

 19  officers and the plaintiff?

11:29  20      MS. ROXAS:  I believe the first contact occurred on

 21  the sidewalk.

 22      THE COURT:  All right.

 23      MS. ROXAS:  As far as whether or not the officers knew

 24  about whether it was in a secure zone, I think at that point, I

11:29  25  think Officer Lopez testified that he actually saw plaintiff

1   walk into -- not the security zone for -- the Cox Cable crew,

2   but actually the parade route, so he is already outside -- if

3   he is not in one secure zone, he is in another.

4         So Officer Lopez testified, and credibly so, that when

11:29   5   he saw Mr. Nguyen, he is going in and out of another restricted

6   area, so he is in the parade route where he is not supposed to

7   be, and he is going about, mowing -- with eyes wide open,

8   looking like he is mowing -- about to mow the crowd down,

9   things like that.

11:29   10        Those are the things that trigger the officers and

11   their belief that there is something wrong here to the point

12   where this man is so disconnected that he could possibly be a

13   danger to himself.  That is the reason why they took him out.

14        They took him out to evaluate him, not to deter his

11:30   15   speech, not to silence him, not to stop him from cursing.  They

16   took him out to evaluate him under the 5150.

17        THE COURT:  All right.

18        MS. ROXAS:  Another point that I want to touch on is

19   the issue of qualified immunity.  I know that during summary

11:30   20   judgment it was brought up and the immunity, that portion of

21   the motion was denied, holding that there was a question of

22   fact with respect to what the officers testified to.

23        I believe that at the end of this trial, the evidence

24   was clear that they are entitled to qualified immunity in this

11:30   25   case that a reasonable officer would believe under these

1    circumstances, under the facts of the case that they were --

2    that they did have probable cause to deter -- to detain

3    Mr. Nguyen and that -- because of that they are entitled to

4    qualified immunity.

11:31   5              THE COURT:  That would be based on what facts?

6              MS. ROXAS:  Well, the officers received a call that

7    plaintiff was disrupting the parade.  They got information that

8    plaintiff was on the parade route screaming incoherently,

9    cursing, screaming, scaring other spectators.  When they saw

11:31   10   him, they realized it is much more than a man screaming,

11   cursing.  His eyes are wide open.  He is spitting.  He is

12   sweating.  He is out of context.  He is staring at us like

13   we're not even there.  He is holing his stick really tight.

14             Those -- those factors, Your Honor, they could see

11:31   15   that something was clearly wrong and his actions were bizarre

16   and out of context.  That would give a reasonable officer

17   reason to believe they had probable cause.  Even if this Court

18   finds that they didn't have probable cause, it can't be said

19   that a reasonable officer wouldn't believe that under those --

11:31   20   under the circumstances, and for those reasons, Your Honor,

21   they are entitled to qualified immunity.

22             THE COURT:  All right.  Thank you.

23             MS. ROXAS:  Thank you, Your Honor.

24             MR. REXRODE:  Very briefly, sir.

11:32   25             At the end of the day you have to determine what

1    happened.  It is pretty obvious what happened.  There was some

2    guy at a parade who was bothering people.  He was bothering

3    people because he was carrying a weird sign, walking around,

4    maybe yelling obscenities, maybe not, and yelling about the

11:32    5    CIA, and he was bothering people.

6         THE COURT:  Although in the context -- it has been

7    argued before, that -- and I just used the example of a

8    Chargers game.  You can go there, and unfortunately people in

9    front of you, beside you, and they stand and scream profanities

11:32    10   for two and a half hours, and so to go some place and to see

11   people that may appear to be intoxicated or may be screaming

12   profanity, it is really not out of the -- unfortunately, it is

13   just not unusual behavior.

14        And so to have people -- I guess people feel they can

11:33    15   react that way in that type of a setting and it is not at all

16   out of the ordinary, so if you had an officer, you know, walk

17   by, it wouldn't be out of the ordinary behavior, and they would

18   probably just keep going and say, okay, well, okay, that is

19   what people are doing here.

11:33    20        Counsel makes the point that, hey, this is a setting

21   that is more aligned, you know, for small kids, not -- it is

22   more of a family event, and so to the extent that somebody may

23   appear to be angry and may be using that type of a language, it

24   is -- it is a little bit -- it might cause a little bit more

11:33    25   sort of investigation or look to say, well, that is usually not

1    what we see here.

2         Usually people don't do that here.  Maybe there is

3    something else to look at, and to see, all right, there is

4    somebody, you know, with a very large sign that is involved in

11:34    5    a protest.  We don't normally have, like, a protest at this

6    event, just based on upon the nature of the event, whereas if

7    there was the Democratic convention or Republican convention at

8    the Convention Center you would see people with signs marching

9    up and down yelling freedom of speech, that would be sort of

11:34    10    not out the ordinary.

11         Do those factors matter?  Is that something that the

12    officers can say, it is a little unusual to hear that type of

13    language at an event like this?  Protests, we normally don't

14    get those.  It is a little unusual here that the CIA protest

11:34    15    would be here just based on the audience, and so it doesn't

16    seem like that would be that effective here based on the people

17    that are here, so let me just make some inquiry.

18         And so -- and there is an inquiry, and if for whatever

19    reasons -- suppose the inquiry is, you know, maybe part of it

11:34    20    is language, you know, part of it is just a difficulty

21    communicating, and so that is a little bit of a factor, and

22    perhaps there is some annoyance with being, you know,

23    questioned or, you know, someone saying why are you talking to

24    me, and perhaps there is some annoyance from the plaintiff,

11:35    25    maybe difficulty language skills, and so from that point the

1    officers, they just can't understand.  They can't -- they can't

2    really communicate.

3           And so if they can't communicate and they won't get a

4    responsive question -- or responsive answer to their question,

11:35  5    are they then permitted to say, well, let's -- let me have

6    further inquiry?

7           Or is it the case they can't even do that if it is the

8    case -- or is it a case of, look, you can swear at a parade?

9    You know, you can't stop somebody from swearing, and obviously

11:35  10   you can protest at a parade.  You can't stop somebody from

11   doing that, so that is it, you couldn't do anything?

12          I mean, somebody calls you.  You see it.  Well, the

13   guy has a sign.  He can have a sign here.  You can scream all

14   you want.  You can say whatever you want.  I am not going to

11:36  15   talk to him.  I am just going to walk away.  End of story?

16          MR. REXRODE:  That would have been the appropriate and

17   lawful thing to do.

18          THE COURT:  Well, if you had the case, though -- is it

19   case that if the officer is in the position that someone says,

11:36  20   look, there is somebody down there that, you know, they got

21   this huge sign -- they have a sign, a sign, it is on a stick.

22   They seem very, very agitated, screaming, yelling, cursing, you

23   know, saying -- just seems totally out of context here.  The

24   behavior just seems very unusual.  I want you to investigate.

11:36  25          And the officers goes down and says, look, I am not

1   doing anything.  I am not going to talk to him.  I am not going

2   to do anything.  Forget it.

3          And then suppose the case is that the person is that

4   the person does have a mental health issue and hurts somebody

11:37   5   or hurts himself right there, is that just a risk the officer

6   has to take, look, if you contact him and you talk to him, you

7   can't do that, because you are going to violate the First

8   Amendment rights.

9          And if somebody directs you there and they say, I

11:37   10   think this person may have a mental health issue, I think you

11   should investigate, the officer says, I am not doing it, and if

12   they do something to somebody, then maybe they can sue me for

13   not doing something, but, you know, I am going to get sued one

14   way or the other.

11:37   15          If I talk to him, I am getting sued because I am not

16   really supposed to do that, and if I don't make any inquiry,

17   even though I've been directed to them and my observations are

18   it is very -- it is conduct that is out of the ordinary just

19   based on the language, the nature of the activity, and I can't

11:37   20   understand what the gentleman is saying, I can't understand it,

21   it makes no sense to me what I listened to, but I am not going

22   to -- I am not going to ask him anything, and if he does

23   something to himself or to someone else, I'll get sued for

24   that.

11:38   25          Is that -- let me ask you, is that really what the --

1    is that the officer's -- kind of like, that is -- is that the

2    cost of doing business?  Is that --

3           MR. REXRODE:  Look, can a cop go up and talk to anyone

4    and talk to them?  Sure, but let's --

11:38   5           THE COURT:  I am talking about context.

6           MR. REXRODE:  I understand.

7           THE COURT:  I understand your argument -- or your

8    position is you can't -- I mean, under the facts, when did the

9    violation first occur?  Is it when the officer -- assuming that

11:38  10    a public street -- I understand whether it is debated about

11    whether he is going on the parade route, in or out of the

12    parade route.  Let's put that aside.

13           Let's say, for argument sake, on the sidewalk, or

14    really close to the sidewalk, you know, large sign on a stick,

11:39  15    primarily a family event, a lot of loud noise, some cursing but

16    a lot of loud noise, people unable to make out exactly what it

17    is but something to do with the CIA, and some difficulty

18    understanding clearly what is being said, so you have those

19    facts, and suppose somebody directs the officers and says, hey,

11:39  20    I want you to investigate this event, so the officer goes up

21    and sees those things.

22           In your view, what can the officer do before there is

23    a violation?  Can the officer go up and say, sir, I would like

24    to talk to you?  Can -- can they do that?

11:39  25           MR. REXRODE:  Yes, they can do that to anyone.  I can

1       go up to this officer and ask him to talk to me.

2            THE COURT:  So the officer goes up and talks to the

3       individual, and the person is -- appears to the officer to be

4       very, very upset with the fact that they are being spoken to,

11:40  5       and maybe just feel passionately about what they are saying --

6       it would be impossible to tell whether or not they are upset

7       that you interrupted them from expressing themselves or they

8       are just upset that you are interrupting them.

9            And your interaction with them is that you are not

11:40  10      getting a responsive answer.  You may ask, like, a basic

11      question, but what you get back is not responsive at all to the

12      question, and the -- you question whether this person has the

13      ability to communicate with you.  Can you do anything then, or

14      are you required to just walk away?

11:40  15           MR. REXRODE:  There is two problems with that, the

16      first is that is not what occurred here.

17           THE COURT:  I understand -- and there is a dispute on

18      the facts.

19           MR. REXRODE:  Actually, I don't think that there is a

11:41  20      dispute as --

21           THE COURT:  Well, all I am asking you is for the

22      hypothetical.

23           MR. REXRODE:  In that hypothetical, of course, there

24      is something else that they can do.

11:41  25           THE COURT:  Can you do it without committing a

1    constitutional violation?

2            MR. REXRODE:  Sure.

3            THE COURT:  What is that?

4            MR. REXRODE:  How is it going?  How are you?

11:41    5            THE COURT:  If the responses are nonresponsive, then

6    what?

7            MR. REXRODE:  Stand there.

8            THE COURT:  And then what?

9            MR. REXRODE:  Look at him, and if he is not a danger

11:41   10    to himself or others, walk away.

11            THE COURT:  But how would you -- when you are trying

12    to decide whether someone is a danger to themselves or others,

13    and hypothetically if you are trying to communicate with

14    somebody and you are just unable to, can you -- can you have

11:41   15    any additional conversation?  Can you continue to try to

16    communicate?

17            Or do you have to say, look, I don't understand what

18    the person is saying.  I don't think that they understand me.

19    I don't know if there is a language difference or not, but

11:42   20    we're not able to communicate.  So are they a danger to

21    themselves or others?  I have no idea because I was trying to

22    find that out, and I can't.

23            And so does the officer have to walk away not knowing

24    it, or are they allowed to make some additional inquire to find

11:42   25    out?

1         MR. REXRODE:  Something else just slipped into the

2    hypothetical, which is that --

3         THE COURT:  I didn't slip anything.  I am asking the

4    questions.

11:42    5         MR. REXRODE:  No, no, no.  I'm sorry.  That I

6    wasn't -- that my earlier answer wasn't factored in.  I am not

7    saying you are trying to cross me or anything like that.

8         Look, if the reason that you are going up is to see if

9    someone is a danger to themselves or to others, there has to be

11:42   10   a reason to think that.  And if all the person is doing is

11   oddly protesting, my position would be that is insufficient to

12   even raise that cause.

13        And, yeah, if you are talking to someone and you are

14   having trouble communicating with them and in the back of your

11:43   15   mind you are wondering like, hey, I wonder if they are a danger

16   to themselves or others, and talking to them, just talking, not

17   telling them what to do, not ordering them to do anything, just

18   talking, how is your day, that stuff, if that doesn't get you

19   to the point that shows you one way or the other, yes, you walk

11:43   20   away because it goes down -- it comes back to this repugnant

21   idea that is in the defendant's brief that we question the

22   apparently mentally ill and whether they are going to hurt

23   someone.

24        We can do that with anyone.  I can -- I can make -- I

11:43   25   represent Hells Angels sometimes.  You see a Hells Angels

378

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:44 | 5 |

1   walking down the street, right, instinctively, hey, I wonder if

2   he is a danger to someone else, but we don't have a right to go

3   up and say, hey, are you a danger to someone else right now and

4   take coercive measures -- and by coercive, I mean moving

5   somebody to figure that out.  To base that assumption on what

6   someone is wearing is just as ridiculous that you make the

7   decision based on what you think the mental status is.

8        Look, it is weird.  It is the first civil case I've

9   ever done, and it is just like the criminal cases.  It comes

10  back to common knowledge.  It is not common knowledge that the

11  mentally ill are more prone to violence because it is not true.

12  It is just not.

13       And going back, that's not what happened.  Going away

14  from the hypothetical, walking up to someone saying, hey, what

15  is that all about or this is a weird place to be ranting about

16  the CIA, that is not what happened.  Officer Lopez, first

17  thing, your language is not appropriate.  That is the

18  testimony.  Your language is not appropriate, dressed officer,

19  right, that is the violation, because that is the authority of

20  the state telling you your speech is not appropriate and go,

21  move back to the grass so we can talk to you.

22       Physically moving a citizen from where they are

23  standing with the coercive force of the state, ordering someone

24  to move from where they are standing -- and I don't care if it

25  is ten feet away -- that is a First Amendment violation.

1          THE COURT:  Now, in your view, is there an agreement

2     on those being the facts?

3          MR. REXRODE:  There was testimony by Officer Lopez

4     that the first thing that came out --

11:45    5          THE COURT:  I understand that.  But to say --

6     certainly, from reading the briefs, there seems to me to be

7     certainly a disagreement as to what the facts are, and so

8     you've indicated that there was no real disagreement on the

9     facts.  I don't know that is the case, but that is in the

11:45   10     briefs, and I heard the trial.

11          MR. REXRODE:  Okay.  You have the facts --

12          THE COURT:  I don't need to people -- just one at a

13     the time.  I don't need people to tell me what -- I am

14     certainly interested in your version or what your view is of

11:46   15     the evidence.  That is obviously very important.

16          MR. REXRODE:  My view is that the first thing that

17     they said to Mr. Nguyen was your speech was inappropriate, and

18     they told him to move back to that grassy area.  And they are

19     not allowed to do that.  They just aren't.

11:46   20          And, look, we can -- he was bugging people.  He was

21     bugging people.  He is allowed to bug people.  And that's why

22     they came up.  That's why they moved him.

23          And, you know, I mean everything about this case tells

24     you that -- from the very first radio transmittal through the

11:46   25     testimony to one of the last transmittal, this is the Exhibit

1   J, does he, Mr. Nguyen, normally oblige to your request to

2   leave the area?  Okay.  Ten four.  Thank you very much.  I

3   think we'll be okay then.  Right?

4            Remember, that is these officers talking to the PERT

11:47   5   unit, right, asking them, hey, is this the kind of guy that is

6   just going to get the hell out of here?  Yeah, he is.  Then

7   we're going to be fine.

8            If there isn't clearer evidence about what motivated

9   these officers, you know what, it is just -- it is -- it is

11:47   10   disingenuous to say that the officers were not motivated by

11   trying to move him out of the area because he was bothering

12   parade-goers, and that is the reason, because that is what it

13   says.

14            There is nothing about, oh, boy, we have to find out

11:47   15   if he is a danger to himself or others or we're really

16   concerned about this guy.  It is, will this guy just get the

17   hell out of here?  If so, then ten-four.  Thank you very much.

18   We'll be okay then.  It is just right there.  It is what

19   happened.

11:48   20            THE COURT:  Any final comments?

21            MS. ROXAS:  No, Your Honor.

22            THE COURT:  I thank you for your presentations and

23   your briefing, and I'll issue a written decision.

24            Thank you for your representation of Mr. Nguyen.

11:48   25            MR. REXRODE:  Your Honor, you are quite welcome.

1        THE COURT:  I want to certainly thank you.

2        And I appreciate the work of the city attorney.

3        Mr. Stutler, you are winding up your lustrous career

4   soon.

11:48   5        MR. STUTLER:  This will be my last time in court.

6        THE COURT:  It was a pleasure having you in this case

7   and in the previous cases, so I wish you well in your future

8   endeavors.

9        MR. STUTLER:  Thank you, Your Honor.  It has been

11:48   10  wonderful.

11       THE COURT:  Thank you very much, Mr. Rexrode, for your

12  excellent advocacy on behalf of Mr. Nguyen.

13       MR. REXRODE:  Thank you.

14    (Proceedings concluded at 11:48 a.m.)

15                 ---000---

16

17                 C-E-R-T-I-F-I-C-A-T-I-O-N

18       I hereby certify that I am a duly appointed, qualified
    and acting official Court Reporter for the United States
19  District Court; that the foregoing is a true and correct
    transcript of the proceedings had in the aforementioned cause;
20  that said transcript is a true and correct transcription of my
    stenographic notes; and that the format used herein complies
21  with the rules and requirements of the United States Judicial
    Conference.
22       DATED:  February 7, 2016, at San Diego, California.

23                          /s/ Melinda S. Setterman
                      _____
24                    Melinda S. Setterman,
                      Registered Professional Reporter
25                    Certified Realtime Reporter